UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER BORMUTH,                          Case No. 13-13726

             Plaintiff,            Marianne O. Battani
v.                                      United States District Judge

COUNTY OF JACKSON,                      Michael Hluchaniuk
                                        United States Magistrate Judge

             Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkt. 25, 37)**

## I.    PROCEDURAL HISTORY

On August 30, 2013, plaintiff filed this complaint for violations of First

Amendment Establishment Clause by the Jackson County Commissioners.  (Dkt.

1).  Plaintiff filed an amended complaint on November 14, 2013.  (Dkt. 10).

Defendant filed an answer to the amended complaint on November 27, 2013.

(Dkt. 11).  On June 11, 2014, defendant filed its motion for summary judgment.

(Dkt. 25).  Plaintiff filed his response on June 27, 2014.  (Dkt. 29).  Defendant

filed its reply on July 11, 2014.  (Dkt. 30).  On September 11, 2014, plaintiff filed

his motion for summary judgment.  (Dkt. 37).  On October 6, 2014, defendant filed

its response.  (Dkt. 39).  On October 20, 2014, plaintiff filed his reply.  (Dkt. 41).

These matters are now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that the plaintiff's motion for summary judgment be **GRANTED**, that defendant's motion for summary judgment be **DENIED** and that an **INJUNCTION** precluding the County of Jackson's Board of Commissioners from utilizing its current legislative prayer practice be entered.

## II.    FACTUAL BACKGROUND

Plaintiff contends that the practice of the Jackson County Board of Commissioners (the Board) to open its meetings with a invocation given by individual members of the Board on a rotating basis violates the Establishment Clause of the First Amendment.  Jackson County's invocation practice permits one of the nine individual Commissioners, on a rotating basis, to give a short invocation before its Board of Commissioners meetings.  Commissioners of any religion (or no religion) are permitted to offer an invocation based on the dictates of his/her own conscience.  According to defendant, the County, and the Board of Commissioners as a body, does not engage in any prior inquiry, review of, or involvement in, the content of any invocation to be offered.  Defendant maintains that no Commissioner has ever been disallowed from the rotating opportunity to provide an invocation based on the Commissioners beliefs or the contents of the invocation and that all Commissioners are treated equally irrespective of an individual Commissioners' beliefs.  (Dkt. 25-4, Affidavit of Michael Overton,

2

Administrator/Controller for Defendant).

Plaintiff bases his claims on seven invocations (Dkt. 10, ¶¶ 19- 23, 28, 35), which plaintiff claims are unconstitutional because they included sectarian references such as "Jesus," "in your holy name," "heavenly father," "lord," "amen," or "bless our troops."  Plaintiff asserts, on numerous occasions, that the inclusion of sectarian references violates the Establishment Clause or the rights of non-Christians.  Jackson County opens its County Commissioners meetings with an invocation.  (Dkt. 11, p. 1, ¶ 1).  The Commissioners themselves lead the invocations on a rotating basis.  (Dkt. 11, p. 1, ¶ 1).  Citizens who attend the meetings have been asked to rise and bow their heads.  (Dkt. 11, p. 1, ¶ 1). These prayers are often made in the name of Jesus Christ.  (Dkt. 11, ¶¶ 19-23).  The County of Jackson Policy manual has no posted rules regarding this invocation prayer.  (Dkt. 11, p. 1, ¶ 2).  The invocation/prayer is immediately followed by the Pledge of Allegiance on the meeting agenda.  (Dkt. 11, p. 1, ¶ 3). Children are regularly invited to the Commissioners meeting to lead the Pledge of Allegiance. (Dkt. 11, p. 1, ¶ 3).

Plaintiff attended the July 23, 2013 Commissioner's meeting and after Chairman Shotwell directed "all rise," Commissioner Gail Mahoney led the following prayer:

> Bow your heads with me please. Heavenly father we

> thank you for this day and for this time that we have
> come together. Lord we ask that you would be with us
> while we conduct the business of Jackson County. Lord
> help us to make good decisions that will be best for
> generations to come. We ask that you would bless our
> troops that protect us near and far, be with them and their
> families. Now Lord we wanna give you all the thanks
> and all the praise for all that you do. Lord I wanna
> remember bereaved families tonight too, that you would
> be with them and take them through difficult times. We
> ask these things in your son Jesus's name. Amen.

(Dkt. 11, p. 1, ¶ 23).  This was immediately followed by two children, Eli and

Gavin Lattner, coming forward to lead the Pledge of Allegiance.  (Dkt. 11, p. 1,

¶ 23).

On August 17, 2013, plaintiff stopped by Chairman Shotwell's shoe store,

Miller's Shoe Parlor at 103 W. Michigan Ave in downtown Jackson to

communicate his feelings that the invocations to Jesus Christ violated the

Establishment Clause and were offensive to non-believing citizens.  (Dkt. 11, p. 1,

¶ 27).  On Tuesday August 20, 2013, plaintiff attended the County

Commissioner's Meeting.  The meeting opened with the following invocation by

Commissioner David Elwell:

> Please rise. Please bow our heads. Our heavenly father
> we thank you for allowing us to gather here in your
> presence tonight. We ask that you watch over us and
> keep your guiding hand on our shoulder as we deliberate
> tonight.  Please protect and watch over the men and
> women serving this great nation, whether at home or
> abroad, as well as our police officers and firefighters. In

4

this we pray, in Jesus name, Amen.

(Dkt. 11, p. 1, ¶ 28).

On August 30, 2013 plaintiff filed his original complaint with this Court

seeking an injunction to prevent this establishment of the Christian religion; these

sectarian prayers in the name of Jesus Christ; and what he characterizes as

"deliberate religious coercion of the worst possible kind affecting young

impressionable minds." (Dkt. 10, ¶ 32). On September 9, 2013, Jackson County

officials (Agencies and Affairs committee) voted on a pool of applicants and

nominated members for the county's new Solid Waste Planning Committee.

Plaintiff, who had applied and who had been working on related issues for the last

three years, was not nominated. On September 17, 2013 the Commissioners

approved the nominations. (Dkt. 10, ¶¶ 33-34).

On Tuesday October 15, 2013, plaintiff again attended the County

Commissioner's meeting. After Chairman Shotwell directed "All rise,"

Commissioner David Lutchka gave the following invocation:

> Our Heavenly Father, watch over us tonight, help us to
> make the best decisions for the total population of the
> County of Jackson. And I know you're tough so give all
> those guys in Washington a two by four upside the head
> and tell them to start working together. In Jesus name we
> pray. Amen.

