**UNTIED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PETER BORMUTH,

Plaintiff,

v.

COUNTY OF JACKSON,

Defendant.

______________________________________/

CASE NO. 2:13-cv-13726

HON. MARIANNE O. BATTANI

**OPINION AND ORDER OVERRULING THE PLAINTIFF'S OBJECTIONS, OVERRULING IN PART AND SUSTAINING IN PART DEFENDANT'S OBJECTIONS, ADOPTING IN PART THE REPORT AND RECOMMENDATION, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The present case arises from Plaintiff Peter Bormuth's ("Bormuth's") *Establishment Clause* challenge to Defendant County of Jackson's ("Jackson's") practice of opening its Board of Commissioner meetings with prayer invocations delivered by members of the Board. Before the Court are Bormuth's and Jackson's objections to Magistrate Judge Hluchaniuk's March 31, 2015, Report and Recommendation ("R&R"). (Docs. 51, 53.) In the R&R (Doc. 50), the Magistrate Judge recommended that the Court grant Bormuth's motion for summary judgment (Doc. 37) and deny Jackson's motion for summary judgment (Doc. 25). For the reasons that follow, the Court **OVERRULES** Bormuth's objections, **OVERRULES IN PART AND SUSTAINS IN PART** Jackson's objections, **ADOPTS IN PART** the R&R, **GRANTS**

Jackson's Motion for Summary Judgment, and **DENIES** Bormuth's Motion for Summary Judgment.

## I. STATEMENT OF FACTS

As the parties have not objected to the R&R's recitation of the facts, the Court adopts that portion of the R&R. (See Doc. 50, pp. 2-6.)

## II. STANDARD OF REVIEW

### A. Report and Recommendations

Pursuant to statute, this Court's standard of review for a magistrate judge's report and recommendation requires a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C). A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. Id.

### **B.** Summary Judgment

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." State Farm Fire & Cas. Co. v. McGowan, 421 F.3d 433, 436 (6th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light

most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with “specific facts showing that there is a genuine issue for trial.” Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must “designate specific facts in affidavits, depositions, or other factual material showing ‘evidence on which the jury could reasonably find for the plaintiff.’” Brown v. Scott, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. Anderson, 477 U.S. at 248; McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant’s pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 251.

## III. DISCUSSION

### A. Sectarian Prayer

As a preliminary matter, the Court briefly addresses Bormuth’s objection that the Magistrate Judge failed to determine the merits of the case in accordance with the Treaty of Tripoli of 1797. The Court agrees with the Magistrate Judge’s conclusion that the Treaty of Tripoli is nothing more than a confirmation that the treaty was executed by the United States not as a religious power but as a secular state. Frank Lambert, The Founding Fathers and the Place of Religion in America 11 (2006) (“The assurances . . .

were intended to allay the fears of the Muslim state by insisting that religion would not govern how the treaty was interpreted and enforced . . . . [and] that the pact was between two sovereign states, not between two religious powers."). Therefore, the appropriate authority controlling this case is the *First Amendment*.

Though the *Establishment Clause* mandates government neutrality amongst religions, the Supreme Court has carved out a narrow exception to this guaranty in the case of legislative prayer. Marsh v. Chambers, 463 U.S. 783, 796 (1983) (Brennan, J., dissenting). In light of the historical tradition of legislative prayer tracing back to the First Congress, the Supreme Court found counstitutional the Nebraska Legislature's practice of opening its sessions with prayer delivered by an official chaplain who had held this position for sixteen consecutive years. Id. at 794-95. In deciding this case, the court did not apply the familiar tripartite test set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971) but rather introduced the following standard:

> The content of the prayer is not of concern where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

Id. Likewise, following Marsh, the Sixth Circuit expressly declined to apply the Lemon test in a case involving legislative prayer. Jones v. Hamilton County Gov't, 530 F. App'x 478, 487 (6th Cir. 2013). Contrary to Bormuth's objection, the fact that the prayer at issue in this case is government speech does not place it within the realm of the Lemon test. See Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276, 288 (4th Cir. 2005) (applying the standard set forth in Marsh after finding prayers delivered by

chaplains to be government speech). Therefore, the Court agrees with the Magistrate Judge's conclusion that the Lemon test does not apply in the present case.