(Dkt. 11, ¶ 35). This was followed by a child, David Rice, coming forward to lead

5

the Pledge of Allegiance.  (Dkt. 11, ¶ 36).

## III.   PARTIES' ARGUMENTS

According to defendant, the facts in *Town of Greece v. Galloway*, 134 S. Ct. 1811, 188 L. Ed. 2d 835 (2014) are virtually identical to the facts in this case.  In *Town of Greece*, the plaintiffs claimed that prayers provided during a town board meeting improperly included sectarian references such as "Jesus" or other sectarian references in alleged violation of the Establishment Clause or the rights of non-Christians; that aspects of the town meeting, such as the presence of children, the public being "asked" to rise or bow their heads, the local nature of the business of a town, or the direct participation by Town board members in the prayer cumulatively took such actions outside of the legislative prayer which was permitted in *Marsh v. Chambers*, 463 U.S. 783 (1983).  The Supreme Court rejected this argument and reversed.  The Court made clear that:

> Ceremonial prayer is but a recognition that, since this Nation was founded and until the present day, many Americans deem that their own existence must be understood by precepts far beyond the authority of government to alter or define and that willing participation in civic affairs can be consistent with a brief acknowledgment of their belief in a higher power, always with due respect for those who adhere to other beliefs. The prayer in this case has a permissible ceremonial purpose. It is not an unconstitutional establishment of religion.

*Town of Greece*, 134 S.Ct. at 1827, 1828.  The Court further noted that:

> For members of town boards and commissions, who
> often serve part-time and as volunteers, ceremonial
> prayer may also reflect the values they hold as private
> citizens. The prayer is an opportunity for them to show
> who and what they are without denying the right to
> dissent by those who disagree.

*Id*. at 1826.

Defendant maintains that the Supreme Court rule is directly contrary to

plaintiff's position in this case -- that legislative prayers by a town (or other

municipal) board as part of their meeting was Constitutional even if such prayers

contained sectarian references:

> Respondents maintain that prayer must be nonsectarian,
> or not identifiable with any one religion; and they fault
> the town for permitting guest chaplains to deliver prayers
> that "use overtly Christian terms" or "invoke specifics of
> Christian theology." Brief for Respondents 20. A prayer
> is fitting for the public sphere, in their view, only if it
> contains the "'most general, nonsectarian reference to
> God,'" *id*., at 33 (quoting M. Meyerson, Endowed by
> Our Creator: The Birth of Religious Freedom in America
> 11-12 (2012)), and eschews mention of doctrines
> associated with any one faith, Brief for Respondents
> 32-33.

*Town of Greece*, 134 S.Ct. at 1820.  Further, the Court held:  "This proposition is

irreconcilable with the facts of *Marsh* and with its holding and reasoning.  *Marsh*

nowhere suggested that the constitutionality of legislative prayer turns on the

neutrality of its content.  *Id*. at 1821.  In rejecting the suggestion that legislative

prayer must be nonsectarian, the Court in *Town of Greece* did not hold that no

7

constraints remain on its content. The *Town of Greece* Court found sectarian invocations constitutional at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage. Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function. *Town of Greece*, 134 S.Ct. at 1814, 1815. However, the Court noted:

> If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort. That circumstance would present a different case than the one presently before the Court.

*Id*. at 1823. Given the facts and holding of *Town of Greece*, defendant contends that there is no meaningful basis to distinguish *Town of Greece* from the matter presently before the Court.

Defendant also asserts that plaintiff's attempt to distinguish *Marsh* and *Town of Greece* based on members of the Board giving the invocation is without merit. According to defendant, no such distinction is made in *Marsh* or *Town of Greece*. Rather, defendant maintains that the majority and plurality decision in *Town of Greece* contains language which supports the freedom of local legislators

8

in offering invocations.  Moreover, defendant contends that nothing in *Town of Greece* supports an assertion that the standards established are limited to outside clergy, or do not apply where the invocation is given by a member of the legislative body.

Defendant also argues that other cases on legislative prayer have made clear that the issue is not who gives the invocation, but rather whether such invocation is given in a setting as to make the invocation "government speech."  Defendant points out that courts have historically faced a variety of factual scenarios regarding whether or not a legislative prayer violates the Establishment Clause, including situations in which the invocation is given by a member of the governing body, a chaplain employed by the body (as in *Marsh*), volunteer religious leaders, or even members of the public.  Courts, prior to *Town of Greece*, made clear that it is not the identity of the speaker, but whether the speech is attributed to government, which makes it subject to Establishment Clause scrutiny. *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d 276 (4th Cir.), cert. denied, 546 U.S. 937 (2005).  Defendant also points to *Turner v. City Council of City of Fredericksburg, VA*, 534 F.3d 352, 355 (4th Cir. 2008) which noted that "[t]he identity of the speaker, and the responsibility for the speech, was, in that case, less clearly attributable to the government than the speech here, because the speakers there were not government officials."  *Simpson* nonetheless held that 'the

speech ... was government speech.'" *Id*. at 355, quoting *Simpson*, 288.  Likewise,

in *Joyner v. Forsyth Cnty., NC.*, 653 F.3d 341, 350 (4th Cir. 2011), the Fourth

Circuit held "It was the governmental setting for the delivery of sectarian prayers

that courted constitutional difficulty, not those who actually gave the invocation."

*Id.* at 350. Thus, defendant maintains that, in deciding whether such invocations

may violate the Establishment Clause, the relevant inquiry is not based on the

identity of the person who gave the invocation, but rather whether the setting

made the invocation part of government (as opposed to personal) speech.  Once

determined to be government speech, courts then advance to the *Marsh/Town of

Greece* analysis as to whether the content of the invocation violates the

Establishment Clause (i.e. a legislature's "exploitation" of the prayer opportunity

to achieve the promotion or disparagement of a particular religious view).

   According to defendant, plaintiff's position that invocations given by

members of a governing body are somehow different and subject to different

standards than an invocation by an outside clergy member was specifically

addressed, and rejected in *Joyner v. Forsyth County, N.C.*, 653 F.3d 341 (4th Cir.

2011).  In *Joyner*, the defendant attempted to claim the existence of a legal

distinction under the Establishment Clause between a member of a governing body

giving an invocation as opposed to outside clergy, which was rejected by the

Fourth Circuit.