The Supreme Court later confronted a case challenging the constitutionality of a religious holiday display at a government building. County of Allegheny v. ACLU, 492 U.S. 573, 597-80 (1989). The court distinguished the outcome of Allegheny from that in Marsh by noting that the legislative prayer at issue in Marsh was nonsectarian in that it had "removed all references to Christ." Id. at 603 ("Indeed, in *Marsh* itself, the Court recognized that not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief.") (citations omitted) (quoting Marsh, 463 U.S. at 793 n.14). In the wake of Allegheny, many courts' decisions were therefore premised on the understanding that sectarian legislative prayer amounts to a constitutional violation. See, e.g., Joyner v. Forsyth County, 653 F.3d 341, 348-49 (4th Cir. 2011); Hinrichs v. Bosma, 440 F.3d 393, 401-02 (7th Cir. 2006), *rev'd on other grounds*, 506 F.3d 584; Wynne v. Town of Great Falls, 376 F.3d 292, 301 (4th Cir. 2004); Hudson v. Pittsylvania County, No. 4:11cv00043, 2013 U.S. Dist. LEXIS 43012 at *31-32 (W.D.Va. March 27, 2013).

Most recently, the Supreme Court has dismantled this line of jurisprudence in Town of Greece v. Galloway. 134 S. Ct. 1811 (2014). Greece scrutinized the constitutionality of a town's practice of opening its monthly board meetings with an invocation delivered by a local clergyman. Id. at 1816. The town solicited guest chaplains by placing calls to local congregations listed in a local directory, ultimately compiling a list of willing chaplains. Id. Although the town never excluded or denied an

opportunity to deliver the invocation, nearly all of the local congregations were Christian and, consequently, so too were the guest chaplains. Id. Accordingly, the content of the invocations frequently made sectarian references to Jesus and the Christian faith. Id. The town never reviewed the content prior to the board meetings or provided guidance on the content. Id.

Beginning with a summary of Marsh's historical analysis of legislative prayer, the Supreme Court's decision in Greece repudiated the notion that legislative prayer must be completely nonsectarian in order to pass constitutional muster. Id. at 1820 ("An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases."). The decision proceeded to dismiss Allegheny's interpretation of Marsh as mere dictum "that was disputed when written" and that is "irreconcilable with the facts of *Marsh*." Id. at 1821 ("*Marsh* nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content."). The Court reasoned that to hold otherwise would compel legislatures and reviewing courts to censor religious speech, leading to a far greater degree of governmental entanglement with religion than to allow sectarian prayer. Id. at 1822. Nor did Greece find problematic the fact that the guest chaplains invited to deliver invocations were predominantly Christian, as it was merely representative of the town's demographic. Id. at 1824 ("So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers."). Nonetheless, Greece imposed the following constraints on the content of legislative prayer, similar to the standard set forth in Marsh:

> If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach

> conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.
>
> . . .
>
> Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation.

Id. at 1823-24.

Firstly, given the clear holding of Greece, there can be no dispute that the sectarian and exclusively Christian nature inherent to Jackson's prayer invocations does not alone render the practice unconstitutional. The fact that all nine of the Commissioners are Christian is immaterial. As elected officials, they were chosen as representatives whose interests were most closely aligned with the public's, and their personal beliefs are therefore a reflection of the community's own overwhelmingly Christian demographic. Like the Town of Greece, Jackson was under no obligation to ensure representation by all religions. See Greece, 134 S. Ct. at 1824. As argued by Jackson, the future may bring Commissioners of more diverse religious backgrounds who will deliver invocations in those traditions. To hold otherwise would contravene Marsh's sanction of legislative prayer delivered for sixteen years by a single Presbyterian clergyman. See 403 U.S. at 793.

Secondly, there has there been no showing that the invocations delivered at Jackson's board meetings have denigrated or attempted to proselytize nonbelievers. Indeed, the content of the invocations incorporates rather benign religious references, such as blessing America's troops and requesting divine guidance during deliberation. Bormuth objects in particular to a prayer entreating God to "[b]less the Christians

worldwide who seem to be targets of killers and extremists." He contends that this prayer was "violently offensive" because of its exclusive protection of Christians. This hypersensitive interpretation is patently misguided, as the prayer's sentiment is innocuous and unlikely to give offense to any reasonable person – the prayer did not seek to bless Christians to the detriment of non-Christians. Given the respectful tone of the prayers, the Court finds that they are consistent with the constitutional boundaries applicable to sectarian legislative prayer as delineated in Greece. This conclusion comports with the most recent outcome in Joyner v. Forsyth County, which vacated its previous findings that the sectarian legislative prayer was unconstitutional. See Order, No. 1:07-cv-00243, M.D.N.C. (Nov. 21, 2014) (Doc. 136) ("[T]he Court will lift the injunction without prejudice to the Plaintiffs presenting a proper case . . . that Defendant's prayer policy represents . . . a constitutional violation as envisioned by Town of Greece. Such a proper case may also include a claim by Plaintiffs that Defendant coerces public participation in its legislative prayers.").