10

In response, plaintiff argues that it is an elemental First Amendment principle that government may not coerce its citizens "to support or participate in any religion or its exercise." *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989),  (KENNEDY, J., concurring in judgment in part and dissenting in part); *see also Van Orden v. Perry*, 545 U.S. 677, 683 (2005) (plurality opinion) (recognizing that our "institutions must not press religious observances upon their citizens").  Plaintiff also points out that, in allowing the legislative prayers by guest chaplains, including requests to rise and bow heads, the majority opinion in *Town of Greece* specifically noted that:

> The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive.

*Town of Greece*, 134 S. Ct. at 1823.  According to plaintiff, the present facts obviously differ from those in *Town of Greece*.  Specifically, after the gavel

11

sounds opening the meeting, Chairman Shotwell commands the audience to "All rise and assume a reverent position" (April 16, 2013) or "Everyone rise and assume a reverent position" (January 15, 2013). Similarly, Commissioner John Polaczyk demands "All rise. Please bow your head" Commissioner Gail Mahoney requests "Bow your heads with me please" (July 23, 2013). Commissioner David Elwell directs the audience to "Please rise" (August 20, 2013). Plaintiff points out that these instructions are directed specifically to the audience. Plaintiff contends that words like "everyone" and "all" clearly indicate that the Jackson County Commissioners are coercing citizens to participate in and support a Christian religious exercise.

According to plaintiff, every Commissioner is Christian, and thus every prayer in this case has been Christian, to a complete exclusion of other beliefs or nonbelief. Plaintiff contends that defendant seeks to establish majority rule in matters of religion, something the Court in *Town of Greece* specifically disallowed. Plaintiff asserts that the lack of separation in this case is apparent to any neutral observer, given that every invocation/prayer has been Christian. In *Larson v. Valente*, 456 U.S. 228, 244 (1982) the Court held: "[t]he clearest command of the Establishment Clause"; is that "one religious denomination cannot be officially preferred over another." In Jackson County, plaintiff asserts that the Christian religion is being preferred and that the Commissioners are

12

officially practicing  a form of Christian worship and compelling the acceptance of the Christian creed by coercing citizens to pray to Jesus Christ.

Plaintiff also distinguishes *Town of Greece* by pointing out that the prayers were being made by guest chaplains and directed at the City Council members, while, in this case, the prayers are being made by the Commissioners themselves and directed at the audience.  Plaintiff contends that the Court in *Town of Greece* found this distinction to be of significant importance.  The majority opinion held that: "The case [*Marsh*] teaches instead that the Establishment Clause must be interpreted by reference to historical practices and understandings." *Town of Greece*, 134 S. Ct. at 1823, quoting *County of Allegheny*, 492 U. S. at 670.

According to plaintiff, there is not a single case where a court has ruled that prayers by government officials themselves in the course of their official duties are Constitutional.  Rather, plaintiff maintains that historical practices and understanding have always held such activity to be problematic and a violation of the Establishment Clause.  Such a practice removes this case from the *Marsh/Town of Greece* exception and demands that it be scrutinized under the standard of *Lemon v. Kurtzman*, 403 U.S. 602 (1971) in which the Court held that to survive an Establishment Clause challenge, the governmental action must satisfy three independent requirements: 1) "it must have a secular legislative purpose, 2) its principal or primary effect must be one that neither advances nor

13

inhibits religion; and 3) it must not foster an excessive governmental entanglement with religion." Plaintiff contends that the practice at issue before this Court does not survive scrutiny under any of the three prongs of the *Lemon* test. Plaintiff contends that the invocation/prayers by the Jackson County Commissioners: (1) are government speech that lacks a secular legislative purpose and they advance the Christian religion; (2) intrude on the right to conscience by forcing some citizens either to participate in an invocation/prayer with which they are in basic disagreement, or to make their disagreement a matter of public comment by declining to stand and participate; (3) force all residents of Jackson County to support a religious exercise that may be contrary to their own beliefs; (4) require the State to commit itself on fundamental theological issues such as the divinity of Jesus Christ; and (5) inject religion into the political sphere. According to plaintiff, this is excessive government entanglement with religion.

Plaintiff also relies on *Wynne v. Town of Great Falls, South Carolina*, 376 F.3d 292 (4th Cir. 2004), in which the Fourth Circuit Court of Appeals stated: "*Marsh* does not permit legislators ... to engage, as part of public business and for the citizenry as a whole, in prayers that contain explicit references to a deity in whose divinity only those of one faith believe." The Court in *Wynne* determined that the practice of Great Falls violated the *Marsh* prohibition against advancing a particular religion, as does the practice of Jackson County, but plaintiff contends

14

that *Lemon v. Kurtzman*, 403 U.S. 602 (1971) should be applied to this case.

Plaintiff also seeks to distinguish *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d 276 (4th Cir. 2005). In *Simpson*, the Fourth Circuit considered the prayer practice of the Board and upheld it because the County Policy asked private religious leaders to give non-sectarian prayers. The Chesterfield Board had a formal policy and they used private religious leaders to give invocations. They required nonsectarian prayers. Plaintiff contends that, unlike the Chesterfield Board of Supervisors policy, which states that each "invocation must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief," the County of Jackson has no posted rules in their Policy Manual. Jackson County brings forward an Affidavit by Michael Overton in lieu of a formalized policy, which plaintiff contends does not comprise a formal policy and it contains statements that are false.

Plaintiff acknowledges that the majority in *Town of Greece* found that the occasional presence of students did not require drawing a distinction. Here, however, plaintiff says that children are routinely present at these Jackson County Commissioner's meetings to lead the Pledge of Allegiance, which immediately follows the prayer by the Commissioner on the agenda. They are specifically invited for this purpose. Plaintiff maintains that this is "deliberate religious

15

coercion of the worst possible kind affecting young impressionable minds" and is prohibited by *Lee v. Weisman*, 505 U.S. 577 (1992) and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). These prayers by the Commissioners carried an "obvious and inherent risk" of affiliation and coercion. Plaintiff notes that these children invited to lead the Pledge of Allegiance do not stay for the entire Commissioners meeting, but depart immediately after leading the pledge. They do not see the Commissioners engage in rational discussion on items of community business. Rather, they are only exposed to two ritual ceremonies: a religious invocation/prayer led by an elected official made in the name of Jesus Christ and the public patriotic ritual of the Pledge of Allegiance. According to plaintiff, this is clearly intended to establish in these young impressionable minds a connection between the religion of Jesus Christ and the government of the United States. The Supreme Court has ruled that prayer exercises involving elementary or secondary school children carry a particular risk of indirect coercion (*see Engel v. Vitale*, 370 U.S. 421 (1962); *Abington School District v. Schempp*, 374 U.S. 203 (1963)) and that standard must be applied to this case.