**B. Coercion**

The more difficult inquiry presented by this case is whether the fact that the prayer invocations were delivered by government officials rather than by volunteers or members of the clergy distinguishes this case from the outcome reached in Greece by rendering the prayer unduly coercive. Many of Jackson's invocations contained cues from the Commissioners, such as: "Everyone please stand. Please bow your heads," "All rise," and "All rise and assume a reverent position." Bormuth maintains that these directions were commands amounting to coercion by forcing citizens to respect the Christian religion when they come before the Commissioners on secular business.

Meanwhile, Jackson contends that no authority subjects invocations delivered by government officials to a higher standard than those delivered by guest chaplains. Neither Greece nor Marsh directly confronts this precise question. Accordingly, the instant case presents a matter of first impression within the Sixth Circuit.

Greece recognized the "elemental *First Amendment* principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" Id. at 1825 (quoting Allegheny, 492 U.S. at 659). When determining whether a government entity has coerced the practice of a religion, the inquiry is a fact-sensitive one to be made on a case-by-case basis. Id. In ultimately determining that the Town of Greece's practices were not coercive, the Supreme Court adduced that adults are often confronted with speech they find disagreeable and that a sense of affront resulting from exposure to religious views contrary to their own does not give rise to an *Establishment Clause* violation. Id. at 1826. The court also considered that any member of the public was welcome to offer an invocation reflecting his own beliefs; that the prayers were delivered in the solemn, respectful tradition authorized in Marsh; and that members of the public were free to leave during the prayer. Id. at 1826-27.

Although the Supreme Court ultimately found that the invocation at issue in Greece was not coercive, the plurality opinion noted in dicta:

> The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity . . . . Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers . . . .

Id. at 1826. While the Court agrees with Jackson that legislative prayer delivered by government officials themselves is not *per se* unconstitutional, it is clear from the cautionary language in the Greece plurality opinion that the identity of the speaker is a significant factor distinguishing the present case from the reasoning in Greece. See Lund v. Rowan County, No. 1:13CV207, 2015 U.S. Dist. LEXIS 57840 at *24 (M.D.N.C. May 4, 2015) (finding the distinction between legislative prayer delivered by clergymen and prayer delivered by the legislators themselves to be significant for *Establishment Clause* purposes). Language from Joyner v. Forsyth County, relied upon by Jackson for the proposition that the identity of a speaker is immaterial, is taken out of context. In that case, the Fourth Circuit stated, "With respect to *Wynne*, the Board is right to observe that the prayers were delivered by members of the town council. But that fact was not dispositive. It was the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation." See 653 F.3d at 350 (citations omitted). That excerpt simply notes that the basis for the decision in Wynne v. Town of Great Falls, 376 F.3d 292, rested on the sectarian references included in the prayer and not on the fact that the prayers were delivered by government officials. Id. It does not follow, however, that the identity of the speaker is never pertinent.

Since the Supreme Court decided Greece, at least one other district court has had the opportunity to confront the issue of sectarian legislative prayer delivered by a government official. In Lund v. Rowan County, county board meetings were opened with sectarian prayers delivered by the commissioners, all of whom were Christian. See 2015 U.S. Dist. LEXIS 57840 at *2-3. The prayers frequently began with phrases such

as "let us pray" or "please pray with me." From 2007 onwards, because all commissioners identified as Christian, the invocations were delivered exclusively in the Christian tradition. Id. at *3. The district court struck down the county's prayer practice and distinguished the case from Greece on the grounds that Greece did not concern legislative prayer delivered by government officials. Id. at *24-30. The court further determined that because the case did not fall within the legislative prayer exception as carved out in Marsh and Greece, whether the practice violated the *Establishment Clause* must be determined by applying the Lemon and coercion tests. Id. at *33. Although the court briefly discussed the Lemon test, it decided that the prayer at issue was unconstitutional by conducting a fact-driven coercion analysis. Id. at 40-45.