While this Court is not to parse content of prayers, plaintiff contends that the repeated inclusion of content to "bless our troops" allows defendant to challenge the patriotism of anyone who objects to these unconstitutional prayers to Jesus Christ. According to plaintiff, this content is deliberately included by

16

defendant to produce this result and plaintiff suggests that this practice is particularly insidious. Plaintiff contends that the facts in *Town of Greece* and *Marsh* are not analogous because this case involves "government speech." The Jackson County Commissioners are leading prayer as part of their official duties and they are coercing citizen participation in religion while deliberately inviting children with young impressionable minds to witness this conjunction of Christian prayer with the Pledge of Allegiance. Plaintiff asserts that defendant seeks to enlarge the limited historical exemption created in *Marsh* and *Town of Greece*, thus swallowing the Establishment Clause. They make the exception the rule, and establish the Christian religion.

Plaintiff also argues that the Treaty of Tripoli specifically states that the Government of the United States shall not be officially be associated with the Christian religion. The Treaty of Tripoli, Article 11 (1797) gives expression to the doctrine and law which the Court must apply in this case: "As the Government of the United States of America is not, in any sense, founded on the Christian religion; ..." According to plaintiff, this treaty was debated and ratified by the full U.S. Senate and signed into law by President John Adams in 1797 without any objection being expressed to this specific language. Plaintiff asserts that the

ratification of this Treaty made it law which the Courts are bound to uphold.[1]

## IV.    ANALYSIS AND CONCLUSIONS

It is quite clear that neither the *Lemon* test nor the principles set forth in school prayer jurisprudence apply to the controversy in this matter as the Supreme Court has specifically articulated standards for the evaluation of legislative prayer. *See e.g.*, *Jones v. Hamilton Cnty.*, *Tenn.*, 891 F. Supp. 2d 870, 880 (E.D. Tenn. 2012) aff'd sub nom. *Jones v. Hamilton Cnty. Gov't*, *Tenn.*, 530 Fed. Appx. 478 (6th Cir. 2013) ("The Court's research yielded – and the parties have identified – no legislative prayer case that post-dates *Marsh* and either (1) disregards *Marsh* or (2) relies on *Lemon* to test the constitutionality of a challenged prayer practice."). In the view of the undersigned, the analysis of this dispute neither begins nor ends with the *Town of Greece*.  Moreover, contrary to defendant's position, this controversy cannot be decided solely by an examination of the content of the prayers at issue.  It is constitutionally significant, contrary to defendant's argument that the prayer givers in this case were the Commissioners themselves, as opposed to either a paid chaplain or members of the community invited to give invocations.

An examination of the Supreme Court's first legislative prayer case is an appropriate starting point.  In *Marsh*, a state legislator challenged the Nebraska

---

[1]  The undersigned agrees with defendant that the Treaty of Tripoli is nothing more than a pronouncement that Christianity, as a formal institution, is not part of the Federal government and has nothing to do with whether a given legislative prayer practice is constitutional.

18

legislature's practice of opening sessions with a prayer led by a Presbyterian chaplain, Robert Palmer, who was paid by the State. *See Jones v. Hamilton Co. Gov't, Tenn.*, 530 Fed.Appx. 478, 484 (6th Cir. 2013), citing *Marsh*, 463 U.S. at 784-85. For sixteen years, Palmer was the only clergyman selected to conduct the prayers, which were of the Judeo-Christian tradition. *Jones*, 530 Fed.Appx. at 484, citing *Marsh*, 463 U.S. at 793. While the Eighth Circuit applied the three-part *Lemon* test to strike down Nebraska's prayer practice, in reversing and upholding Nebraska's practice, the Supreme Court abandoned the *Lemon* test in favor of a history-based analysis. *Jones*, 530 Fed.Appx. at 484, citing *Marsh*, 463 U.S. at 786.

As explained in *Jones*, the *Marsh* majority began its opinion by explaining the historical tradition of opening legislative sessions with a prayer. Tracing legislative prayer to "colonial times through the founding of the Republic and ever since," the Supreme Court recognized that the First Congress, "as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." *Marsh*, 463 U.S. at 787-88. The Senate and House elected their first chaplains in 1789. *Id*. at 788. As the Supreme Court explained, "[i]t can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment" that "they intended the Establishment Clause of the Amendment to

19

forbid what they had just declared acceptable." *Id*. at 790.  The Supreme Court

concluded that, "[i]n light of the unambiguous and unbroken history of more than

200 years, there can be no doubt that the practice of opening legislative sessions

with prayer has become part of the fabric of our society." *Id*. at 792.  Thus, the

Supreme Court reasoned that, "[t]o invoke Divine guidance on a public body

entrusted with making the laws is not, in these circumstances, an 'establishment'

of religion or a step toward establishment." *Id.*

As the *Jones* Court explained, in applying these historical principles, the

Supreme Court held that Nebraska's policy passed constitutional muster:

> First, the Supreme Court reasoned that the Presbyterian
> clergyman's long tenure—sixteen years—standing alone,
> did not "advance[ ] the beliefs of a particular church. To
> the contrary, the evidence indicat[ed] that [the
> clergyman] was reappointed because his performance
> and personal qualities were acceptable to the body
> appointing him." *Id*. at 793, 103 S.Ct. 3330.  Second,
> because of its historical roots, the Supreme Court stated
> that the public funds used to compensate the clergyman
> did not violate the Establishment Clause. *Id*. at 794, 103
> S.Ct. 3330. Finally, the Supreme Court stated that "[t]he
> content of the prayer is not of concern to judges where ...
> there is no indication that the prayer opportunity has
> been exploited to proselytize or advance any one, or to
> disparage any other, faith or belief." *Id*. at 794-95, 103
> S.Ct. 3330. The Supreme Court reasoned that it is not for
> courts to "embark on a sensitive evaluation or to parse
> the content of a particular prayer." *Id*. at 795, 103 S.Ct.
> 3330.