Consistent with the above discussion of sectarian prayer, the Court declines to apply the Lemon test when analyzing whether legislative prayer is coercive. Contrary to the district court's finding in Lund, the Court maintains that the present factual circumstances fall within the legislative prayer exception. That the conclusion in Greece regarding coercion is not controlling does not remove the present case from the realm of legislative prayer jurisprudence. As Justice Brennan's dissent in Marsh demonstrates, applying the Lemon test in legislative prayer cases would essentially result in a *per se* ban on all legislative prayer, even where the majority opinion deemed it constitutional. See Marsh, 463 U.S. at 797-98 (Brennan, J., dissenting). When engaging in a coercion analysis, the plurality opinion in Greece did not apply the Lemon test but rather conducted a fact-sensitive inquiry "that considers both the setting in which the prayer arises and the audience to whom it is directed." See Greece, 134 S. Ct. at 1825. Indeed, the Supreme Court also dispensed with the Lemon test in favor of

a "psycho-coercion test" when determining that a religious benediction at middle school graduation placed primary and secondary school students in a coercive situation. See Lee v. Weisman, 505 U.S. 577, 644 (1992) (Scalia, J., dissenting). Ultimately, application of the Lemon test is unnecessary because, as recognized in Lund, a government act that fails the coercion analysis would necessarily also fail the Lemon test. See 2015 U.S. Dist. LEXIS 57840 at *34. A fact-sensitive inquiry is thus the order of the day.

Whether the prayer practice at issue is coercive, in spite of potential tension amongst the implications of certain factual elements, is not a question of fact to be reserved for trial but rather a legal question. First, the identical issue was decided on summary judgment in both Greece and Lund. Secondly, in the analogous examination of whether a city's inclusion of a crèche in a holiday display communicated an impermissible endorsement of religion under the Lemon test, Justice O'Connor's concurring opinion implied that the issue presented a legal question. See Lynch v. Donnelly, 465 U.S. 668, 695 (1984) (O'Connor, J., concurring) ("Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.").

Many aspects of the prayer at issue here support a finding that the practice is not coercive. The prayers "neither chastised dissenters nor attempted lengthy disquisition on religious dogma." See Greece, 134 S. Ct. at 1826. Rather, as discussed above, the content comports with the spirit of solemn, respectful prayer approved in Marsh. See id. at 1827. Nothing in the record suggests that members of the public are prevented from

leaving the meeting room for the duration of the prayer or that their absence would be remarkable or perceived as disrespectful. See id. Furthermore, should nonbelievers have chosen to stay for the duration of the prayer, "their quiet acquiescence [would] not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." Id. Indeed, contrary to Bormuth's allegations regarding the psychosocial pressures to join the prayer, neither of these two options "represents an unconstitutional imposition as to mature adults, who 'presumably' are 'not readily susceptible to religious indoctrination or peer pressure.'" See id. (quoting Marsh, 463 U.S. at 792). Accordingly, Bormuth's subjective sense of affront resulting from exposure to sectarian prayer is insufficient to sustain an *Establishment Clause* violation.

Conversely, certain other elements of the legislative prayer in the present case could be construed as coercive. First, the invocations are delivered exclusively in the Christian tradition, without the opportunity for members of the public to offer invocations according to their own convictions. Second, by exercising exclusive dominion over the content of the prayers, the legislators may be acting as "supervisors and censors of religious speech," potentially running afoul of Greece's caution against excessive entanglement with religion. See id. at 1822. Third, the Commissioners invited the public to participate in the prayers by beginning the invocations with statements such as "Please rise," "Please bow your heads," and "Let us pray." Greece may be interpreted to imply that such invitations made by government officials are coercive. See id. at 1826 ("The analysis would be different if town board members directed the public to participate in the prayers . . . ."). As articulated in Lund, members of the public may not perceive such cues, particularly from the Commissioners, as voluntary invitations that

may be declined but rather as commands that must be obeyed. See 2015 U.S. Dist. LEXIS 57840 at *42. See also Hudson, 2014 U.S. Dist. LEXIS 106401 at *6 (finding legislative prayer delivered by county board members unconstitutional based in part on the members' requests that the public stand for the prayer – as directed by one member, "If you don't want to hear this prayer, you can leave. Please stand up."). Indeed, Bormuth claims that on two occasions, when he addressed the Commissioners during Board meetings on the subjects of sectarian prayer and abortion, two of the Commissioners swiveled their chairs and turned their backs to Bormuth while he spoke.