*Jones*, 530 Fed.Appx. at 485.  As observed in *Jones*, ultimately, the Supreme

Court in *Marsh* permitted legislative prayer as long as "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794-95. Unless there is an indication that the prayer opportunity has been exploited to advance one faith or belief over another, the Supreme Court cautioned that courts should not "embark on a sensitive evaluation or ... parse the content of a particular prayer." *Id*. at 795.

After *Marsh*, the most notable legislative prayer cases came from the Eleventh and Fourth Circuit Courts of Appeal. In *Wynne v. Town of Great Falls, South Carolina*, 376 F.3d 292 (4th Cir. 2004), the court had occasion to examine the prayer practices of a town council, concluding that the practice at issue violated the Establishment Clause. In *Wynne*, it was established that "Town Council meetings always open with prayer," that the Mayor and all Council Members are Christian, and that Council Member John Broom "often" leads the prayer. *Id*. at 293. It was further established that the opening prayer "frequently refers to Jesus, Jesus Christ, Christ or Savior in the opening or closing portion" of the prayer. *Id*. The records established that, during the prayers, "citizens attending the meetings customarily stand and bow their heads." *Id*. The record also contained uncontroverted evidence that residents of the Town participated in the prayers by saying "amen" at the end. *Id*. The plaintiff, a member of the

21

Wiccan faith, filed suit to stop the practice of Christian prayers.  She asked the Court to decide that prayers should only refer to a generic deity such as "God" without reference to any deity that is associated with one religion.  After a trial, the lower court granted judgment to the plaintiff and permanently enjoining the Town Council "from invoking the name of a specific deity associated with any one specific faith or believe in prayers given at Town Council meetings."  *Id*. at 296.

On appeal, the Fourth Circuit upheld the lower court's ruling.  According to the Fourth Circuit, the prayers challenged stood in "sharp contrast" to the prayer practice held not to constitute an "'establishment' of religion" in *Marsh*.  The *Wynne* court pointed out that, in *Marsh*, the approved prayer was characterized as "nonsectarian" and "civil" and the chaplain had affirmatively "removed all references to Christ."  *Id*. at 298, citing *Marsh*, 463 U.S. at 793 n. 14.  In contrast, the prayers sponsored by the Town Council "frequently" contained references to "Jesus Christ," and "thus promoted one religion over all others, dividing the Town's citizens along denominational lines."  *Id*. at 298-299.  In reaching this conclusion, the Court concluded that the "prayers sponsored by the Town Council have invoked a deity in whose divinity only those of the Christian faith believe," which was not a "prayer within the embrace of what is known as the Judeo-Christian tradition," *id*. at 300 –  a "nonsectarian prayer" without "explicit references ... to Jesus Christ, or to a patron saint" – references that can "foster a

22

different sort of sectarian rivalry than an invocation or benediction in terms more neutral." *Wynne*, 376 F.3d at 300, quoting *Lee v. Weisman*, 505 U.S. 577, 589 (1992). Thus, the Court rejected the Town Council's contention that the *Marsh* Court's approval of a nonsectarian prayer "within the Judeo-Christian tradition" equates to approval of prayers that invoke the exclusively Christian deity, Jesus Christ. *Id*.

The Fourth Circuit also rejected the Town Council's argument that, although its prayers frequently referred to Christ, because each did so only once, the prayers did not "advance" Christianity. The Council contended that in warning legislators against "exploit[ing]" a "prayer opportunity" to "proselytize or advance any one ... faith or belief," *Marsh*, 463 U.S. at 794-95, the *Marsh* Court intended "advance" simply to be a synonym for "proselytize." *Wynne*, 376 at 300. Rather, the Fourth Circuit concluded that "proselytize" and "advance" have different meanings and denote different activities. *Id*. To "proselytize" on behalf of a particular religious belief necessarily means to seek to "convert" others to that belief, whereas to "advance" a religious belief means simply to "forward, further, [or] promote" the belief. *Id*., quoting Webster's Third New International Dictionary 30, 1821 (3d ed. 1993). Advancement could include "conversion" but it does not necessarily contain any "conversion" or "proselytization" element. Similarly, although  proselytization involves some element of advancement, the

word "proselytize" stresses conversion in a manner that the word "advance" does

not.  Thus, according each word—"proselytize" and "advance"—its particular,

ordinary meaning does not render the other "meaningless."  *Id*. at 300.  The court

concluded that to adopt the Town Council's contrary view and interpret "advance"

as merely a synonym for "proselytize," would most certainly render the word

"advance" meaningless, and would force us to ignore the *Marsh* Court's use of the

disjunctive in cautioning against "proselytiz[ation] or advance[ment]" of a

particular religious creed.  *Id*. at 300, quoting *Marsh*, 463 U.S. at 794.  The court

concluded that *Marsh* simply does not allow legislators to engage – "as part of

public business and for the citizenry as a whole" – in prayers that contain specific

references to a deity in whose divinity only one faith believes.  A key factor in the

*Wynne* court's analysis, which distinguished the facts before it from *Marsh*, was

not just the nonsectarian nature of the prayer, but the fact that the prayers were not

simply directed at the legislators themselves.

   In 2005, the Fourth Circuit revisited *Marsh* and *Wynne*, finding

constitutional a county's practice of inviting clergy from diverse faiths to offer "a

wide variety of prayers" at meetings of its governing body.  *Simpson v.

Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 284 (4th Cir. 2005).  The

prayers included "wide and embracive terms" such as " 'Lord God, our creator,'

'giver and sustainer of life,' 'the God of Abraham, Isaac and Jacob,' 'the God of

Abraham, of Moses, Jesus, and Mohammad,' 'Heavenly Father,' 'Lord our Governor,' 'mighty God,' 'Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator.'" *Id*. at 284. The court stated that "a practice would remain constitutionally unremarkable where 'there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" *Id*. at 283, quoting *Marsh*, 463 U.S. at 794-95. The court distinguished *Wynne* on the ground that the prayers of the city council had been exploitive because their "pervasively and exclusively sectarian nature" had "undermined ... participation by persons of all faiths in public life." *Id*.