From this analysis, the Court gleans that nothing about the content of these prayers is objectionable – the trouble arises wholly because of the surrounding circumstances. However, as discussed *supra*, the Supreme Court has already determined that legislative prayer delivered exclusively according to one religious tradition, even over many years, does not violate the constitution. Marsh, 463 U.S. at 794-95. The Supreme Court has also decided that requests to rise for sectarian prayer, when delivered by a guest minister, likewise pass constitutional muster. Greece, 134 S. Ct. at 1826. Had prayers identical to those in the instant case been delivered by a chaplain rather than the legislators, the Court would not be faced with such a heavy conundrum, as the outcome in Greece would unquestionably apply. The outcome of the present case therefore hinges exclusively on the fact that the prayer was delivered by the Commissioners.

The Court is not persuaded that the legislative prayer at issue here is unduly coercive based on the identity of the prayer-giver. As a practical matter, nonadherents had several options available to them: leave for the duration of the prayer; remain for

the prayer without rising; or remain for the prayer while rising, in which case their acquiescence would not have been interpreted as agreement with the religious sentiments. See id. at 1827. It is not clear that the direction to "Please rise" carries more coercive weight when voiced by the Commissioners themselves than by a guest chaplain selected by the Board of Commissioners. Although nonadherents to Christianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not. The language in Greece regarding requests to participate in prayer being made by legislators does not provide clear guidance on the outcome of this case – it is dicta contained in a plurality opinion and is therefore not binding. Additionally, the opinion states merely that "[t]he *analysis* would be different," not that the *outcome* would be different had the instruction to rise been delivered by one of the legislators. See id. (emphasis added). Bormuth's attestation that two Commissioners turned their backs to him during his presentations, while evidence of disrespect, does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer – rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited by his sentiments.

Further, in the opinion of this Court, the Commissioners' development of the prayers' content does not foster an entanglement with religion. Indeed, the hiring and payment of an official chaplain as upheld in Marsh may be regarded as a greater governmental

entanglement with religion than the Commissioners' rather benign religious references at issue in the present case. That is, the presence of a religious figure could serve to strengthen perceived governmental ties to religion, not to distance them. Moreover, if the Court determined that the constitutionality of a legislative prayer is predicated on the identity of the speaker, potentially absurd results would ensue. Under such a holding, an invocation delivered in one county by a guest minister would be upheld, while the identical invocation delivered in another county by one of the legislators would be struck down. In light of these considerations, the Court finds that the present legislative prayer practice is not coercive.

**C. Pledge of Allegiance**

Bormuth also objects to the Magistrate Judge's R&R on the grounds that it does not discuss the Board's practice of inviting children to lead the Pledge of Allegiance, immediately following the prayer invocation. Bormuth contends that the children's exposure to prayer in the context of a civic meeting forms an indelible connection between religion and the government in their impressionable minds.

In order to meet the minimum constitutional standards for individual standing,

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). Although ordinarily, one may not claim standing to vindicate the rights of some third party, this rule is not absolute. Smith v. Jefferson County Bd. of Sch. Comm'rs, 641 F.3d 197, 208 (2011). A party may assert the rights of another where "the party

asserting the right has a 'close' relationship with the person who possesses the right," and where "there is a 'hindrance' to the possessor's ability to protect his own interests." Id. (citing Kowalski v. Tesmer, 543 U.S. 125, 130 (2004)). Here, Bormuth's claim rests on the constitutional rights of the children leading the Pledge of Allegiance. There is no indication anywhere in the record that he had any relationship whatsoever with these children, let alone a "close" relationship. Moreover, there is no indication that the children's ability – or rather their parents' ability – to protect their own rights is hindered in any way. Accordingly, Bormuth lacks standing to assert his *Establishment Clause* and coercion claims on these grounds.

## IV. CONCLUSION

For the reasons articulated above, the Court finds that Jackson's legislative prayer practice does not violate the *Establishment Clause*. Although the Court believes the better practice would be to exclude legislative prayer from governmental proceedings altogether, it is constrained to follow the Supreme Court precedents set forth in Marsh and Greece by upholding the practice presently at issue. Accordingly, the Court **OVERRULES** Bormuth's objections, **OVERRULES IN PART AND SUSTAINS IN PART** Jackson's objections, **ADOPTS IN PART** the R&R, **GRANTS** Jackson's Motion for Summary Judgment, and **DENIES** Bormuth's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Date: July 22, 2015

s/Marianne O. Battani
MARIANNE O. BATTANI
United States District Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on July 22, 2015.

s/ Kay Doaks
Case Manager