In *Turner v. City Council of City of Fredericksburg, Va.*, 534 F.3d 352, 354-356 (4th Cir. 2008), the city council permitted only nondenominational prayers at its meetings, and Turner, a member of the council who had not been allowed to offer a sectarian prayer, challenged that policy. The Fourth Circuit upheld the policy and concluded that "[s]o long as the prayer is not used to advance a particular religion or to disparage another faith or belief, courts ought not to 'parse the content of a particular prayer.'" *Id*. at 356, quoting *Marsh*, 463 U.S. at 795. Notably, the Fourth Circuit expressly declined to hold that *Marsh* required a policy of nondenominational prayers: "We need not decide whether the Establishment Clause compelled the Council to adopt their legislative prayer

25

policy, because the Establishment Clause does not absolutely dictate the form of legislative prayer." *Id*.

In 2008, the Eleventh Circuit decided *Pelphrey v. Cobb Co., GA*, 547 F.3d 1263 (11th Cir. 2008), in which taxpayers sued the county, claiming that its practice of offering religious invocations at the beginning of county commission sessions violated the Establishment Clause. Examining all of these above described cases, the *Pelphrey* court rejected the taxpayers argument that *Marsh* permits only "nonsectarian" prayers for commission meetings. In addition, the court concluded that the taxpayers' reading of *Marsh* was contrary to its command that courts must not evaluate the content of the prayers absent evidence of exploitation. *Id*. at 1271. While the taxpayers relied on the acknowledgment by the Supreme Court in *Marsh* that the chaplain had "removed all references to Christ" after 1980 and offered "nonsectarian" prayers at the time of the challenge, *Marsh*, 463 U.S. at 793 n. 14, the *Pelphrey* court observed that the Supreme Court never held that the prayers in *Marsh* were constitutional because they were "nonsectarian." *Id*. *Pelphrey* concluded that "[t]o read *Marsh* as allowing only nonsectarian prayers is at odds with the clear directive by the Court that the content of a legislative prayer 'is not of concern to judges where ... there is no indication that the prayer opportunity has been exploited to proselytize or advance any one ... faith or belief.'" *Id*. at 1271, quoting *Marsh*, at 794-95. Indeed, the

26

*Pelphrey* court points out that the *Marsh* Court considered *several factors* to determine whether the legislative prayers had been exploited to advance one faith such as the chaplain's religious affiliation, his tenure, and the overall nature of his prayers. *Pelphrey*, at 1271, citing *Marsh*, at 792-95. Thus, the "'nonsectarian' nature of the chaplain's prayers was one factor in this fact-intensive analysis; it did not form the basis for a bright-line rule." *Id.*

The *Pelphrey* court indicated that it must first determine, in accordance with *Marsh*, whether there was any "indication that the prayer opportunity ha[d] been exploited to proselytize or advance any one or to disparage any other faith or belief" at the Commission meetings. *Id.* at 1273, 1277. To make that determination, the court applied a three-factor test analyzing "[(1)] the identity of the invocational speakers, [(2)] the selection procedures employed, and [(3)] the nature of the prayers." *Id.* at 1277. As to the first factor, the court affirmed the trial court's determination "that the [Cobb County Board] did not exploit the prayers to advance one faith by using predominantly Christian speakers. Although the majority of speakers were Christian, the parties agree that prayers were also offered by members of the Jewish, Unitarian, and Muslim faiths." *Id.* at 1277. The court also concluded that the district court's "finding that the diverse references in the prayers, viewed cumulatively, did not advance a single faith" was not clearly erroneous. *Id.* As to the second factor, the court agreed with the

27

district court that the Cobb County Board's selection process was "not motivated by an improper motive" because its "list of potential speakers [included clergy] from various sources and included diverse religious institutions, including a mosque and three synagogues." *Id*. at 1278.  "Because there [was] no clear error in the findings that the prayers of the County Commission were not exploited to advance one faith or belief, we need not evaluate the content of the prayers.  The federal judiciary has no business in 'compos[ing] official prayers for any group of American people to recite as a part of religious program carried on by government....'"  *Id*., quoting *Lee v. Weisman*, 505 U.S. 577, 588 (1992).  Indeed, the *Pelphrey* courted held that "we read *Marsh* ... to forbid judicial scrutiny of the content of prayers absent evidence that the legislative prayers have been exploited to advance or disparage a religion."  547 F.3d at 1274.

As to the Cobb County Planning Commission's prayer practices, the Court also affirmed the district court's conclusion that the prayers offered "during 2003-2004 were unconstitutional because the selection procedures violated the 'impermissible motive' standard of *Marsh*," since the evidence showed that the Planning Commission expressly "exclud[ed] certain faiths because of their beliefs."  *Id*. at 1281-82.  The court explained that "[t]he 'impermissible motive' standard does not require that all faiths be allowed the opportunity to pray[, but] instead prohibits purposeful discrimination."  *Id*. at 1281-82 (holding that

28

"categorical exclusion of certain faiths based on their beliefs is unconstitutional").

In declaring the 2003 and 2004 prayers unconstitutional, the court rejected the

Planning Commission's argument that "the selection process is immaterial when

the content of the prayer is constitutional," because "[t]he central concern of

*Marsh* is whether the prayers have been exploited to created an affiliation between

the government and a particular belief or faith." *Id*. at 1281, citing *Marsh*, 463

U.S. at 794-95.

The Fourth Circuit returned to the issue of legislative prayer in 2011 in

*Joyner v. Forsyth Co.*, 653 F.3d 341 (4th Cir. 2011).  In *Joyner*, residents of

Forsyth County brought suit against the County Board of Commissioners,

claiming that the practice of having invocations at the opening of public board

meetings violated the Establishment Clause.  The Fourth Circuit concluded that

the prayer practice at issue was unconstitutional.  In 2007, Forsyth County adopted

a formal written policy.  *Id*. at 343.  "Using the Yellow Pages, [I]nternet research,

and consultation with the local Chamber of Commerce, the clerk to the Board

compiled and maintained the 'Congregations List'—a database of all religious

congregations with an established presence in the community." *Id*.  The list was

updated once a year, and "any congregation could confirm its inclusion by writing

to the clerk." *Id*.  The clerk mailed a letter to all religious leaders on the

Congregations List and "informed those individuals that they were eligible to

29

deliver an invocation and could schedule an appointment on a first-come, first-serve basis." *Id*. The letter informed the religious leaders that the opportunity was voluntary, and that "the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker." *Id*. Speakers were not scheduled for consecutive meetings, nor were they scheduled for more than two meetings in any calendar year. *Id*. The Fourth Circuit held that Forsyth County's policy, "as implemented, cannot withstand scrutiny" because "[t]he undisputed record shows that the prayers delivered at the outset of Board meetings from May 29, 2007 through December 15, 2008 referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency." *Id*. at 349 (internal quotation marks omitted). Because almost four-fifths of prayers contained such explicit sectarian references, the court of appeals held that the application of the policy ran afoul of the Supreme Court's decision in *Marsh*. *Id*. at 349-50. Notably, in *Joyner*, the pastor giving the invocation asked the audience and the commissioners to stand for the prayer. *Id*. at 344.

The issue of legislative prayer returned to the Eleventh Circuit in *Atheists of Florida, Inc. v. City of Lakeland, Fla*., 713 F.3d 577 (11th Cir. 2013). In *Atheists of Florida*, the Court first turned to the "*Pelphrey* factors," observing that, as

30

required by *Marsh*, the court considers whether there was any "indication that the prayer opportunity ha[d] been exploited to proselytize or advance any one or to disparage any other faith or belief." And, to make that determination, the court applied a three-factor test analyzing "[(1)] the identity of the invocational speakers, [(2)] the selection procedures employed, and [(3)] the nature of the prayers." *Atheists of Floria*, 713 F.3d at 591, quoting *Pelphrey*, at 1277. Under the first and second factors, the court concluded that inclusive identity of the speakers and the practices of selecting invocation speakers paralleled the post-suit practices found to be constitutional in *Pelphrey*. As to the third factor, the court re-affirmed the conclusion in *Pelphrey* that the content of the prayers themselves should not be scrutinized absent evidence that the legislative prayers have been exploited to advance or disparage a religion, which was not presented by the plaintiff in *Atheists of Florida*. *Id*. at 592-593

This post-*Marsh* history now brings us to *Town of Greece v. Galloway*. In the view of the undersigned, *Town of Greece* did not greatly alter the landscape of Establishment Clause jurisprudence as it relates to legislative prayer, especially in those cases where the persons offering the prayers were the legislators themselves, a fact that is far more significant than defendant posits. Rather, the *Town of Greece* focused on the issue of the sectarian versus nonsectarian nature of the legislative prayer, concluding that legislative prayer need not be nonsectarian to

31

pass constitutional muster. The limited scope of the holding in *Town of Greece* has not been lost on the courts in the short time since *Town of Greece* was decided. For example, in *Joyner v. Forsyth Co*., the North Carolina District Court has vacated the injunction upheld in *Joyner v. Forsyth County*, 653 F.3d 341 (4th Cir. 2011). *See* Case No. 07-243 (M.D. N.C. 2014), Dkt. No. 136, Order Granting Motion for Relief from Order Enjoining the Continuation of the Invocation Policy of the Forsyth County Board of Commissioners. As the *Joyner* district court explained:

> In May of this year, in the decision of *Town of Greece v. Galloway*, 134 S. Ct. 1811, 188 L. Ed. 2d 835 (2014), the Supreme Court held that sectarian legislative prayer does not violate the First Amendment. Relying on the history and tradition of legislative prayer, the Supreme Court held that "[a]n insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases." *Id*. at 1820. The Supreme Court rejected a rule that legislative prayer must be nondenominational and invoke only a generic God, because sectarian prayer can still serve the legitimate function of solemnizing the proceedings and invoke universal goals of cooperation: "Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion . . . ." *Id*. at 1823.
>
> Moreover, the Supreme Court determined that the fact that the Town of Greece's nondiscriminatory policy resulted in the majority of prayers being Christian and the fact that they were being delivered by Christian ministers did not contravene the First Amendment of the Constitution. The Supreme Court explained:

32

> That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing.

*Id*. at 1824.

*See* Case No. 07-243 (M.D. N.C. 2014), Dkt. No. 136, pp. 1-2. The court concluded that because *Town of Greece* "effected a significant change in the law of legislative prayer, the Court finds that Defendant is entitled to relief. Thus, to the extent that the injunction entered by this Court against Defendant enjoined the delivery of per se sectarian legislative prayers at Forsyth County Board meetings, the injunction must be dissolved in light of *Town of Greece*." *Id*. at p. 3. Notably, the prayer policy and practice in *Joyner* involved members or the clergy and other religious leaders offering invocations and not legislators themselves delivering prayers.

In *Hudson v. Pittsylvania County, Va.*, Case No. 11-43 (W.D. Va. 2013), Dkt. 83, the district court entered an order granting summary judgment in favor of the plaintiff and against the defendants and entered a permanent injunction against the legislative prayer policies and practices of defendants. In *Hudson*, the prayers at issue were given by legislators themselves, not by religious leaders or clergy.

*Id.* at Pg ID 1762.  Relying on Fourth Circuit precedent, in particular, *Wynne*, the

court found the Pittsylvania practices to be unconstitutional; indeed, the court

concluded that this matter was factually and legally indistinguishable from *Wynne*.

*Id.* at Pg ID 15.  After the decision in *Town of Greece*, defendants moved the

district court to dissolve the injunction.  *Id.* at Dkt. 103.  The district court

preliminarily granted this motion in part and denied it in part.  *Id.* at Dkt. 107.  The

court indicated that it was inclined to grant the defendants' motion to the limited

extent necessary to make it clear that, consistent with *Town of Greece*, that

opening prayers offered at the board of supervisors meetings need not be generic

or nonsectarian.  *Id.* at Dkt. 107, Pg ID 1931-1932.

        The court preliminarily denied, however, the request to dissolve the

injunction, finding that the facts stood in stark contrast to those presented in *Town

of Greece*.  The court explained those critical distinctions and the need for a

modified injunction to remedy the violation of the Establishment Clause as

follows:

> There are several critical points of distinction
> between the facts of *Town of Greece* and the prayer
> practice of the Board of Supervisors of Pittsylvania
> County. First and foremost, unlike in *Town of Greece*,
> where invited clergy and laypersons offered the
> invocations, the Board members themselves led the
> prayers in Pittsylvania County. Thus, in contrast to *Town
> of Greece*, where the town government had no role in
> determining the content of the opening invocations at its

34

board meetings, the government of Pittsylvania County itself, embodied in its elected Board members, dictated the content of the prayers opening official Board meetings. Established as it was by the Pittsylvania County government, that content was consistently grounded in the tenets of one faith. Further, because the Pittsylvania County Board members themselves served as exclusive prayer providers, persons of other faith traditions had no opportunity to offer invocations. Put simply, the Pittsylvania County Board of Supervisors involved itself "in religious matters to a far greater degree" than was the case in *Town of Greece*. 134 S. Ct. at 1822. In so doing, the prayer practice in Pittsylvania County had the unconstitutional effect, over time, of officially advancing one faith or belief, violating "the clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

Not only did the Pittsylvania County Board members determine the content of the opening prayers at Board meetings, the Board members often directed the assembled citizens to participate in the prayers by asking them to stand. For example, on September 20, 2011, the Pittsylvania County supervisor delivering the opening prayer directed: "If you don't want to hear this prayer, you can leave.  Please stand up." Second Suppl. Decl. of Rebecca K. Glenberg, Dkt. No. 24, at ¶ 5. In *Town of Greece*, the majority opinion noted that such a request from the government makes a difference. 134 S. Ct. at 1826. ("The analysis would be different if town board members directed the public to participate in the prayers.").

In sum, the active role of the Pittsylvania County Board of Supervisors in leading the prayers, and, importantly, dictating their content, is of constitutional dimension and falls outside of the prayer practices

35

>approved in *Town of Greece*. Thus, while *Town of Greece* calls for a limited modification of the existing injunction in this case, it does not support its dissolution.

*Id*. at Dkt. 107, Pg ID 1932-1933.  Based on the foregoing, the district court indicated that it was inclined to grant the motion in part and deny it in part.  It determined that it could not, at that time, enter an order modifying the existing injunction, given the pendency of the appeal.  *Id*. at Dkt. 107, Pg ID 1933.[2]

The undersigned is persuaded that *Town of Greece* is distinguishable from the present factual circumstances and that *Wynne* and *Hudson v. Pittsylvania Co.* provide the proper construct, to the extent that they are not based solely on the sectarian nature of the prayers and prayer practices at issue.  Here, unlike in *Town of Greece*, it is undisputed that it was the general practice of the Commissioners to ask the audience to rise and bow their heads, thus requesting participation in the prayers.[3]  The invocations in *Town of Greece* were deemed not coercive because

---

[2] The request for attorney fees was affirmed on appeal.  The Fourth Circuit determined, however, that the appeal of the substantive issues was untimely and declined review.  *Hudson v. Pittsylvania Co*., 774 F.3d 231 (4th Cir. 2014).  A new motion to dissolve the injunction remains pending in *Hudson*, having been filed after the Fourth Circuit issued its decision on appeal.  *Hudson v. Pittsylvania Co.*, Case No. 11-043 (W.D. Va. 2014), Dkt. 113, 114.  The district court held a hearing on March 16, 2015 and no decision has yet been issued.  *Id*. at Dkt. 120.  Notably, there is a similar matter pending in the District of Maryland where members of the county board of commissioners are also the persons offering the prayers.  *Hake v. Carroll Co., Md*., Case No. 13-01312 (D. Md.).  In that case, cross-motions for summary judgment remain pending, with supplemental briefs having recently been filed.

[3] While Mr. Overton's affidavit states that there "is no requirement that the public participate in the invocation," (Dkt. 25-4), the Answer to the Complaint also admits that "a Commissioner has asked citizens who come to the meetings to rise and bow their heads."  (Dkt. 11, p. 1, ¶ 1).  Additionally, defendant offers no contrary evidence to plaintiff's claims that

"the reasonable observer is acquainted with this tradition and understands that its

purposes are to lend gravity to public proceedings and to acknowledge the place

religion holds in the lives of many private citizens, not to afford government an

opportunity to proselytize or force truant constituents into the pews." *Id*. at 1825.

The Court noted, however:

> *The analysis would be different if town board members directed the public to participate in the prayers* . . . . No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. *These requests, however, came not from town leaders but from the guest ministers*.

*Id*. at 1826 (emphasis added).  In this case, the it was the government officials

themselves who asked the public to rise and bow their heads for prayers.  *See also*

*Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 284 (4th Cir.

2005) (upholding legislative prayer where the county, "unlike Great Falls, did not

invite the citizenry at large to participate during its invocations …. Chesterfield's

invocations are 'directed only at the legislators themselves,' as the court in *Wynne*

explained that they should be.").

 The undersigned also finds it quite significant, contrary to defendant's point

---

members of the public were asked on several occasions to rise and bow their heads.  *See* Factual Background, *supra*.

of view, that the County Commissioners exclusively delivered and controlled the content of the prayers, per their policy and practice.  Defendant would like the court to conclude that the identity of the speaker is irrelevant.  It is not.  Indeed, such a conclusion is contrary to the holding in *Town of Greece*.  Specifically, the Supreme Court noted that "Greece neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content, in the belief that exercising any degree of control over the prayers would infringe both the free exercise and speech rights of the ministers."  *Town of Greece*, 134 S.Ct. at 1816; *see also Pelphry*, at 1281, citing *Marsh*, 463 U.S. at 794-95 (In declaring the 2003 and 2004 prayers unconstitutional, the court rejected the Planning Commission's argument that "the selection process [of the speaker] is immaterial when the content of the prayer is constitutional," because "[t]he central concern of *Marsh* is whether the prayers have been exploited to created an affiliation between the government and a particular belief or faith.").  To restrict private clergy to nonsectarian prayers would require government officials "to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact."  *Id*. at 1822.  Here, as the speakers are drafting and offering the prayers, the Commissioners are acting as "supervisors and censors of religious speech,"

which involves the government in religious matters to a far greater degree than in *Town of Greece* and which crosses the constitutional line.

For these reasons, the undersigned concludes that the legislative prayer practice of the Jackson County Board of Commissioners violates the Establishment Clause.

## V.  RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the plaintiff's motion for summary judgment be **GRANTED**, that defendant's motion for summary judgment be **DENIED** and that an **INJUNCTION** precluding the County of Jackson's Board of Commissioners from utilizing its current prayer practice be entered.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: March 31, 2015                    s/Michael Hluchaniuk
                                        Michael Hluchaniuk
                                        United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on March 31, 2015, I electronically filed the foregoing paper
with the Clerk of the Court using the ECF system, which will send electronic
notification to all counsel of record and to the following non-ECF participant:
Peter Bormuth, 142 West Pearl Street, Jackson, MI 49201.

                                        s/Tammy Hallwood
                                        Case Manager
                                        (810) 341-7887
                                        tammy_hallwood@mied.uscourts.gov