# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 06, 2017

Mr. Bryan Howard Beauman
Sturgill, Turner, Barker & Moloney
333 W. Vine Street
Suite 1500
Lexington, KY 40507

Mr. Daniel Howard Blomberg
The Becket Fund for Religious Liberty
1200 New Hampshire Avenue, N.W., Suite 700
Washington, DC 20036

Mr. Peter Carl Bormuth
142 W. Pearl Street
Jackson, MI 49201

Mr. Douglas R. Cox
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036

Mr. Benjamin L. Ellison
Dorsey & Whitney
50 S. Sixth Street, Suite 1500
Minneapolis, MN 55402

Mr. Ed R. Haden
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201

Ms. Allyson Newton Ho
Morgan, Lewis & Bockius
1717 Main Street, Suite 3200
Dallas, TX 75201

Mr. Richard Brian Katskee
Americans United for Separation of Church and State
1310 L Street, N.W., Suite 200
Washington, DC 20005

Mr. Michael E. Kenneally
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

Mr. Michael B. Kimberly
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

Mr. Kenneth Alan Klukowski
First Liberty Institute
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075

Mr. Daniel S. Korobkin
American Civil Liberties Union Of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Mr. Aaron D. Lindstrom
Office of the Attorney General of Michigan
P.O. Box 30212
Lansing, MI 48909-0000

Mr. Daniel Mach
American Civil Liberties Union
Program on Freedom of Religion & Belief
915 15th Street, N.W.
Washington, DC 20005

Mr. Eric Dean McArthur
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Richard D. McNulty
Cohl, Stoker & Toskey
601 N. Capitol Avenue
Lansing, MI 48933

Mr. Eric C. Rassbach
The Becket Fund for Religious Liberty
1200 New Hampshire Avenue, N.W., Suite 700
Washington, DC 20036

Mr. Hiram S Sasser
First Liberty Institute
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075

Mr. Michael Jay Steinberg
American Civil Liberties Union Of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Mr. Judd Edward Stone II
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004

Mr. John Clay Sullivan
Morgan, Lewis & Bockius
1717 Main Street
Suite 3200
Dallas, TX 75201

Mr. Michael Paul Taunton
Mr. Jason B. Tompkins
Balch & Bingham
P.O. Box 306
Birmingham, AL 35201

Ms. Heather L. Weaver
American Civil Liberties Union
Program on Freedom of Religion & Belief
915 15th Street, N.W.
Washington, DC 20005

Mr. Edward Lawrence White
American Center for Law and Justice
3001 Plymouth Road, Suite 203
Ann Arbor, MI 48105

Re: Case No. 15-1869, *Peter Bormuth v. County of Jackson*
Originating Case No. : 2:13-cv-13726

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                    Yours very truly,

                    Deborah S. Hunt, Clerk

                    Cathryn Lovely
                    Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---



PETER CARL BORMUTH,

*Plaintiff-Appellant*,

*v.*

COUNTY OF JACKSON,

*Defendant-Appellee*.

No. 15-1869

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-13726—Marianne O. Battani, District Judge.

Argued: June 14, 2017

Decided and Filed: September 6, 2017

Before: COLE, Chief Judge; BATCHELDER, MOORE, CLAY, GIBBONS, ROGERS,
SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD,
and THAPAR, Circuit Judges.[*]

---

## COUNSEL

**ARGUED EN BANC:** Peter Bormuth, Jackson, Michigan, pro se. Allyson N. Ho, MORGAN,
LEWIS & BOCKIUS LLP, Dallas, Texas, for Appellee. Richard B. Katskee, AMERICANS
UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., Aaron D.
Lindstrom, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for
Amici Curiae. **ON BRIEF:** Peter Bormuth, Jackson, Michigan, pro se. Allyson N. Ho, John C.
Sullivan, MORGAN, LEWIS & BOCKIUS LLP, Dallas, Texas, Judd E. Stone, Michael E.
Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., Hiram S. Sasser, III,
Kenneth A. Klukowski, FIRST LIBERTY INSTITUTE, Plano, Texas, Richard D. McNulty,
COHL, STOKER & TOSKEY, Lansing, Michigan, for Appellee. Richard B. Katskee,
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C.,

---

[*]The clerk submitted this case to the en banc panel of the Sixth Circuit Court of Appeals before Judge John
K. Bush received his commission on August 31, 2017.

Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., Daniel S. Korobkin, Michael J. Steinberg, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Aaron D. Lindstrom, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Michael B. Kimberly, MAYER BROWN LLP, Washington, D.C., Ed R. Haden, Jason B. Tompkins, Michael P. Taunton, BALCH & BINGHAM LLP, Birmingham, Alabama, Eric C. Rassbach, Daniel H. Blomberg, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., Benjamin L. Ellison, DORSEY & WHITNEY LLP, Wayzata, Minnesota, Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, Eric D. McArthur, Benjamin Beaton, SIDLEY AUSTIN LLP, Washington, D.C., Edward L. White III, AMERICAN CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, Douglas R. Cox, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Curiae.

GRIFFIN, J., delivered the opinion of the court in which BATCHELDER, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, KETHLEDGE, and THAPAR, joined. ROGERS, J. (pp. 34–36), delivered a separate concurring opinion in which COOK and McKEAGUE, JJ., joined. SUTTON, J. (pp. 37–43), delivered a separate concurring opinion in which BATCHELDER, McKEAGUE, KETHLEDGE, and THAPAR, JJ., joined. MOORE, J. (pp. 44–71), delivered a separate dissenting opinion in which COLE, C.J., and CLAY, STRANCH, and DONALD, JJ., joined, and WHITE, J., joined in part. WHITE, J. (pp. 72–73), delivered a separate dissenting opinion.

---

## OPINION

---

GRIFFIN, Circuit Judge. Since the founding of our Republic, Congress, state legislatures, and many municipal bodies have commenced legislative sessions with a prayer. Consonant with this historical practice, defendant Jackson County Board of Commissioners opens its public meetings with a prayer that is generally solemn, respectful, and reflective. Plaintiff Peter Bormuth claims that this custom violates the Establishment Clause of the United States Constitution[1] because the Commissioners themselves offer the invocations. We disagree and affirm the judgment of the district court.

In doing so, we hold that Jackson County's invocation practice is consistent with the Supreme Court's legislative prayer decisions, *Marsh v. Chambers*, 463 U.S. 783 (1983), and

---

[1]The Establishment Clause is applicable to the states by operation of the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1 (1947).

*Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), and does not violate the Establishment Clause.

## I.

### A.

The Jackson County Board of Commissioners is an elected board of nine individuals that represents the citizens of Jackson County, Michigan. The Board opens its monthly meetings with Commissioner-led prayers. Following a call to order, the Board's Chairman typically requests Commissioners and the public alike to please "rise and assume a reverent position." Other variations include: "Everyone please stand. Please bow your heads"; "Please bow your heads and let us pray"; and "If everyone could stand and please take a reverent stance." One of the Commissioners then offers a prayer, which is followed by the Pledge of Allegiance, and then county business.

The Board's invocation practice is facially neutral regarding religion. On a rotating basis, each elected Jackson County Commissioner, regardless of his religion (or lack thereof), is afforded an opportunity to open a session with a short invocation based on the dictates of his own conscience. Neither other Commissioners, nor the Board as a whole, review or approve the content of the invocations. There is no evidence that the Board adopted this practice with any discriminatory intent.

Prayers offered by the Commissioners are generally Christian in tone and often ask "God," "Lord," or "Heavenly Father" to provide the Commissioners with guidance as they go about their business. Some prayers ask for blessings for others, from county residents suffering particular hardships, to military members, first responders serving in Jackson County, and others. The following is illustrative of the prayers at issue:

> Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna give you all the thanks and all the praise for all that you do. Lord I wanna remember bereaved families tonight too, that you would be with them and

take them through difficult times.  We ask these things in your son Jesus's name. Amen.

Plaintiff, a "self-professed Pagan and Animist," objects to this practice.  In his words, the "prayers are unwelcome and severely offensive to [him] as a believer in the Pagan religion, which was destroyed by followers of Jesus Christ."  The distinctly Christian prayers offered by the Commissioners make him feel "like he [i]s in Church" and that "he [i]s being forced to worship Jesus Christ in order to participate in the business of County Government."  He admits, however, that he does not stand and participate in the invocation portion of the meetings.  Nor does he contend that the Commissioners dissuaded or attempted to dissuade him, or any other member of the public, from leaving the meeting during the prayer, arriving late, or protesting the practice after the fact.

And protest after the fact he did.  Bormuth first raised his concerns about the invocations during a public comment portion of an August 20, 2013, meeting.  While Bormuth was speaking "on the issue of their sectarian prayers," one of the Commissioners "swiveled his chair and turned his back to [Bormuth]."  This "insulted and offended" him.

Bormuth commenced this litigation on August 30, 2013.  A month later, he sought appointment to Jackson County's Solid Waste Planning Committee.  According to Bormuth's Amended Complaint, the Board appointed two other lesser-qualified individuals instead.

Bormuth moved for summary judgment in December 2013.  Following the Supreme Court's May 2014 decision in *Town of Greece* and while plaintiff's motion was pending, Jackson County moved for summary judgment.  Thereafter, the magistrate judge directed Bormuth to file a revised motion addressing *Town of Greece*.  He did so in September 2014.

Ultimately, the magistrate judge issued a report and recommendation granting Bormuth's motion for summary judgment, denying Jackson County's motion for summary judgment, and enjoining Jackson County's invocation practice as violative of the Establishment Clause. However, the district court rejected this portion of the magistrate's report and recommendation and found Jackson County's prayer practice to be consistent with the Supreme Court's holdings in *Marsh* and *Town of Greece*.  Bormuth appealed, claiming that the district court erred in

concluding Jackson County's prayer practice does not violate the Establishment Clause and abused its discretion regarding two discovery matters. On appeal, a panel of our court ruled in Bormuth's favor on his Establishment Clause challenge. *Bormuth v. Cty. of Jackson*, 849 F.3d 266 (6th Cir. 2017). Thereafter, we sua sponte granted rehearing en banc. 855 F.3d 694 (6th Cir. 2017) (mem.).

## B.

Before turning to the merits of the appeal, we pause to address why our factual recitation excludes certain statements made by Commissioners after Bormuth commenced this litigation (and in particular, during a November 12, 2013, meeting of a subset of the Board to review a proposed revised invocation practice in response to Bormuth's lawsuit—a proposal which was ultimately tabled). Both Bormuth and Amicus Americans United for Separation of Church and State argue that because Jackson County records by video its Board of Commissioners' meetings and makes these videos available online on its website, the videos are either in the record or are judicially noticeable for purposes of this appeal. We disagree, and refuse to fault the district court for failing to address facts that were not before it.

"Our review of a district court's summary-judgment ruling is confined to the record." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 765 (6th Cir. 2015) (en banc). Under Federal Rule of Civil Procedure 56(c), the opposing party "has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007) (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). "This burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992). Simply stated, we "will not entertain on appeal factual recitations not presented to the district court when reviewing a district court's decision." *Chicago Title Ins. Corp.*, 487 F.3d at 995 (internal citation omitted). And this rule applies even if an appellant proffers evidence "that might . . . show a genuine issue of material fact after the district court had granted the defendants' motion for summary judgment. . . ." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 491 (6th Cir. 2000).

Bormuth did not present any video evidence to the district court. One need look no further than the opinions of the magistrate judge and district judge to confirm this. Like the parties' briefing below, those opinions make no reference to the videos.

We acknowledge that Bormuth's Amended Complaint averred that "[t]he County commissioners meetings are video recorded and posted on the Jackson County website: www.co.jackson.mi.us," and that a transcription of the offered prayers attached to his motion for summary judgment also referred to the videos' availability. In our view, the mere reference to the videos' general availability falls well short of "direct[ing] the court's attention to those specific portions of the record upon which [Bormuth sought] to rely to create a genuine issue of material fact." *Chicago Title Ins. Corp.*, 487 F.3d at 995 (citation omitted). Such a fleeting nonspecific reference did not require the district court to spend countless hours looking for evidence on Bormuth's behalf in response to Jackson County's motion for summary judgment by: (1) surfing the County's website to find the archive of the meetings; (2) watching the several years' worth of monthly meetings (and as but one example, the November 12, 2013, meeting alone lasted over one hour); and (3) attempting to discover facts supporting Bormuth's claim. We have never required such advocacy by a district court, even for a pro se litigant. *See, e.g.*, *Guarino*, 980 F.2d at 410 (a district court is not obligated to "comb the record from the partisan perspective of an advocate for the non-moving party"); *cf. Pliler v. Ford*, 542 U.S. 225, 231 (2004) ("District judges have no obligation to act as counsel or paralegal to *pro se* litigants.").

Furthermore, the manner in which this appeal was briefed is another reason to decline the invitation to supplement the appellate record. Bormuth's initial appellate brief was silent with respect to the videos or their content. It was only in his reply at the panel stage that he first referenced the videos and made an argument regarding the new facts contained therein. "We have consistently held, however, that arguments made to us for the first time in a reply brief are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). "[W]here the facts relied upon were presented neither to the district court nor to this Court until Plaintiff Appellant filed his reply, it would be improper for the Court to find that the district court erred in its failure to consider this newly-developed . . . argument," *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002), especially, as it is here, "when the issue raised for the first

time in reply is based largely on the facts and circumstances of the case. . . ."  *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986).  The same goes for Amicus's attempt to raise this argument.  *See Cellnet Commc'ns, Inc. v. F.C.C.*, 149 F.3d 429, 443 (6th Cir. 1998) ("While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties.").

That leaves us with Bormuth's and Amicus Americans United's requests that we take judicial notice of the videos under Federal Rule of Evidence 201.  Because Jackson County admitted the accuracy of these publicly-available videos, the argument is made that this court "must take judicial notice," because the facts within the videos "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and the court has been "supplied with the necessary information."  Further, the court "may take judicial notice at any stage of the proceeding."  Fed. R. Evid. 201.

Admittedly, there is some tension between these judicial notice procedures and our voluminous case law providing that "[o]ur function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006); *cf. Sovereign News Co. v. United States*, 690 F.2d 569, 571 (6th Cir. 1982) ("A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal.").  However, our court recently and persuasively addressed this tension as follows:

> The problem is that taking judicial notice of . . . [new evidence] now might create an evidentiary loophole through which a litigant could present a district court with one record and then ask an appellate court to reverse the district court based on another record.  That would subvert the relationship between district and appellate courts.  Here, the district court considered and rejected the defendants' . . . arguments.  Now the defendants and *amici* urge reversal based in part upon facts that the defendants could have presented to the district court, but chose not to. They are not entitled to burnish the record on appeal.  *See Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 690 n.2 (D.C. Cir. 2015); *U.S. ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 303 (3d Cir. 2011).

*United States v. Carpenter*, No. 14-1572, Order at 2 (6th Cir. April 11, 2016); *see also Conlin v. Mort. Ele. Registration Sys., Inc.*, 714 F.3d 355, 360 n.5 (6th Cir. 2013); *United States v. Bonds*, 12 F.3d 540, 552–53 (6th Cir. 1993).

For these reasons, we decline to consider the videos presented for the first time on appeal by amicus, and then by Bormuth in his reply.[2]

C.

There is one more preliminary matter to resolve at the outset, relating to a discovery issue.[3]   After Bormuth moved for summary judgment, he sought to depose the County's Administrator and three Commissioners.  In his Rule 26 disclosures, Bormuth identified these individuals as possessing information regarding "the County Commissioner's practice of offering a prayer invocation at the opening of their regular monthly meetings," "the practice of having children lead the Pledge of Allegiance which directly follows the invocation on the agenda," and "Plaintiff's activities regarding the Jackson County Resource Recovery Facility."  He further explained his desire to take these depositions in response to Jackson County's motion to quash, noting he wanted to discover "the practice, intent, and history of the invocations, [County Administrator] Overton's proposed [revised invocation] policy, and the role that religious interest and bias from the Commissioners has played in this case."  The magistrate judge granted the motion to quash because of the pending cross-motions for summary judgment.  That is, Bormuth did "not indicate[] the need for any additional discovery in order to fully respond to defendant's motion or to support his own motion as required by Federal Rule of Civil Procedure 56(d)."  The district court agreed to quash the scheduled depositions for different reasons:  under *Town of Greece*, "the Commissioners' private and personal attitudes toward religion or nonreligion are not relevant to the present action."  It also ruled that to the extent he sought information about the Jackson County Resource Recovery Facility, it was irrelevant because Bormuth alleged an Establishment Clause claim, not an employment discrimination claim.

We review district court decisions regarding discovery matters for abuse of discretion.  *See Himes v. United States*, 645 F.3d 771, 782 (6th Cir. 2011).  A district court abuses its

---

[2]We note that even if we were to consider the proffered videos, our disposition would not change.

[3]Bormuth also contends the district court erred by not permitting him to supplement the record with respect to the decision by the Board to not appoint him to a vacancy on the Board of Public Works.  We address this claim of error in our text below.

discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard. *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509–10 (6th Cir. 2013).

We conclude that the district court did not abuse its discretion because Bormuth failed to comply with Federal Rule of Civil Procedure 56(d). As the magistrate judge correctly recognized, Bormuth did not assert his need to take these depositions in response to Jackson County's motion for summary judgment. Under Rule 56(d), Bormuth could have opposed this motion on the grounds that he could not "present facts essential to justify its opposition." "We have observed that filing an affidavit that complies with Rule 56(d) is essential, and that in the absence of such a motion or affidavit, 'this court will not normally address whether there was adequate time for discovery.'" *Unan v. Lyon*, 853 F.3d 279, 292 (6th Cir. 2017) (citation omitted). Although we have set aside Rule 56(d)'s formal affidavit requirement "when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment," *id.* at 293 (citation omitted), there is no need to do so here.

By twice moving for summary judgment, Bormuth conceded his position "that there [wa]s no genuine dispute as to any material fact and that . . . [he wa]s entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, instead of responding to Jackson County's motion for summary judgment by arguing the need for additional discovery, Bormuth's motions for summary judgment expressly disclaimed it. *See Unan*, 853 F.3d at 293 (finding no abuse of discretion where, despite plaintiff's providing of some evidence about the need for additional discovery, the plaintiff subsequently moved for summary judgment). We therefore decline to sanction the "I did not have all the evidence I needed" argument made for the first time following the district court's adverse ruling on the cross-motions for summary judgment.

## II.

We review the district court's grant of summary judgment de novo. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the

nonmovant, *Rogers*, 737 F.3d at 1030, "the plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

III.

The Supreme Court has recognized "[w]e are a religious people whose *institutions* presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952) (emphasis added). All three of our branches of government have officially acknowledged religion's role in American life. *See Lynch v. Donnelly*, 465 U.S. 668, 674–78 (1984) (detailing the "official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders").

Legislative prayer is part of this tradition: "The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Marsh*, 463 U.S. at 786; *see also Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 588 (6th Cir. 2015) ("At the state and local levels, too, legislative prayer has long been accepted." (citing *Town of Greece*, 134 S. Ct. at 1819)). Indeed, "the Framers considered legislative prayer a *benign acknowledgment* of religion's role in society." *Town of Greece*, 134 S. Ct. at 1819 (emphasis added). It "has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court' at the opening of [the Supreme Court's (and Sixth Circuit's)] sessions." *Id.* at 1825 (Kennedy, J.). That tradition includes offering prayers, even those that reflect "beliefs specific to only some creeds," that "seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws." *Id.* at 1823 (Majority Op.). With this historical grounding, it comes as no surprise that the Supreme Court has twice approved the practice of legislative prayer as consistent with the Framers' understanding of the Establishment Clause. Because these cases shape our inquiry, we examine *Marsh* and *Town of Greece* in detail.

### A.

The Supreme Court first rejected an Establishment Clause challenge to legislative prayer in *Marsh*. That case examined the Nebraska Legislature's practice of opening its sessions with a prayer by its chaplain. The salient facts of Nebraska's practice included that the chaplain was of only one denomination (Presbyterian); the Legislature selected the chaplain for sixteen consecutive years and paid him with public funds; and the chaplain gave prayers "in the Judeo-Christian tradition." 463 U.S. at 793.

In rejecting the claim that Nebraska's invocation practice violated the Establishment Clause, the Supreme Court emphasized legislative prayer's deep historical roots: "From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." *Id.* at 786. Notable to the Court was how the drafters of the Establishment Clause embraced this practice. In 1774, the Continental Congress "adopted the traditional procedure of opening its session with a prayer offered by a paid chaplain." *Id.* at 787. And in one of its "early items of business," the First Congress "adopted the policy of selecting a chaplain to open each session with prayer" and "authorized the appointment of paid chaplains" just three days before it approved the language of the First Amendment. *Id.* at 787–88.

Based on this "unique," "unambiguous and unbroken history," the Court held that "the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.* at 791–792. Stated a different way, "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* at 788.

That the Nebraska Legislature selected a chaplain of the same denomination for sixteen consecutive years was of no moment: "Absent proof that the chaplain's reappointment stemmed

from an impermissible motive," one could not "perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church." *Id.* at 793. Nor was it material that public funds paid for the chaplain, given that the Continental Congress did the same. *Id.* at 794. And finally, the Supreme Court cautioned against the judiciary "embark[ing] on a sensitive evaluation or . . . pars[ing] the content of a particular prayer." *Id.* at 795. That is, "[t]he content of the prayer is not of concern to judges where . . . there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95.

B.

*Marsh* is widely viewed as "carving out an exception to the [Supreme] Court's Establishment Clause jurisprudence . . . because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry." *Town of Greece*, 134 S. Ct. at 1818 (citation and quotation marks omitted). This includes the generally applicable three-part *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971), test for which Bormuth advocates. *See, e.g.*, *Am. Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 305–06 (6th Cir. 2001) (en banc); *accord Smith*, 788 F.3d at 589–90.

Unfortunately, dicta in the *Marsh* opinion led to judicial confusion regarding its holding. This arose from a footnote in which the Court explained the "Judeo-Christian" nature of the prayers:

> [Chaplain] Palmer characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion." Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.

463 U.S. at 793 n.14 (internal citations omitted). In *County of Allegheny v. A.C.L.U.*, 492 U.S. 573 (1989), a case involving a crèche placed on the steps of a county courthouse, the Court drew a distinction between sectarian and nonsectarian references based upon this footnote. *Id.* at 603. The nonsectarian reference in *Marsh*, as "recast[]" by *County of Allegheny*, *Town of Greece*, 134 S. Ct. at 1821, led some courts, including our own, to conclude that the constitutionality of ceremonial prayer turned upon content neutrality. *See Stein v. Plainwell Cmty. Sch.*, 822 F.2d

1406, 1410 (6th Cir. 1987); *see also Rubin v. City of Lancaster*, 710 F.3d 1087, 1094 n.6 (9th Cir. 2013) (collecting cases). The Supreme Court corrected this error in *Town of Greece v. Galloway*.

C.

In *Town of Greece*, the town council invited local ministers to give invocations before each town board meeting. 134 S. Ct. at 1816. The town permitted any person of any faith to give the invocation, did not review the prayers in advance, and did not provide any guidance as to tone or content. *Id.* Although some had a "distinctly Christian idiom," and for eight years only Christian ministers gave prayers, upon complaint of such pervasive themes, the town expressly invited persons of other faiths to deliver the prayer. *Id.* at 1816–17. Contending that the Establishment Clause mandated that legislative prayers be "inclusive and ecumenical" to a "generic God," some town residents sued. *Id.* at 1817.

In reversing the Second Circuit's decision that Greece's practice violated the Establishment Clause, the Supreme Court again emphasized the unique nature of legislative prayer: "legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *Id.* at 1818. Purposeful prayers seeking to solemnly bind legislators are consistent with our tradition where the prayer givers "ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that tradition. These religious themes provide particular means to universal ends." *Id.* at 1823. Most importantly, history teaches that these solemn prayers "strive for the idea that people of many faiths may be united in a community of tolerance and devotion." *Id.* They are permissible because "[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith." *Id.* This tradition extends not just to state and federal legislatures, but also to local deliberative bodies like city councils. *Id.* at 1819; *see also Am. Humanist Ass'n v.*

*McCarty*, 851 F.3d 521, 527 (5th Cir. 2017) (applying *Town of Greece* to prayers before school boards).[4]

Accordingly, the Supreme Court in *Town of Greece* directed that a court's "inquiry . . . must be to determine whether the prayer practice [at issue] fits within the tradition long followed in Congress and the state legislatures," and held that Greece's did. 134 S. Ct. at 1819. First, the Court rejected the notion that *Marsh* permits only generic prayers, abrogating *County of Allegheny* and overruling decisions to the contrary. *Id.* at 1820–24. That is, "*Marsh* nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content." *Id.* at 1821. *Marsh* revolved not on espousement of "generic theism," but rather on the "history and tradition" showing prayer—even one that is explicitly Christian in tone—"in this limited context could coexist with the principles of disestablishment and religious freedom." *Id.* at 1820 (citation and alteration omitted). Requiring nonsectarian prayers "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." *Id.* at 1822. Put differently, once the government has "invite[d] prayer into the public sphere," it "must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.* at 1822–23. Nonetheless, the Court acknowledged that there are limits to the prayers' *content* to fit within our historical tradition:

> The relevant constraint derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage. Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function. If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.

---

[4]In our pre-*Town of Greece* case law, we refused to apply *Marsh*'s historical analysis to prayers offered before public school boards and instead applied *Lemon*'s endorsement test in line with public school prayer cases. *See Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 379–83 (6th Cir. 1999). Because the issue is not before us, now is not the time to decide whether *Coles* is still viable post-*Town of Greece*.

* * *

> Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not "exploited to proselytize or advance any one, or to disparage any other, faith or belief."

*Id.* at 1823 (quoting *Marsh*, 463 U.S. at 794–95).

The Supreme Court in *Town of Greece* had little trouble finding the invocation prayers were in keeping with our tradition. *Id.* at 1824. Though invoking Jesus and other Christian references, the prayers involved "universal themes" such as celebrating the changing of the seasons or calling for a "spirit of cooperation." *Id.* To be sure, some prayers strayed from these themes, with one condemning "objectors [to the prayer practice] as a minority who are ignorant of the history of our country" and another "lament[ing] that other towns did not have God-fearing leaders." *Id.* (quotation marks omitted). But these remarks did not "despoil a practice that on the whole reflects and embraces our tradition." *Id.* That is, "[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. *Marsh* . . . requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer." *Id.*

The Court also rejected the claim that the town violated the Establishment Clause by inviting predominantly Christian ministers to lead the prayer, noting that the town made reasonable efforts to identify all congregations within its borders and represented that it would welcome a prayer by anyone who wished to give one. *Id.* Moreover, the town's composition of nearly all Christians did not "reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Id.*

Next, the Supreme Court addressed the petitioner's claim "that the setting and conduct of the town board meetings create social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor the prayer and will vote on matters citizens bring before the board." *Id.* at 1820.

Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, analyzed coercion broadly in the context of the "subtle coercive pressures" the audience might feel while listening to the prayer. He emphasized that "[t]he inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed," and "must be evaluated against the backdrop of historical practice." *Id.* at 1825. (Kennedy, J.). Notably, Justice Kennedy applied the following presumption: "the reasonable observer is acquainted with this tradition and understands that [legislative prayer's] purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews." *Id.* It is the "lawmakers themselves," not the public, who are the "principal audience for these invocations" as they "may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." *Id.* "For members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree." *Id.* at 1826. And in concluding that "legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate," Justice Kennedy emphasized that "[a]dults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions." *Id.* at 1826–27.

In one paragraph, the three Justices discussed hypothetical facts that could change their analysis:

> The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but

> from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive.  Respondents suggest that constituents might feel pressure to join the prayers to avoid irritating the officials who would be ruling on their petitions, but this argument has no evidentiary support.  Nothing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined.  In no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished.  A practice that classified citizens based on their religious views would violate the Constitution, but that is not the case before this Court.

*Id.* at 1826 (citations omitted).  They also noted the audience had options to avoid the prayers altogether:

> Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest.  In this case, as in *Marsh*, board members and constituents are "free to enter and leave with little comment and for any number of reasons."  Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy.  And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed.  Neither choice represents an unconstitutional imposition as to mature adults, who "presumably" are "not readily susceptible to religious indoctrination or peer pressure."

*Id.* at 1827 (citations omitted).

Justices Thomas and Scalia did not join the coercion section of Justice Kennedy's opinion (Part II-B), but expressly disagreed with it.  In a separate opinion, Justice Thomas, joined by Justice Scalia, wrote that coercion is limited to "coercive state establishments" "by force of law or threat of penalty," such as mandatory church attendance, levying taxes to generate church revenue, barring ministers who dissented, and limiting political participation to members of the established church.  *Id.* at 1837 (Thomas, J., concurring in part and in the judgment).  Therefore, they rejected Justice Kennedy's broadening of coercion to also include social pressures:

At a minimum, there is no support for the proposition that the framers of the Fourteenth Amendment embraced wholly modern notions that the Establishment Clause is violated whenever the "reasonable observer" feels "subtle pressure," or perceives governmental "endors[ement]."

* * *

Thus, to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts—not the "subtle coercive pressures" allegedly felt by respondents in this case. The majority properly concludes that "[o]ffense . . . does not equate to coercion," since "[a]dults often encounter speech they find disagreeable[,] and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum." I would simply add, in light of the foregoing history of the Establishment Clause, that "[p]eer pressure, unpleasant as it may be, is not coercion" either.

*Id.* at 1838 (alterations in original and internal citations omitted).

IV.

Our first inquiry is "to determine whether the prayer practice in [Jackson County] fits within the tradition long followed in Congress and the state legislatures." *Id.* at 1819 (Majority Op.). We hold that it does.[5]

A.

At the heart of this appeal is whether Jackson County's prayer practice falls outside our historically accepted traditions because the Commissioners themselves, not chaplains, or invited community members, lead the invocations. Bormuth contends legislator-led prayer is per se unconstitutional, and "[b]ecause each Commissioner is Christian . . . , every prayer offered has been Christian" and therefore the Jackson County Board of Commissioners is endorsing the Christian faith. We reject this narrow reading of the Supreme Court's legislative-prayer jurisprudence and our history.

---

[5]We recognize our view regarding Jackson County's invocation practice is in conflict with the Fourth Circuit's recent en banc decision. *See Lund v. Rowan Cty.*, 863 F.3d 268 (4th Cir. 2017) (en banc). However, for the reasons stated in the text of this opinion, and as more fully explained by the dissenting judges in *Lund, see id.* at 296–300 (Niemeyer, J., dissenting) and *id.* at 301–323 (Agee, J., dissenting), we find the Fourth Circuit's majority en banc opinion unpersuasive.

1.

There is no support for Bormuth's granular view of legislative prayer. In this regard, neither *Marsh* nor *Town of Greece* restricts *who* may give prayers in order to be consistent with historical practice. In *Marsh*, for example, the Supreme Court separately listed "paid legislative chaplains *and* opening prayers" as consistent with the Framers' understanding of the Establishment Clause. 463 U.S. at 788 (emphasis added). And *Town of Greece* made clear that we are to focus upon "the prayer opportunity as a whole" in light of "historical practices and understandings." 134 S. Ct. at 1819, 1824 (citation omitted).

Most significantly, history shows that legislator-led prayer is a long-standing tradition. Before the founding of our Republic, legislators offered prayers to commence legislative sessions. *See, e.g.*, American Archives, Documents of the American Revolutionary Period, 1774-76, v1:1112 (documenting legislator-led prayer in South Carolina's legislature in 1775); *see also Town of Greece*, 134 S. Ct. at 1833 (Alito, J., concurring); *cf.* S. Rep. No. 32-376, at 4 (1853) ("[The Founders] did not intend to prohibit a just expression of religious devotion by the legislators of the nation, even in their public character as legislators."). Legislator-led prayer has persisted in various state capitals since at least 1849.[6] *See* Brief of Amici Curiae State of Michigan and Twenty-One Other States, at 5–6; Brief of Amici Curiae Local and State Legislators and the Commonwealth of Kentucky, at 5–9; Brief of Amici Curiae Members of Congress, at 4. Indeed, the Michigan House of Representatives and Senate sit just north of Jackson County and have documented legislator-led prayer examples dating back at least to 1879

---

[6]As but one substantive example, consider the following prayer offered by a delegate to Illinois's Constitutional Convention on January 12, 1870, which is not unlike the many prayers offered by the Jackson County Commissioners:

> Almighty God, our Heavenly Father! We recognize Thee as the great Sovereign of the Universe; the Father of our spirits; the Framer of our bodies; the Author of our life, and the Giver of every blessing and comfort that makes life desirable. We thank Thee for the kind care Thou hast exercised over us during the last night. We thank Thee for the blessing of this morning; and we pray Thee, Heavenly Father, that Thy blessing may rest upon us as a Convention, during this day; that we may be wise in our conduct; that we may have reference to the Divine Glory, and regard for the best interests of all who shall be affected by our action, in all we may do. Give us not only a sense of our dependence upon Thee, but give us all necessary wisdom and grace, that we may discharge our duties so that the result shall be conducive to the good of all concerned. We ask in the name of Christ, our Great Redeemer. Amen.

State of Illinois, Debates and Proceedings of the Constitutional Convention of 1869, at 166.

and 1898, respectively.  *See* H.R. Journal, at 10, 82, 591, 956 (Mich. 1879) (prayers by representatives); S. Journal, Extra Sess., at 180 (Mich. 1898) (prayer by senator).[7]

These historical examples are consistent with those relied upon by the Supreme Court to find traditions of legislative prayer in *Marsh* and *Town of Greece*.  Nebraska's legislature, noted the Court in *Marsh*, paid a chaplain since at least 1867.  463 U.S. at 794.  The same is true for *Town of Greece*, where the Court extended *Marsh* from state capitals to town halls by way of one prayer offered before the City Counsel of Boston in 1910.  134 S. Ct. at 1819.  Amici's helpful identification of the historical breadth of legislator-led prayer in the state capitals for over one hundred fifty years more than confirms to us that our history embraces prayers by legislators as part of the "benign acknowledgment of religion's role in society."  *Id.*  Accordingly, we give no credence to Bormuth's contention that these examples are just "historical aberrations."  The same can be said for the Fourth Circuit's conclusion in *Lund* that legislator-led prayer is a "phenomenon [that] appears to be the exception to the rule," 863 F.3d at 279, especially because that court apparently did not consider the numerous examples of such prayers presented to us.

As reflected in *Marsh* and *Town of Greece*, this history of legislators leading prayers is uninterrupted and continues in modern time.  Take *Marsh*'s conclusion that "the practice of opening sessions with prayer . . . has also been followed consistently in most of the states." 463 U.S. at 788–89.  In drawing this conclusion, the Court relied on an amicus brief by the National Conference of State Legislatures ("NCSL"), which surveyed the various practices across the state legislatures.  *Id.* at 789 n.11.  The NCSL expressly disclaimed the notion that chaplain-only prayers are the norm:  "The opening legislative prayer may be given by various classes of individuals.  They include chaplains, guest clergymen, *legislators*, and legislative staff members. . . .  All bodies, including those with regular chaplains, *honor requests from individual legislators either to give the opening prayer* or to invite a constituent minister to conduct the prayer."  Brief of NCSL as Amicus Curiae, *Marsh v. Chambers*, 463 U.S. 783 (1983) (No. 82-83), 1982 WL 1034560, at *2, *3 (emphasis added).

---

[7]Bormuth suggests these examples do not show a tradition of legislator-led prayer because some "involve prayers led by legislators who were also ministers" and moves that we take notice of these—and other—alleged historical nuances.  We find no appreciable difference between prayers by ordained legislators and those legislators who are not, for both reflect prayers given in a capacity as a legislator.  Nonetheless, we grant Bormuth's motion, Dkt. #120, which we view as a response to the historical record submitted by the Amici.

The record in *Town of Greece* also shows the long-standing practice of legislator-led prayer has continued to today. Observe the prayer offered by one of Greece's councilmen (and one that is quite similar to the prayers offered here):

> Please bow your heads and join me in prayer. Heavenly Father we thank you for this day. We thank you for the opportunity to now join together here to conduct the important public business that is before us. We ask that you would guide the decision making and the discussions that take place this evening, and that you would bless each of the participants in the town board as well as all of those who are here in the audience and may be viewing on television. We pray this in your name, amen.

Joint Appendix at 66a-67a, *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), 2013 WL 3935056. Other council members offered silent prayers, directing the audience to "remain standing" and "bow heads" while reflecting upon the September 11, 2001, terrorist attacks and Greece residents who recently passed away. *Id.* at 26a–27a, 29a, 45a, 57a.

Here, Jackson County presented a 2002 NCSL study reinforcing the earlier conclusion cited in *Marsh* that chaplains do not exclusively give opening prayers: "Forty-seven chambers allow people other than the designated legislative chaplain or a visiting chaplain to offer the opening prayer. *Legislators*, chamber clerks and secretaries, or other staff may be called upon to perform this opening ceremony." (Emphasis added.) More specifically, legislators gave prayers in thirty-one states. The same study notes that *only* members are permitted to deliver prayers in Rhode Island. Closer to Jackson County, for example, the Michigan House of Representatives permits an invocation to "be delivered *by the Member* or a Member's guest." Mich. H.R. R. 16 (emphasis added). So, too, does Congress. *See, e.g.*, 161 Cong. Rec. S3313 (daily ed. May 23, 2015) (documenting invocation by Oklahoma Senator James Lankford); United States House of Representatives, Office of the Chaplain, Guest Chaplains, http://chaplain.house.gov/chaplaincy/ guest_chaplains.html (last visited Aug. 15, 2017) (listing guest chaplains "who have been recommended by the Members of Congress"); Sen. Robert C. Byrd, Senate Chaplain, *in 2 The Senate*, *1789-1989*, *Addresses on the History of the United States Senate* 297, 305 (1982); *see also* Brief of Amici Curiae State of Michigan and Twenty-One Other States, at 10–12 (listing over 100 counties within the Sixth Circuit alone that permit lawmaker-led prayer).

This tradition of legislator-led prayer makes sense in light of legislative prayer's purpose—it "invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing." *Town of Greece*, 134 S. Ct. at 1823. Legislative prayer exists "largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers." *Id.* at 1826 (Kennedy, J.). It "reflect[s] the values [public officials] hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree." *Id.* As one of Jackson County's Commissioners stated, "Commissioners, as individuals, have a right to pray as we believe." Preventing Jackson County's Commissioners from giving prayers of their own choosing detracts from their ability to take "a moment of prayer or quiet reflection [to] set[] the[ir] mind to a higher purpose and thereby ease[] the task of governing." *Id.*

*Town of Greece* instructs that "government must permit a prayer giver to address his or her own God or gods as conscience dictates," and that it is not the role of the judiciary to act "as [a] supervisor[] and censor[] of religious speech." *Id.* at 1822 (Majority Op.). We heed this advice and decline the invitation to find an appreciable difference between legislator-led and legislator-authorized prayer given its historical pedigree. Put simply, we find it insignificant that the prayer-givers in this case are publicly-elected officials. In our view and consistent with our Nation's historical tradition, prayers by agents (like in *Marsh* and *Town of Greece*) are not constitutionally different from prayers offered by principals. *See also Turner v. City Council of City of Fredericksburg*, 534 F.3d 352, 355–56 (4th Cir. 2008) (O'Connor, J., retired) (finding in a pre-*Town of Greece* case that opening prayers offered by *only* city council members were permissible under the Establishment Clause). The Establishment Clause does not tolerate, much less require, such mechanical line drawing. *See Lynch*, 465 U.S. at 678–79 ("The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test.").

Here, the district court correctly concluded that if "the constitutionality of a legislative prayer is predicated on the identity of the speaker, potentially absurd results would ensue. Under such a holding, an invocation delivered in one county by a guest minister would be upheld, while the identical invocation delivered in another county by one of the legislators would be struck

down." *See also Am. Humanist*, 851 F.3d at 529 ("It would be nonsensical to permit legislative prayers but bar the legislative officers for whom they are being primarily recited from participating in the prayers in any way.").

### 2.

Although the prayers offered before the Board generally espouse the Christian faith, this does not make the practice incompatible with the Establishment Clause. Quite the opposite, the content of the prayers at issue here falls within the religious idiom accepted by our Founders. Consistent with *Town of Greece*, the solemn and respectful-in-tone prayers demonstrate the Commissioners permissibly seek guidance to "make good decisions that will be best for generations to come" and express well-wishes to military and community members. *Cf.* 134 S. Ct. at 1823. The prayers "vary in their degree of religiosity" and often "invoke the name of Jesus, the Heavenly Father, or the Holy Spirit," but *Town of Greece* makes clear the Founders embraced these universal and sectarian references as "particular means to universal ends." *Id.* at 1823–24.

Nor do the prayers themselves fall outside *Town of Greece*'s pertinent constraint on content—there is no evidence that the "invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion" or that there is a "pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose." *Id.* at 1823, 1824. Bormuth has identified one portion of one prayer where a Commissioner stated, "Bless the Christians worldwide who seem to be targets of killers and extremists"; he claims this is evidence of a prayer practice that "denigrates all nonbelievers and minority faiths." Even assuming that such a reference "disparage[s] those who did not accept the . . . prayer practice," this stray remark does "not despoil a practice that on the whole reflects and embraces our tradition." *Id.* at 1824. One stray remark, we might add, pales in comparison to the litany of prayers the Fourth Circuit concluded impermissibly advanced Christianity in *Lund*. 863 F.3d at 284–85 (detailing prayers that "implicitly 'signaled disfavor toward' non-Christians," "characterized Christianity as 'the one and only way to salvation,'" "proclaim[ed] that Christianity is exceptional and suggest[ed] that other faiths are inferior," and "urged attendees to embrace Christianity, thereby preaching conversion") (citations and brackets omitted); *but see id.*

at 313–16 (Agee, J., dissenting) (criticizing majority for condemning prayers similar to those approved in *Marsh* and *Town of Greece*).

That the prayers reflect the individual Commissioners' religious beliefs does not mean the Jackson County Board of Commissioners is "endorsing" a particular religion, Christianity or otherwise. For one, while all the Commissioners presumably believe in Jesus Christ, the faiths of Christianity are diverse, not monolithic. The Reformation of the Sixteenth Century spawned an explosion of Christian faiths. Many of those practicing these new Christian faiths sought religious freedom in America and found refuge from the tyranny inflicted by sectarian governments. To guarantee religious liberty to all persons, including those practicing the emerging Christian religions, the drafters and ratifiers of the First Amendment of our Constitution provided:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

U.S. CONST. amend. I.

We do not know the religious faiths of the 2013-2014 Jackson County Commissioners. The nine "Christian" Commissioners may have included Roman Catholics, Southern Baptists, Mormons, Quakers, Episcopalians, Lutherans, Methodists, and others.

Nor do we know the religious faiths of the current Commissioners. But we do know that Commissioners of different faiths, or no faith, may be elected. With each election, the people of Jackson County may elect a Commissioner who is Muslim, Buddhist, Hindu, Jewish, Mormon, Roman Catholic, Eastern Orthodox Christian, Baptist, Methodist, Presbyterian, Lutheran, Episcopalian, Congregationalist, Quaker, Amish, Mennonite, Pentecostal, Animist, Pagan, Atheist, or Agnostic (and so on). The religious faiths of periodically elected officials—including Jackson County's Commissioners—are dynamic, not static. In fact, east of Jackson County is the City of Hamtramck, Michigan, which just elected a Muslim majority city council.[8] Were Mr. Bormuth elected to the Jackson County Board of Commissioners, he could freely begin a

---

[8]*See* Kris Maher, *Muslim-Majority City Council Elected in Michigan*, Wall St. J., Nov. 9, 2015, http://www.wsj.com/articles/muslim-majority-city-council-elected-in-michigan- 1447111581.

legislative session with an invocation of his choosing, under the religion-neutral Jackson County prayer practice.

It is clear from *Marsh* and *Town of Greece* that creed-specific prayers alone do not violate the First Amendment. Specifically, in *Marsh*, the Supreme Court sanctioned the practice of selecting the same Presbyterian clergyman for sixteen consecutive years. 463 U.S. at 793. And in *Town of Greece*, the Supreme Court instructed that *Marsh* did not "imply the rule that prayer violates the Establishment Clause any time it is given in the name of a figure deified by only one faith or creed." 134 S. Ct. at 1821. Rather, "[p]rayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not 'exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" *Id.* at 1823 (quoting *Marsh*, 463 U.S. at 794–95).

Thus, in the present case, the district court correctly concluded that the all-Christian makeup of the Commissioners is "immaterial":

> As elected officials, they were chosen as representatives whose interests were most closely aligned with the public's, and their personal beliefs are therefore a reflection of the community's own overwhelmingly Christian demographic. . . . [T]he future may bring Commissioners of more diverse religious backgrounds who will deliver invocations in those traditions. To hold otherwise would contravene *Marsh*'s sanction of legislative prayer delivered for sixteen years by a single Presbyterian clergyman.

This reasoning also aptly applies *Town of Greece*'s express command that once government "invites prayer into the public sphere," it "must permit a prayer giver to address his or her own God or gods as conscience dictates. . . ." *Id.* at 1822.

*Marsh* and *Town of Greece* do not require Jackson County to provide opportunities for persons of other faiths to offer invocations. Just like Greece, Jackson County maintains a facially neutral prayer policy. *Id.* at 1824. Under this policy, the Board as a whole cannot be said to "act as supervisors and censors of religious speech. . . ." *Id.* at 1822. To the extent the prayer opportunity in *Town of Greece* produced prayers by a variety of faiths, we disagree with the dissent and the Fourth Circuit that *Town of Greece*'s holding is dependent upon religious heterogeneity. *See Lund*, 863 F.3d at 281–82. Its holding on this point is that "[s]o long as the

town maintains a policy of nondiscrimination," the Establishment Clause does not mandate a municipality of predominately one faith to "achieve religious balancing." *Town of Greece*, 134 S. Ct. at 1824. Jackson County's prayer policy *permits* prayers of any—or no—faith, and the County need not adopt a different policy as part of a "quest to promote a diversity of religious views." *Id.* (internal quotation marks omitted). To find otherwise would "require the [County] to make . . . judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each." *Id.* (alterations and citation omitted). But as *Town of Greece* commands, such "judgments" are "wholly inappropriate." *Id.* (citation omitted).

Finally, religious "endorsement" is a thread woven by the *Lemon* test. *Smith*, 788 F.3d at 587 (explaining that "the Sixth Circuit 'has treated the endorsement test as a refinement or clarification of the *Lemon* test'" (citation omitted)). Were we to agree with our dissenting colleagues that the prayers by the Jackson County Commissioners run afoul of the Establishment Clause because the prayer-givers and the government officials are "one and the same" (i.e., "excessive entanglement") and therefore "the Commissioners are effectively endorsing a specific religion," we would be rewriting thirty-plus years of Supreme Court jurisprudence—by applying *Lemon*'s endorsement rubric in lieu of looking through history's lens as dictated by *Marsh* and *Town of Greece*.

Neither *Marsh* nor *Town of Greece* applies *Lemon*'s balancing of purposes and government entanglement when examining the constitutionality of legislative prayer. Rather, *Marsh* "carv[ed] out an exception to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry." *Town of Greece*, 134 S. Ct. at 1818 (internal quotation marks and citation omitted). As we have previously noted en banc before, "even the author of the *Lemon* decision, the late Chief Justice Burger, did not see fit to apply the *Lemon* test when he wrote the Court's opinion in [*Marsh*]." *Am. Civil Liberties Union of Ohio*, 243 F.3d at 305–06. This omission is made all the more notable by the fact that Justice Brennan expressly advocated for application of the *Lemon*-test in dissent, and the lower court opinion applied *Lemon*. *Marsh*, 463 U.S. at 797–801 (Brennan, J., dissenting) (discussing "indirect coercive pressure upon

religious minorities to conform" in the context of the *Lemon* test); *Chambers v. Marsh*, 675 F.2d 228, 233–35 (8th Cir. 1982). Accordingly, we follow the Supreme Court's precedent and conclude *Lemon*'s endorsement test is inapplicable to legislative prayer cases.[9]  *See also Elmbrook Sch. Dist. v. Doe*, 134 S. Ct. 2283, 2284 (2014) (Scalia, J., dissenting from the denial of certiorari) ("*Town of Greece* abandoned the antiquated 'endorsement test.'"); *Jones v. Hamilton Cty. Gov't*, 530 F. App'x 478, 487–88 (6th Cir. 2013) (in pre-*Town of Greece* case, stating that "[g]iven the Supreme Court's choice not to apply *Lemon* in *Marsh*, we decline Appellants' invitation" to apply *Lemon*).

B.

On the issue of coercion, the *Town of Greece* decision produced a majority result, but not a majority rationale. Under these circumstances, *Marks v. United States* provides that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . ." 430 U.S. 188, 193 (1977) (citation omitted). "Taken literally, *Marks* instructs lower courts to choose the 'narrowest' concurring opinion and to ignore dissents." *United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009) (citation omitted). That is, we take the "one which relies on the 'least' doctrinally 'far-reaching-common ground' among the Justices in the majority. . . ." *Id.* at 209 (citation omitted).

In our panel opinion, we were divided regarding whether Justice Kennedy's three-Justice plurality opinion or Justice Thomas's two-Justice concurring opinion controls under *Marks* on the question of coercion. *Compare Bormuth v. Cty. of Jackson*, 849 F.3d 266, 279–81 (6th Cir. 2017) (Moore, J.), *with id.* at 304–05 (Griffin, J., dissenting).[10]  Because Bormuth's challenge fails under either standard, we need not resolve this issue.

---

[9]Bormuth also claims the 1797 Treaty of Tripoli forbids Jackson County's practice. We find this argument meritless and follow the Supreme Court's instruction to focus on whether the practice "fits within the tradition long followed in Congress and the state legislatures." *Town of Greece*, 134 S. Ct. at 1819. Unrelatedly, we agree with the district court that Bormuth does not have standing to assert an Establishment Clause violation on behalf of the children who sometimes lead attendees in the Pledge of Allegiance following the prayer. *See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489–90 (1982).

[10]Writing not for the court, I remain of the view as expressed in my panel dissent that the concurring opinion of Justice Thomas is narrower on the issue of coercion and therefore controlling. The Supreme Court has told us that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent

1.

First, Justice Kennedy's opinion. The societal "pressures" exerted upon Bormuth during the prayers are consistent with those advanced by the petitioners in *Town of Greece* and rejected by Justice Kennedy. Under his approach, whether a legislative prayer practice rises to the level of coercion "remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed," and "must be evaluated against the backdrop of historical practice." 134 S. Ct. at 1825 (Kennedy, J.); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) ("Whether a government activity violates the Establishment Clause is 'in large part a legal question to be answered on the basis of judicial interpretation of social facts. Every government practice must be judged in its unique circumstances.'" (alteration and citation omitted)). We presume that a "reasonable observer . . . understands that . . . [the] purpose [of legislative prayer is] . . . to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews." 134 S. Ct. at 1825 (Kennedy, J.). That we permit legislative prayer "does not suggest that those who disagree are compelled to join the expression or approve its content." *Id.*; *see also id.* at 1827 ("But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate.").

We start, consistent with *Town of Greece*, by declining to view the coercive effect of prayers at local government meetings differently from the effect of prayers at legislative sessions because local government meetings are small, intimate, and often involve citizens raising issues that most immediately affect their lives. In these tightknit gatherings of a few community members, the argument goes, residents who appear before local officials are likely to join in prayers despite misgivings for fear of offending the officials. To be sure, this difference was at

---

of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks*, 430 U.S. at 193 (internal quotation marks and citation omitted). Only five justices concurred in *Town of Greece*. Justices Thomas and Scalia specifically concurred in Justice Kennedy's tradition analysis, but not in his social-coercion analysis. Instead, Justice Thomas offered a narrower definition of coercion: that a more limited set of government actions—those backed "by force of law and threat of penalty"—will constitute coercion. *Town of Greece*, 134 S. Ct. at 1837 (Thomas, J., concurring in part and in the judgment) (quoting *Lee v. Weisman*, 505 U.S. 577, 640 (1992) (Scalia, J., dissenting)). As such, Justice Thomas's opinion is the narrowest and should control. Judges Batchelder and Thapar concur.

the core of an opinion in *Town of Greece*:  Justice Kagan's dissent.  *Id.* at 1851–52 (Kagan, J., dissenting) ("The majority thus gives short shrift to the gap—more like, the chasm—between a legislative floor session involving only elected officials and a town hall revolving around ordinary citizens.").  However, the five Justices in the *Town of Greece* majority did not adopt these distinctions.  Neither do we.

It is significant here, as in *Town of Greece*, that "[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest." *Id.* at 1827 (Kennedy, J.).[11]  Bormuth admitted to not participating in Jackson County's prayer practice.  His "quiet acquiescence [should] not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." *Id.*

Instead of acknowledging this critical concession, Bormuth and Amicus Americans United argue Jackson County's invocation practice is coercive in three ways *Town of Greece* was not:  (1) the Board's Chairman (or other Commissioners) preface the prayers with a request to rise and assume a reverent position; (2) two Commissioners turned their backs on Bormuth while he was speaking during public comment, and two others made statements reflecting their dislike of him; and (3) the Board denied Bormuth's requests to sit on two citizen committees.  They therefore contend that application of Justice Kennedy's coercion standard requires a different outcome.  We disagree.

First of all, we do not agree that soliciting adult members of the public to assist in solemnizing the meetings by rising and remaining quiet in a reverent position is coercive.  *See Am. Humanist Ass'n*, 851 F.3d at 526 ("polite requests" by governmental officials to stand for invocations "do not coerce prayer").  These "commonplace" and "reflexive" requests—whether from ministers or elected individuals following their own faith's normative cues—do not alone mandate participation, especially as most are preceded with a polite "please." *Town of Greece*, 134 S. Ct. at 1832 (Alito, J., concurring).  We do not think there is a constitutional difference

---

[11]In *Lund*, the Fourth Circuit concluded "these options, such as they were, served only to marginalize." 863 F.3d at 288.  Even if these options so marginalized attendees, they are options Justice Kennedy's plurality opinion expressly approved.  *See id.* at 320 (Agee, J., dissenting) (citing *Town of Greece*, 134 S. Ct. at 1827 (Kennedy, J.)).

here, for government-sanctioned prayers by official chaplains or invited community members still fall within the ambit of the Establishment Clause. More importantly, and as the district court stated, "[a]lthough nonadherents to Christianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not." And, it is not as if a Commissioner specifically ordered Bormuth to stand and remain reverent in the face of Bormuth's protest to the contrary. *See, e.g.*, *Fields v. Speaker of the Penn. House of Representatives*, — F. Supp. 3d —, 2017 WL 1541665, at *2, 11 (M.D. Pa. Apr. 28, 2017) (plaintiffs plausibly pled a violation of the Establishment Clause in a legislative prayer case where the Speaker of the House "publicly singled out [objectors] and ordered them to rise for the invocation," and "[w]hen they refused, the Speaker directed a legislative security officer to 'pressure' them to stand").

Second, that two Commissioners on separate occasions turned their backs on Bormuth during his public comments gives us no constitutional pause. One of these incidents was in response to Bormuth's comments about abortion and thus unrelated to the Board's invocation practice. Rather, as the district court found, "the[] behavior [wa]s likely an unfortunate expression of their own personal sense of affront elicited by [Bormuth's] sentiments." Moreover, these isolated incidents are not indicative of a "pattern and practice" of coercion against nonbelievers of religion. *Town of Greece*, 134 S. Ct. at 1826 (Kennedy, J.).

Bormuth and Amicus Americans United also point to post-litigation statements made by two of the Commissioners as reported in a local newspaper as evidence of him being treated differently on account of his complaints regarding the prayer practice. Those statements are as follows:

- Commissioner Rice: "[Bormuth] is attacking us and, from my perspective, my Lord and savior Jesus Christ. Our civil liberties should not be taken away from us, as commissioners."

- Commissioner Duckham: "What about my rights? . . . If a guy doesn't want to hear a public prayer, he can come into the meeting two minutes late."

- Duckham: "All this political correctness, after a while I get sick of it."
- Rice: "We Commissioners, as individuals, have a right to pray as we believe."

Three are in the context of an individual's right to offer a prayer of his faith, without preclearance by "an administrator or judge," and thus offer no help to Bormuth. *Id.* at 1822–23 (Majority Op.). That is, their comments confirm the prayers accommodate the Commissioners' spiritual needs and are not directed toward the audience. *Id.* at 1826 (Kennedy, J.). The fourth, the political correctness comment, at worst reflects a stray statement by one of the nine Commissioners and is not reflective of the Board as a whole.

Moreover, nothing in the record suggests that the Commissioners who turned their backs on Bormuth or spoke out about him in public were expressing antagonism *for his religious beliefs*. Rather, the record reflects they reacted to *his* antagonism toward *them*. Individuals in Jackson County, including elected officials, know what getting sued by Bormuth feels like, having been in the position many times before. *See, e.g.*, *Bormuth v. City of Jackson*, No. 12-11235, 2013 WL 1944574, at *2 (E.D. Mich. May 9, 2013) (criticizing Bormuth for "inject[ing] into the record venomous, irrelevant, and gratuitous commentary").**[12]** The Commissioners did react poorly to Bormuth's actions. Context shows, however, that they reacted not to his beliefs but to the litigious way he chose to express them. Indeed, the comments quoted above came after Bormuth had brought yet another lawsuit. The Establishment Clause might prevent government officials from making a practice of "singl[ing] out dissidents for opprobrium," *Town of Greece*, 134 S. Ct. at 1826 (Kennedy, J.), but it does not require them to keep their cool. This point separates this case from *Lund*, where the Fourth Circuit found "[m]ultiple" examples of prayers portraying non-Christians as "spiritual[ly] defect[ive]" and "suggesting that other faiths are inferior." 863 F.3d at 284–85. No such practice of opprobrium has been alleged here, let alone shown.

That leaves us with Bormuth's final coercion claim that Jackson County allocated benefits and burdens due to Bormuth's objection to its prayer practice by not appointing him to

---

**[12]** *See also Bormuth v. City of Jackson*, No. 12-11235, 2012 WL 5493599 (E.D. Mich. Nov. 13, 2012); *Bormuth v. Dahlem Conservancy*, 837 F. Supp. 2d 667 (E.D. Mich. 2011); *cf. In re: Peter Carl Bormuth*, No. 13-1194 (6th Cir. April 23, 2013); *Bormuth v. Johnson*, No. 16-13166, 2017 WL 82977 (E.D. Mich. Jan. 10, 2017); *Bormuth v. Grand River Envtl. Action Team*, No. 321885, 2015 WL 6439007 (Mich. Ct. App. Oct. 22, 2015).

the Solid Waste Planning Committee or the Board of Public Works. Assuming appointments to local citizen advisory boards rises to the level of "allocating benefits and burdens" under *Town of Greece*, and including those facts set forth in Bormuth's second motion to supplement that the district court denied, we do not agree.[13]

Beyond a template rejection letter, we know nothing about why Jackson County rejected Bormuth's application to fill a vacancy on the Solid Waste Planning Committee. All we have are unverified assertions from his complaint that he "believes he was excluded deliberately in retaliation for his Pagan religious beliefs, his hostility to an established Christian religion, and his filing of this lawsuit in Federal Court." But in order to defeat Jackson County's motion for summary judgment, Bormuth was required to go "beyond the pleadings" and "do more than simply show that there is some metaphysical doubt as to material facts to survive summary judgment." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 270 (6th Cir. 2010) (citation omitted). Bormuth failed to put forth any evidence tying his objection to the invocations to the Board's decision to not appoint him to the Solid Waste Planning Committee, and we therefore give no weight to this allegation.

We know slightly more with respect to his application for an appointment to the Board of Public Works. Yet, other than Bormuth's attestation that he was "the most qualified applicant," there is nothing in the record linking the refusal to appoint Bormuth to the Board of Public Works to his objection to the prayer policy. Bormuth even admits he was told that the candidate selected "was a former township supervisor who was involved with setting up a township recycling station and that his experience with recycling was the focus for his appointment." Accordingly, there is no record evidence indicating Jackson County "allocated benefits and burdens based on participation in the prayer. . . ." *Town of Greece*, 134 S. Ct. at 1826 (Kennedy, J.).

On this record, Bormuth has not carried his burden to set aside Justice Kennedy's presumption that reasonable observers know legislative prayer "lend[s] gravity to public proceedings[,] and . . . acknowledge[s] the place religion holds in the lives of many private

---

[13]Because we assume those facts not accepted by the district court, the alleged error, if any, in denying Bormuth's second motion to supplement was harmless.

citizens," and does not "afford government an opportunity to proselytize or force truant constituents into the pews." *Id.* at 1825. At bottom, Bormuth has shown he was offended by the Christian nature of the Board's prayers. But "[o]ffense . . . does not equate to coercion." *Id.* at 1826. Jackson County therefore did not "engage in impermissible coercion merely by exposing [Bormuth] to prayer [he] would rather not hear and in which [he] need not participate." *Id.* at 1827.

### 2.

Finally, under Justice Thomas's legal coercion test, Bormuth's challenge easily fails. In fact, he makes no such argument to the contrary. Bormuth only raises "subtle coercive pressures" which do not remotely approach "actual legal coercion." *Id.* at 1838 (Thomas, J., concurring in part and in the judgment).

### C.

In sum, Jackson County's invocation practice is consistent with *Marsh v. Chambers* and *Town of Greece v. Galloway* and does not violate the Establishment Clause.

### V.

For these reasons, we affirm the judgment of the district court.

---

## CONCURRENCE

---

ROGERS, J., concurring.  I concur in the majority opinion.

I write separately to explain why Justice Thomas's concurrence in *Town of Greece*, however compelling it may be, does not constitute binding precedent for us in this case.

The general rule of both horizontal and vertical stare decisis is that holdings of the same court, and of a higher court (to which the parties can appeal), not overruled or superseded by later such holdings, constitute binding precedent.  Horizontal stare decisis protects the fundamental interest of deciding like cases alike (basic fairness), and the interest of having people know what the law is (notice).  Vertical stare decisis in a pyramidal court system, in addition, obviates the need for repeated appeals.  A lower federal court should decide the same way as an unsuperseded holding of the U.S. Supreme Court, assuming that the facts are not materially distinguishable.  In particular, when there is argument as to whether facts are materially distinguishable, we look to the reasoning of the majority Justices to see what facts and reasoning led to the majority holding.

This is straightforward when five or more members of the Supreme Court agree on the reasoning for the holding.  As a matter of long-standing, deeply accepted practice, we do not treat holdings as less binding when the majority members of the precedent-setting Court have been replaced.  We assume for stare decisis purposes that the same Justices are still there.

The above analysis also applies quite simply in the case of split majority opinions.  To the extent that facts are not materially distinguishable, and the case has not been overruled or superseded, we should reach the same result that the precedent Court would have necessarily reached, to the extent that we can do so, by looking one-by-one at the controlling rationale of each of the various opinions that make up the precedent majority.  This serves directly the underlying purposes of horizontal and vertical stare decisis.

The following conclusion of Judge Kavanaugh states with striking elegance the rule that fundamentally serves these purposes:

> Even though it is often not possible to identify a "common rationale" in the multiple opinions from a splintered decision, lower courts can still reach a *result* consistent with the opinions of a majority of the Supreme Court. They can do so by following the opinion that would lead to an outcome that a majority of the Supreme Court in the governing precedent would have reached if confronted with the current case.

*United States v. Duvall*, 740 F.3d 604, 613 (D.C. Cir. 2013) (Kavanaugh, J., concurring).[1]

This test has the incidental advantage of not foisting a strange meta-analysis on lower courts to determine which of two Supreme Court positions is, for instance, more or less "doctrinally far-reaching." *See United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009). All the lower court has to do is run its analysis using the various opinions in the split decision, and then see whether now holding the same way as the split precedent majority would have obtained five votes of that majority.

The test is also consistent with the *Marks* narrowest-grounds rubric. *Marks*, like this case, was one in which multiple opinions were "linear" or "nested." *See King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991). A "linear" or "nested" set of rulings is one in which any ruling in the same direction as the majority, under one of the opinions constituting the majority, would logically require the judges of the other decision to rule the same way. *See id.*; *see also Duvall*, 740 F.3d at 610 (Kavanaugh, J., concurring). It is in that context that the controlling opinion is "narrower": the future cases that it would control comprise a smaller set than the set of cases that would be controlled by the other. As Judge Kavanaugh noted, in such linear cases the opinion "that occupies the middle ground" between the "broader opinion supporting the judgment" and the dissent will normally be controlling. *Duvall*, 740 F.3d at 610 (Kavanaugh, J.,

---

[1]In defense of just this test, an obscure legal academic explained twenty years ago that this is what federal courts actually do. Rogers, "*Issue Voting" by Multimember Appellate Courts*, 49 VAND. L. REV. 997, 1007–09 (1996) (citing *Siegmund v. General Commodities Corp.*, 175 F.2d 952 (9th Cir. 1949) (applying *National Mutual Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582 (1949)); *Detres v. Lions Building Corp.*, 234 F.2d 596 (7th Cir. 1956) (applying *Tidewater*); *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875 (2d Cir. 1981) (applying *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972)); *Greene v. Teffeteller*, 90 F. Supp. 387 (E.D. Tenn. 1950) (applying *Tidewater*)).

concurring).  The "middle ground" in *Town of Greece* with respect to coercion is clearly Justice Kennedy's opinion.

The test also avoids an anomaly like the one that would result if, for instance, we were to hold that Justice Thomas's opinion was controlling precedent in this case.  In a future case, we would have to hold that religious practices that seven *Town of Greece* Justices would clearly find unconstitutional were nonetheless constitutional because of the views of only two Justices.  Such an anomalous result would be inconsistent with fundamental principles of stare decisis.

---

**CONCURRENCE**

---

SUTTON, Circuit Judge, concurring.

"Let us pray."  Or "Let me pray."

"Please join me in prayer."  Or "Please join me, if you wish, in prayer."

"Please stand reverently as we pray."  Or "Please stand reverently, if you wish, as we pray."

"Council member Smith will now offer a prayer."  Or "Our chaplain will now offer a prayer."

"We pray these things in Jesus's name."  Or "We pray these things in God's name."

"We pray these things in God's name" while making the sign of the cross.

Or "We pray these things in God's name" without making the sign of the cross.

In telling Congress and eventually the States that they "shall make no law respecting an establishment of religion," the First Amendment does not preference any of these options.  Nor does the guarantee suddenly spring into action based on the percentage of invocation prayers given in one faith tradition over time—25%?, 50%?, 75%?, 100%?—so long as the governmental body does not exclude prayers because of their content.

Good manners might have something to say about all of this and how it is done.  So too might the Golden Rule.  But the United States Constitution does not tell federal judges to hover over each town hall meeting in the country like a helicopter parent, scolding/revising/okaying the content of this legislative prayer or that one.

Instead of asking judges to referee what will inevitably become arbitrary lines and thus will run the risk of becoming judge-preferenced lines, case law looks to American historical practices to determine what the Establishment Clause allows and what it does not.  History judges us in this area.  We do not judge history.  For all of American history, such prayers have been allowed, whether invoking Jesus, God, or something else, whether by government-paid chaplains or by the elected officials themselves.  And for all of American history, the United

States Supreme Court has authorized such prayers.  No one doubted the practice for most of our history.  And when challenges to the practice first arose about thirty-five years ago, the Supreme Court made clear that such prayers are constitutional so long as they do not coerce non-believers. *See Marsh v. Chambers*, 463 U.S. 783 (1983); *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).

One point on which we can all agree is that the solemnity of the occasion, then and now, makes spiritual invocations a permissible way to begin work on behalf of the People—in legislative bodies, executive proceedings, or court hearings.  I am not aware of a single opinion by a Justice of the United States Supreme Court or by a Judge of our Court who doubts that point.

The point on which we have trouble agreeing is what terms individual chaplains and individual elected officials may use in offering such invocations.  But here's the rub:  If the explanation for an invocation prayer is the humble act of seeking divine guidance before a session of government, is it not strange for judges to interfere with the content (e.g., God, Allah, or Jesus) or symbols (e.g., making the sign of the cross or not) of that official's prayer?  Why permit legislative prayers, then call them a trespass when done sincerely in the manner traditionally used by that individual?  So long as the prayer giver does not try to coerce anyone into adopting their faith, so long in other words as the individual gives an invocation, not an altar call, I see no meaningful role for judges to play.

No less importantly, does the prohibition on establishing any one religion really require us to pick one set of the above invocation options over the other?  Do we really want to go down the road of telling people how to pray?  There would be some irony in accepting this invitation. We have whole bodies of law connected to adjacent guarantees of the First Amendment that confirm the perils of allowing government officials to regulate the content of speech, and still more the content of a religious exercise, unless absolutely necessary.  At some point judicial prescription prevents the words of an invocation prayer from being a prayer at all.  The courts in this country have set their example by using "God," as in "God save this Honorable Court." Others are free to follow the courts' example and perhaps learn from it.  But with the exception of prohibiting coercion or proselytization, I doubt the federal courts can do anything better than

teach by example and trust Americans in large cities and small hamlets to respect our many traditions and to live and learn over time through the experience of using different invocation practices.

Even references to "God," which make most people comfortable, are not a balm for everyone.  It's a multi-perspective word, yes.  But it's not an all-perspective word, as Mr. Bormuth's position in this case confirms.  In his view, *none* of the options listed at the outset of this opinion satisfies the Establishment Clause.  All references to any one faith or to religion in general, he says, must be removed from governmental proceedings.  Who is coercing whom under that approach?  And what are we establishing?

In resolving cases of this sort, I would be mindful about what we are "walling in or walling out."  Governmental bodies, courts included, usually strive to be respectful of the diversity of faiths in any one town, region, or the country as a whole.  As well they should.  But what really counts as respect?  And what really counts as tolerance?  Different perspectives abound.  For some, it's too much information to listen to an individual's traditional way of praying.  For others, it conveys more respect, not less, when the individual invokes their God authentically and unguardedly and in the process offers a glimpse into who they are.  I am reticent to favor one perspective over the other.

Either way, none of this should obscure the broader point that the terms of the Constitution and the words of our cases do not require, or even allow, us to parse highly personal offerings on the basis of our intuitions or social conventions about how best to foster religious sensitivity in America.  Who can say when a prayer offered with humble fervor has too much fervor and too little humility?  That's not a line the Constitution asks us to draw, and any efforts to innovate one are apt to do more harm than good for the cause of tolerance.

The idea that the Establishment Clause favors chaplain-led prayers over legislator-led prayers is particularly puzzling.  Prayers by their nature are personal, even when offered in a public setting.  It is a petition by the individual, not the State or City.  And that's the way most people perceive them given our long history of permitting such invocations.  Just as we would not mistake a legislator's reference to his or her faith during a floor debate as an establishment of

religion, we should not make that mistake when they invoke their personal faith as part of an invocation.  But if there is a message-sending risk with invocation prayers, I would think it grows, rather than diminishes, when the governmental body hires a faith leader (necessarily of one faith) to say the prayers.  A government-sponsored faith leader seems closer to an establishment than allowing each official to pray however they wish or to offer no prayer at all.

How, after all, does a pattern of legislator-led prayer with respect to one faith coerce citizens to follow that faith in a way that chaplain-led prayer of a single faith does not?  If the elected officials offer an invocation prayer in their own personal way, that coerces no one.  If anything, risks of endorsement and any other risks at the outer edges of the Establishment Clause cases increase if the government *must* hire a chaplain to permit an opening prayer.  And if Mr. Bormuth succeeds, that of course will be the remedy:  Hire a minister.  Does that solution really satisfy the concerns of those inclined to adopt it?  And what of a legislator who is also a person of the cloth?  Could John Danforth but not John McCain give an invocation?  When a line offers no meaningful distinctions, it is a good time to ask whether the court should draw it.

One last point deserves emphasis.  There is no cognizable evidence that the council excluded any commissioner who asked to give a prayer or who chose not to give a prayer.  And there is no evidence that the council adopted its invocation practice with the goal of favoring this religion or that one.  The practice was around long before Mr. Bormuth entered the scene, whether in this town or in many others around the country.  In a country of this size and diversity, with thousands of local governmental bodies, it should surprise no one that some small towns have elected officials of one faith.  Just as many people of like-minded political views sometimes live in the same area, so too do many people of like-minded faiths sometimes live in the same area.  That is inevitable in such a large country.  Nor is that the only inevitability in this area.  Just as often, more often in fact, our pluralism leads to a greater diversity of faith and a greater diversity of prayer across the country or in some instances increases the pressure to abandon invocation prayers altogether.  The Establishment Clause does not place a thumb on these local choices.

What I have said so far addresses the main issues presented at the panel stage of this case and the main issues joined at that stage.  At the en banc stage, considerable attention has been

given to the discovery issues and the reaction of a few Council members to Mr. Bormuth's complaints.  Just as I join Judge Griffin's fine opinion in full with respect to the general legal principles in this area, I join his opinion in full with respect to the other features of this case.  Let me add a few points as to these other issues.

Mr. Bormuth cannot have it both ways.  He filed this case as a pro se litigant and insisted on not having an attorney, even when one was offered.  Having refused to take an attorney, he is not entitled to relaxed pleading standards or relaxed motions standards of the sort we sometimes give to pro se litigants.

Virtually all of the evidence that Mr. Bormuth now wants us to consider is not admissible or even in the record.  And it was he, not the county, who first moved—twice—for summary judgment.  At the summary judgment phase of a case, parties no longer may rely on the pleadings.  To generate a material dispute of fact, they must cite "particular parts of . . . the record" or show the absence of supporting evidence on the other side.  Civil Rule 56(c)(1).  Rule 56 expressly limits what we may consider to "materials in the record," Civil Rule 56(c)(3), a mandate that applies to all parties—represented or not, willing to accept representation or not.

All of this means we may not consider most of the "evidence" on which Mr. Bormuth now relies:  the "Pandora's Box" comment; the "nitwit" remark; the "political correctness nonsense" remark; and the absence of prayer in a meeting without public attendance.  A complaint is not evidence.  Briefs are not evidence.  And Bormuth never asked the district court to take judicial notice of any specific video or videos.  The closest he came to introducing the videos was an attachment to his motion for summary judgment.  All he did, however, was recite various prayers given at the town council meetings and cite the online videos as his source.  But his transcriptions did not include any of the comments or incidents mentioned above.  They included only a selection of the prayers given during invocations.

The district court also did not abuse its discretion in rejecting Bormuth's request to depose Council members about their invocation prayers.  It concluded that courts should "focus not on the personal motives or biases of government officials, but rather on the objective content of the prayer, the impact it has on the listeners, and any situational aspects of it that could be

unduly coercive." An invocation prayer does not become unconstitutional under the Establishment Clause, or for that matter become constitutional under the Clause, based on the subjective motives of the individual who gave it. Even when the Court has invalidated a display under the Establishment Clause, it did not do so based on the subjective purposes of the local officials. *See McCreary County v. ACLU*, 545 U.S. 844, 861–63 (2005).

But if one prefers to ignore the conventional rules for resolving summary judgment motions, I would ignore them in full. Other materials, including lower court decisions mentioned in one of the amicus briefs, and *all* of the videos, show why the council members became frustrated with Mr. Bormuth and confirm that this frustration had little to do with his religious beliefs and more to do with his methods of advocacy. This was not his first legal grievance, to put it mildly. *See, e.g., Bormuth v. City of Jackson*, No. 12-11235, 2013 WL 1944574, at *2 (E.D. Mich. May 9, 2013) (chronicling Bormuth's penchant for "inject[ing] into the record venomous, irrelevant, and gratuitous commentary"); *Bormuth v. City of Jackson*, 12-11235, 2012 WL 5493599, at *1–2 (E.D. Mich. Nov. 13, 2012) (denying Bormuth's claim that he suffered religious discrimination when, as in his words "one of the best poets in Jackson County" and a "rare 'druidic bard,'" he was asked to stop attending a community college's poetry readings); *Bormuth v. Dahlem Conservancy*, 837 F. Supp. 2d 667, 670 (E.D. Mich. 2011) (denying Bormuth's religious discrimination claim against a private non-profit nature center that asked Bormuth to stop visiting after he emailed this threat: "tell your groundsman that the next time I see him driving that diesel cart just because he is too la[z]y to walk [I] will . . . have the spirits drop a widow maker on him putting him in a wheel chair the rest of his life."); *see also Bormuth v. Johnson*, No. 16-13166, 2017 WL 82977, at *3 (E.D. Mich. Jan. 10, 2017) (rejecting his claim that his loss in the Democratic primary was due to a "deliberate attempt by [a] Christian"—the Secretary of State—"to deny a Pagan candidate" a fair election); *In re Peter Carl Bormuth*, No. 13-1194 (6th Cir. Apr. 23, 2013) (rejecting his mandamus action seeking the recusal of a judge who was a Christian); *Bormuth v. Grand River Envtl. Action Team*, No. 321865, 2015 WL 6439007 (Mich. Ct. App. Oct. 22, 2015) (rejecting his claim that he should be able to conduct groundwater tests on a nonprofit's property).

During the en banc oral argument, the lawyer for the county acknowledged, quite properly, that the council members should not have expressed their frustration with Mr. Bormuth—or for that matter with anyone else who brings a matter to the council.  But in the context of these other legal disputes, it is a bit rich to say that the council members reacted negatively to him due to his spiritual views in particular or to his position on council prayers in general.

---

### DISSENT

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  When Peter Bormuth voiced his objection to the Jackson County Board of Commissioners' practice of opening public meetings with exclusively Christian prayers, a Jackson County Commissioner made a disgusted face at Bormuth and turned his chair around, refusing to listen.  R. 10 (Am. Compl. ¶ 31) (Page ID #69).  One Commissioner called Bormuth a "nitwit" for questioning the prayer practice.  County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (43:29–43:35).  One Commissioner referred to Bormuth's objection as an attack on "my lord and savior Jesus Christ."  R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149); *see also* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50–32:59) (characterizing Bormuth's challenge to the prayer practice as "an attack on Christianity and Jesus Christ, period").  The Commissioners, all of whom are Christian, refused to allow any non-Commissioners to give prayers, and did so in order to avoid hearing prayers they would not like.  *See* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47–38:16).  When Bormuth sought to join the County's Solid Waste Planning Commission and then the Board of Public Works, the Commissioners denied his applications.  The district court denied Bormuth the opportunity to depose the Commissioners about why they rejected Bormuth's applications, *see* R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2–3) (Page ID #1045–46), but there is reason to believe that they did so because Bormuth objected to the practice of opening public meetings with Christian prayers, *see* R. 10 (Am. Compl. ¶ 33) (Page ID #69).

There is no doubt that some legislative prayer practices are constitutional.  *See Town of Greece v. Galloway*, 134 S. Ct. 1811, 1828 (2014); *Marsh v. Chambers*, 463 U.S. 783, 795 (1983).  The question in this case is whether the undisputed constitutionality of a practice of solemn, respectful, chaplain-led prayer should protect the Jackson County Board of

Commissioners' prayer practice, which involves having local Commissioners themselves direct the public to participate in prayers; offering prayers from only one faith tradition, Christianity; affirmatively excluding non-Christians from the opportunity to offer prayers or invocations; publicly deriding citizens who voice their objections to the Commissioner-led and exclusively Christian prayer practice; and denying public positions to citizens who object to the prayer practice. *Town of Greece* demands that courts distinguish solemn, respectful practices from practices that "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." 134 S. Ct. at 1823. Instead, the majority extends the constitutional protection meant for solemn and respectful prayer traditions to a practice that excludes non-Christians from the prayer opportunity and expresses disgust at people who voice a different opinion. I respectfully dissent.

## I. BACKGROUND

Each meeting of the Jackson County Board of Commissioners begins with a call to order, after which the Chairman directs those in attendance to "rise" and "assume a reverent position." R. 10 (Am. Compl. ¶¶ 17, 19) (Page ID #64–65). Then one of the Commissioners—all of whom are Christian—delivers a prayer. *Id.* ¶¶ 19–23 (Page ID #64–66). The Commissioners always end their prayer in the name of Jesus Christ. County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 ("Every board member here who gets up there and says a prayer during invocation, we end our invocation in the name of Jesus Christ."). Immediately after the prayer, the Board of Commissioners invites residents, often children, to lead attendees in the Pledge of Allegiance. *Id.* ¶ 17 (Page ID #64). The Board of Commissioners' meetings are open to the public and, for citizens who are unable to attend, are videotaped and posted on Jackson County's website. *Id.* ¶ 16 (Page ID #64).

Bormuth is a self-described Pagan and Animist. *Id.* ¶ 13 (Page ID #63). Deeply concerned with environmental issues, Bormuth started attending the Board of Commissioners' monthly meetings because he believed that the County was releasing pollutants into a local river. *Id.* In July 2013, Bormuth attended the Board of Commissioners' meeting to speak about closing the Jackson County Resource Recovery Facility, the mass-burn waste combustor that he believed

was polluting the local river.  *Id.* ¶ 25 (Page ID #66–67).  At the meeting, after the Chairman said "all rise," one of the Commissioners gave the following prayer:

> Bow your heads with me please.  Heavenly father we thank you for this day and for this time that we have come together.  Lord we ask that you would be with us while we conduct the business of Jackson County.  Lord help us to make good decisions that will be best for generations to come.  We ask that you would bless our troops that protect us near and far, be with them and their families.  Now Lord we wanna [sic] give you all the thanks and all the praise for all that you do.  Lord I wanna [sic] remember bereaved families tonight too, that you would be with them and take them through difficult times.  We ask these things in your son Jesus's name.  Amen.

*Id.* ¶ 23 (Page ID #65–66).  As a Pagan and an Animist, Bormuth was uncomfortable with the Commissioner's prayer. *Id.* ¶ 24 (Page ID #66).  He felt like he was being forced to participate in a religion to which he did not subscribe in order to bring a matter of concern to his local government.  *Id.*

Bormuth attended the Board of Commissioners' August 2013 meeting as well.  *Id.* ¶ 28 (Page ID #68).  A Commissioner opened the meeting with the following prayer:

> Please rise.  Please bow our heads.  Our heavenly father we thank you for allowing us to gather here in your presence tonight.  We ask that you watch over us and keep your guiding hand on our shoulder as we deliberate tonight.  Please protect and watch over the men and women serving this great nation, whether at home or abroad, as well as our police officers and firefighters.  In this we pray, in Jesus name, Amen.

*Id.*  During the prayer, Bormuth was the only one in attendance who did not rise and bow his head.  *Id.* ¶ 29 (Page ID #68).  Bormuth felt isolated, and he worried that the Board of Commissioners would hold against him his decision to stay seated.  *Id.*

During the meeting's public-comment period, Bormuth explained that he thought that the monthly prayers violated the Establishment Clause.  *Id.* ¶ 31 (Page ID #69).  While Bormuth was speaking, one of the Commissioners "made faces expressing his disgust" and then turned his chair around, refusing to look at Bormuth while he spoke.  *Id.*  The Commissioner's reaction "confirm[ed] [Bormuth's] fear[]" that his refusal to join the prayers would prejudice the Board of Commissioners against him.  *Id.*

Bormuth filed suit against the County ten days later, alleging that the prayer practice violated the Establishment Clause. R. 1 (Compl.) (Page ID #1). While Bormuth's suit was pending before the district court, the Board of Commissioners nominated residents to the County's new Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had applied to serve on the Solid Waste Planning Committee, and had three years of experience working on related issues, the Board of Commissioners did not nominate him. *Id.* Bormuth surmised that this had something to do with his suit against the County. Indeed, an article published shortly after Bormuth filed his federal complaint revealed the Commissioners' disapproval of the suit, quoting one Commissioner as saying, "Bormuth 'is attacking us and, from my perspective, my Lord and savior Jesus Christ,'" and another Commissioner as remarking, "All this political correctness, after a while I get sick of it." R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149).

Bormuth filed an amended complaint addressing the Board of Commissioners' decision not to nominate him to the Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). He again alleged that the County was violating the Establishment Clause and asked for declaratory and injunctive relief as well as nominal damages. *Id.* ¶¶ 37, 44–50 (Page ID #70–71, 83–84). The parties filed motions for summary judgment. Bormuth moved for summary judgment before the Supreme Court decided *Town of Greece* and then, after *Town of Greece*, the parties filed cross-motions addressing that case. *See* R. 25 (Def. Mot. for Summ. J.) (Page ID #244); R. 37 (Pl. Second Mot. for Summ. J.) (Page ID #509).

While the parties were briefing their motions for summary judgment, they were also embroiled in two discovery disputes. The first dispute involved Bormuth's efforts to take depositions. Bormuth sent the County notices of his intent to depose the Commissioners, R. 24-2 (Notices of Deps.) (Page ID #226), in order to obtain "information relating to [Bormuth's] activities regarding the Jackson County Resource Recovery Facility," as well as information on the Board of Commissioners' practice of opening meetings with prayer and on its use of children to lead the Pledge of Allegiance following the prayer, R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The County filed a motion to quash, arguing that it had already provided Bormuth with all the information that it had on its practice of opening meetings

with prayer and on its use of children to lead the Pledge of Allegiance, and that any information it had on Bormuth's activities regarding the Jackson County Resource Recovery Facility was immaterial. R. 24 (Mot. to Quash at 3–7) (Page ID #213–17). In response, Bormuth stated that he also wanted to uncover the Commissioners' motives in delivering the prayers. R. 26 (Resp. to Mot. to Quash at 7) (Page ID #296). The County replied that the Commissioners' motives were also immaterial. R. 28 (Reply re: Mot. to Quash at 1) (Page ID #306).

The second dispute involved Bormuth's efforts to supplement the record. Bormuth sought to supplement the record with the text of a Commissioner's October 2014 prayer, R. 42 (Pl. First Mot. to Suppl. Record at 1) (Page ID #790), and with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works, R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932). The County objected to the first motion to supplement the record because the October 2014 prayer was similar to the prayers that Bormuth had included in his amended complaint. R. 43 (Resp. to Pl. First Mot. to Suppl. Record at 1–2) (Page ID #801–02). The County did not respond to the second motion to supplement the record, which was filed just days before the magistrate judge issued a Report and Recommendation.

The magistrate judge recommended that the district court deny Jackson County's motion for summary judgment and grant Bormuth's motion for summary judgment because "the legislative prayer practice of the Jackson County Board of Commissioners violates the Establishment Clause." R. 50 (R. & R. at 39) (Page ID #914). Rejecting this recommendation, the district court granted the county's motion for summary judgment and denied not only Bormuth's summary-judgment motion but also his discovery motions. Beginning with the motion to quash depositions, the district court agreed with the County that the information Bormuth sought in deposing the Commissioners—"information relating to [Bormuth's] activities regarding the Jackson County Resource Recovery Facility," R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236)—was not germane to the dispute, R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2–3) (Page ID #1045–46). Confusing the Jackson County Resource Recovery Facility with the Solid Waste Planning Committee (or possibly with the Board of Public Works), the district court explained that because Bormuth "ha[d] not brought an employment discrimination claim," "information regarding the Jackson County Resource

Recovery Facility's failure to hire him . . . is not relevant." *Id.* The district court further stated that although Bormuth also sought information on the Commissioners' motives in giving the prayers, "motive is not a relevant factor." *Id.* at 3 (Page ID #1046). The district court then granted Bormuth's first motion to supplement the record with the Commissioner's October 2014 prayer but denied Bormuth's second motion to supplement the record with the letter that he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 2–3) (Page ID #1048–49). Conflating Bormuth's second motion to supplement the record with his efforts to depose the Commissioners, the district court described the second motion to supplement the record as seeking to introduce "[Bormuth's] application to a position on the Jackson County Resource Recovery Facility," concluding that, "[b]ecause [Bormuth's] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, his affidavit describing the Board's failure to hire him is irrelevant." *Id.* at 3 (Page ID #1049) (emphasis removed).

The district court then turned to the merits of Bormuth's Establishment Clause claim. The district court considered the content of the Board of Commissioners' prayers first, and concluded that, although the prayers were "exclusively Christian," they were composed of only "benign religious references"—making Bormuth's reaction to them "hypersensitive." R. 61 (Dist. Ct. Op. at 7–8) (Page ID #1057–58). "The fact that all nine of the Commissioners are Christian," the district court stated, "is immaterial, [because] [a]s elected officials, they were chosen as representatives whose interests were most closely aligned with the public's, and their personal beliefs are therefore a reflection of the community's own overwhelmingly Christian demographic." *Id.* at 7 (Page ID #1057). Turning to whether the Board of Commissioners' practice was coercive, the district court noted that Bormuth could have left the room during the prayers, and that nothing in the record indicated that his absence would have been perceived as disrespectful. *Id.* at 12–13 (Page ID #1062–63). Accordingly, the district court held that "Bormuth's subjective sense of affront resulting from exposure to sectarian prayer is insufficient to sustain an Establishment Clause violation." *Id.* at 13 (Page ID #1063) (emphasis removed). Although the district court acknowledged that some citizens may not perceive statements such as "rise" and "assume a reverent position," *see, e.g.*, R. 10 (Am. Compl. ¶ 19) (Page ID #64–65), as

the mere "voluntary invitations" that the district court believed they were, the district court did not discuss the point further, R. 61 (Dist. Ct. Op. at 13–14) (Page ID #1063–64).  As for the Commissioners' treatment of Bormuth, the district court stated that, though "evidence of disrespect," the Commissioners' treatment by turning their backs to him "does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer—rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited by his sentiments."  *Id.* at 15 (Page ID #1065).

## II.  ANALYSIS

### A.  Videos of Jackson County Board of Commissioners' Meetings

Some of the evidence that Bormuth presented to the district court comes from videos of the Jackson County Board of Commissioners' meetings, which Jackson County records and posts online.  Before analyzing Bormuth's Establishment Clause claims, I will explain why this court should consider the video evidence.

Before that, it is important to explain what the videos show.  First, the videos reveal that the Board of Commissioners decided not to let guest ministers or members of the public offer opening prayers at their meetings because they were concerned about "certain people com[ing] up here and say[ing] things that they are not going to like."  County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (38:02–38:16).  A Commissioner characterized allowing anyone other than the Commissioners themselves to give prayers as "opening a Pandora's Box."  *Id.*  After this discussion, the Commissioners decided to continue giving the prayers themselves, at least for the time being, to avoid hearing "things that they are not going to like."  *Id.* at 38:02–38:16, 46:51–47:25.  Second, the videos reveal that during a two-year span, the Board of Commissioners prayed at every meeting except the one that no members of the public attended.  *See* County of Jackson, *November 6, 2014 Special Jackson County Board of Commissioners Meeting Video*, YouTube (Nov. 7, 2014), http://tinyurl.com/2014nov6 (0:01–0:47).  This pattern undercuts the argument that the prayers were intended for the Commissioners themselves, not the public.  The facts contained in these videos are relevant to a "fact-sensitive" inquiry that

"considers both the setting in which the prayer arises and the audience to whom it is directed," as *Town of Greece* requires. *Town of Greece*, 134 S. Ct. at 1825.[1]

Despite the majority's argument to the contrary, these videos are part of the record. Bormuth called the district court's attention to the videos.[2]  Bormuth's pleadings notified the district court about the County's practice of recording the Board of Commissioners' meetings and posting the videos online, and repeatedly referenced the existence of the videos and events from the meetings. *See* R. 10 (Am. Compl. ¶ 16) (Page ID #64) (informing the district court that the County records the Board of Commissioners' meetings and posts the videos on the County's website); R. 29 (Pl. Resp. to Def. Mot. for Summ. J. at 11–16) (Page ID #328–33) (reciting what happened at several Board of Commissioners' meetings, videos of which the County posts online); R. 37-1 (Pl. Mot. for Summ. J., Ex. J) (Page ID #611–614 (including transcripts of three Board of Commissioners' meetings and stating that the County posts videos of Board of Commissioners' meetings online).  Including these repeated references to the videos and pointing the district court to the website where the County posted the videos was enough to make them part of the record.[3]

Even if these videos are not part of the record, the Federal Rules of Evidence require this court to take judicial notice of them.  "The court . . . must take judicial notice" of "a fact that is

---

[1]Amicus Americans United for Separation of Church and State, not Bormuth, argued that the Commissioners' pattern of praying only at meetings that members of the public attended shows that the Commissioners directed the prayers at citizens, not at themselves.  Although amicus made this argument rather than Bormuth, it should be considered for two reasons.  First, the Supreme Court has held that it can consider arguments raised only by amicus. *See Davis v. United States*, 512 U.S. 452, 457 n.* (1994) ("[W]e will consider arguments raised only in an amicus brief.") (citing *Teague v. Lane*, 489 U.S. 288, 300 (1989)).  If the Supreme Court considers arguments raised only by amicus, there is no reason this court should not do so as well.  Second, Americans United's argument is a more specific argument in support of Bormuth's general claim that Jackson County's prayer practice violated the Establishment Clause.  "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).  And in a case, like this one, where a party is pro se, it makes all the more sense to consider arguments by amicus that refine the general arguments made by that party. *See, e.g., McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)) ("[W]e read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'").  Regardless of whether the court considers this specific argument about Commissioners praying only at meetings that members of the public attend, it should consider the video evidence more generally.

[2]In fact, at oral argument during the panel stage of this case, counsel for the County stated that the official record includes all of the videos of the Board of Commissioners' meetings.

[3]As discussed below, Bormuth is pro se, so we must construe his pleadings liberally.

not subject to reasonable dispute" "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(b), (c). A fact "is not subject to reasonable dispute" if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "The court may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d). As the majority acknowledges, Jackson County admitted the accuracy of these videos, making the facts contained within not subject to reasonable dispute. Bormuth brought the videos to the attention of the district court (and this court) and supplied the necessary information by pointing the court to Jackson County's YouTube page, where the county publicly posts the videos. As a result, the district court should have at least taken judicial notice of the videos. Because a court can take judicial notice at any point in the proceedings, the district court's failure to take judicial notice of the videos does not affect this court's obligation to take judicial notice of the videos.

The majority attempts to skirt the requirement to take judicial notice of the videos by pointing to an apparent tension between the rule that appellate courts must take judicial notice of facts not subject to reasonable dispute if a party so requests and supplies the necessary information, and the rule that appellate courts cannot consider evidence that was not before the district court. Maj. Op. at 7. Even if this tension exists in some cases, it does not exist here. This tension stems from the concern that appellate courts should not review "a better case fashioned after a district court's unfavorable order." *Id.* (quoting *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006)). In this case, Bormuth called the district court's attention to the videos and the facts contained therein. The videos are not part of a better case fashioned for appeal, but part of the very case that Bormuth presented to the district court. The majority's argument that "[o]ne need look no further than the opinions of the magistrate judge and district judge to confirm" that "Bormuth did not present any video evidence to the district court" gets it backward. Maj. Op. at 6. The district court's failure to consider the videos does not mean that Bormuth erred by not presenting the videos to the district court, it means that the district court erred by not considering the videos that Bormuth

presented.[4]  The district court's error in refusing to consider all the facts does not preclude this court, in reviewing the district court, from considering facts that the district court erroneously ignored.

## B.  Establishment Clause framework

*Marsh* and *Town of Greece* establish that legislative-prayer claims occupy a unique place in First Amendment jurisprudence, and that the question whether a legislative prayer practice violates the Establishment Clause is a fact-sensitive inquiry.  *Marsh*, the first Supreme Court case to consider a legislative-prayer claim, bypassed the Court's previously constructed tests for Establishment Clause violations, reasoning that because "the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom," from "colonial times through the founding of the Republic and ever since," those tests did not apply.  463 U.S. at 786. The Court held that a new formal test was unnecessary.  As the Court explained, "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.* at 792.  Although the Court still asked whether any features of the practice before it violated the Establishment Clause, it evaluated the parties' arguments "against the historical background" of legislative prayer. *Id.* at 792–93.

*Town of Greece* confirmed that "*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted."  134 S. Ct. at 1819.  However, *Town of Greece* cautioned that "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." *Id.*  "The case teaches instead that the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'"  *Id.* (quoting *Cty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989)

---

[4]Moreover, *DaimlerChrysler* and *Conlin v. Mortgage Electronic Registration Systems, Inc.*, 714 F.3d 355 (6th Cir. 2013), the published cases that the majority relies on, are cases in which an argument was not presented in the district court, not cases in which a fact was not presented to the district court.  They do not analyze judicial notice of facts or Federal Rule of Evidence 201.  They are consequently not helpful in analyzing the apparent tension between Federal Rules of Evidence 201 and proper role of appellate courts.

(Kennedy, J., concurring in judgment in part and dissenting in part)).  Following the framework set forth in *Marsh*, the Court in *Town of Greece* considered whether the legislative prayer before it "fit[] within the tradition long followed in Congress and the state legislatures."  *Id.*  *Town of Greece* also asked whether the prayer violated the Establishment Clause by being coercive.  *Id.* at 1825 (controlling opinion).

As the en banc Fourth Circuit recently pointed out, *Marsh* and *Town of Greece* "in no way sought to dictate the outcome of every subsequent case."  *Lund v. Rowan Cty.*, 863 F.3d 268, 276 (4th Cir. 2017) (en banc).  "The Court acknowledged that it has not 'define[d] the precise boundary of the Establishment Clause.'  Accordingly, when the historical principles articulated by the Supreme Court do not direct a particular result, a court must conduct a 'fact-sensitive' review of the prayer practice."  *Id.* (quoting *Town of Greece*, 134 S. Ct. at 1819, 1825).  Thus, we must determine whether the Board of Commissioners' practice is similar to the practices upheld in *Marsh* and *Town of Greece* or if there are critical differences that take the Board of Commissioners' practice outside the ambit of historically tolerated legislative prayer, either because it does not fit within the protected historical practice or because it is coercive.

### 1.  Historical tradition

The first half of Justice Kennedy's opinion in *Town of Greece*, which addressed the historical tradition of legislative prayer, garnered a majority of the court.  The Court held insistence on inclusive and ecumenical prayer was inconsistent with *Marsh*.  *Town of Greece*, 134 S. Ct. at 1820–24.  The Court explained that *Marsh* had held that the use of prayer to open legislative sessions was constitutional not because the prayer was nonsectarian, but because "prayer in this limited context could 'coexist with the principles of disestablishment and religious freedom.'"  *Id.* at 1820 (alteration omitted) (quoting *Marsh*, 463 U.S. at 786).  The Court also noted, however, that there were still constraints on the content of legislative prayer.  *Id.* at 1823.  These constraints came from the prayer's purpose, which is to solemnize the legislative session.  *Id.*  If the prayer's content strayed from this purpose, the prayer would no longer be consistent with the First Amendment.  But "[a]bsent a pattern of prayers that over time

denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer [would] not likely establish a constitutional violation."[5]  *Id.* at 1824.

## 2. Coercion

The second half of Justice Kennedy's opinion addressed coercion.  Justice Kennedy's plurality opinion[6] considered the argument that the town's practice was coercive because it pressured members of the public to participate in the prayers in order to appease town board members.  *Id.* at 1824–28 (controlling opinion).  Justice Kennedy's opinion agreed that this kind of pressure was problematic, stating that "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'"  *Id.* at 1825 (quoting *Cty. of Allegheny*, 492 U.S. at 659 (Kennedy, J., concurring in judgment in part and dissenting in part)).

However, the opinion stated that there was no evidence of coercion in the record.  The opinion explained that the inquiry into whether the government has engaged in such coercion is "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed."  *Id.*  By "offering a brief, solemn, and respectful prayer to open its monthly meetings," the Town of Greece had not "compelled its citizens to engage in a religious observance."  *Id.*  "[L]egislative prayer," the opinion explained, "has become part of our heritage and tradition," and "[i]t is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize."  *Id.*  The opinion determined that there was nothing in the record about the setting of the prayer that undermined this presumption.  *Id.*  As for the principal audience to whom the prayer was directed, the opinion explained that it is presumed that the principal audience is the lawmakers themselves, because legislative prayer is "an internal act" in

---

[5]Because this is one of the Court's more concrete statements, it is tempting to turn it into a test and apply it to the County's prayer practice, as the County endeavored to do in its brief before the panel.  *See* Appellee Br. at 23, 25.  The Court's statement, however, must be viewed through the lens of Galloway and Stephens's insistence that legislative prayers be ecumenical.  In other words, the statement is limited to challenges based on content alone.

[6]Justice Kennedy's plurality opinion is the controlling opinion on the issue of coercion, as discussed more fully below.

which government officials invoke the divine for their own benefit rather than to promote religion to the public. *Id.* (quoting *Chambers v. Marsh*, 504 F. Supp. 585, 588 (D. Neb. 1980)). Again, the opinion determined that there was nothing in the record about the principal audience that undermined this presumption. *Id.* at 1825–26.

The opinion then observed, importantly for our purpose, that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Id.* at 1826.

## C.  The district court abused its discretion by denying discovery to Bormuth

Because *Town of Greece* establishes that the legislative prayer inquiry is fact-sensitive, before discussing whether Jackson County's prayer practice falls within the historically protected practice of legislative prayer, I first address the district court's rulings on Bormuth's requests for discovery.  This court reviews for an abuse of discretion both a district court's ruling on a motion to quash and its ruling on a motion to supplement the record.  *Guy v. Lexington-Fayette Urban Cty. Gov't*, 624 F. App'x 922, 928 (6th Cir. 2015) (motion to quash); *see Duha v. Agrium, Inc.*, 448 F.3d 867, 882 (6th Cir. 2006) (motion to supplement the record).  "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment."  *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) (quoting *Miller v. Countrywide Bank, N.A.* (*In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*), 708 F.3d 704, 707 (6th Cir. 2013)).

In granting the County's motion to quash the depositions of the Commissioners, the district court concluded that because Bormuth "ha[d] not brought an employment discrimination claim," "information regarding the Jackson County Resource Recovery Facility's failure to hire him . . . is not relevant."  R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2–3) (Page ID #1045–46).  This was a misapprehension of the facts.  Bormuth had not sought information regarding the Jackson County Resource Recovery Facility's failure to hire him.  He had sought information about his efforts to close it:  the Jackson County Resource Recovery Facility was the mass-burn

waste combustor that Bormuth believed was polluting the local river.  R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236).  The district court also concluded that, to the extent that Bormuth sought information on the Commissioners' motives in giving the prayers, "motive is not a relevant factor."  R. 59 (Dist. Ct. Order Granting Mot. to Quash at 3) (Page ID #1046).  This was a misapplication of the law.  The Commissioners' purpose in delivering the prayers is highly relevant, because legislative prayer that is intended to proselytize may violate the Establishment Clause by coercing citizens to support and participate in the exercise of religion.  *Town of Greece*, 134 S. Ct. at 1825–26 (controlling opinion).  The district court's order, therefore, was an abuse of discretion.

In denying Bormuth's second motion to supplement the record, which asked the district court to consider the letter that Bormuth received from the Board of Commissioners denying him appointment to the Board of Public Works, the district court also misapprehended the facts and misapplied the law.  The district court characterized Bormuth's second motion to supplement the record as seeking to introduce "his application to a position on the Jackson County Resource Recovery Facility."  R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 3) (Page ID #1049).  But as explained above, Bormuth never applied for a position at the Jackson County Resource Recovery Facility; he attempted to close it.  His second motion to supplement the record concerned his application to the Board of Public Works.  R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932).  The district court then concluded that "[b]ecause [Bormuth's] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, [the letter and] affidavit describing the Board's failure to hire him [are] irrelevant."  R. 60 (Dist. Ct. Order Re: Mots. to Suppl. Record at 3) (Page ID #1049) (emphasis removed).  But the letter and affidavit are relevant—they speak to whether the Board of Commissioners is allocating benefits and burdens based on citizens' participation in the prayers, which is a critical part of the analysis of legislative-prayer claims.  *See Town of Greece*, 134 S. Ct. at 1826 (controlling opinion).  Therefore, the district court's order denying the motion to supplement the record was also an abuse of discretion.

Despite the fact that the district court misapprehended both the facts and the law, the majority concludes that the district court "did not abuse its discretion" in denying Bormuth's

discovery motions because "Bormuth failed to comply with Federal Rule of Civil Procedure 56(d)." Maj. Op. at 9. The majority adds that "[a]lthough we have set aside Rule 56(d)'s formal affidavit requirement 'when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment,' there is no need to do so here" because Bormuth himself moved for summary judgment. Maj. Op. at 9 (quoting *Unan v. Lyon*, 853 F.3d 279, 293 (6th Cir. 2017)).[7] Contrary to the majority's assertion, this is precisely the type of situation that calls for setting aside Rule 56(d)'s formal affidavit requirement. The majority errs, for two reasons, when it attempts to justify its refusal to set aside Rule 56(d)'s formal affidavit requirement by construing Bormuth's summary-judgment motions as a concession that there are no disputed material facts.

First, Bormuth moved for summary judgment by arguing that legislator-led, exclusively Christian prayer at local government meetings is always unconstitutional. Because there is no dispute that Jackson County Commissioners lead prayers before Board of Commissioners' meetings, or that the prayers are sectarian and exclusively Christian, no further factual development would be necessary to award Bormuth summary judgment on this theory. However, even if, contrary to the broader version of Bormuth's argument, some legislator-led prayer at local government meetings is constitutional, Jackson County's prayer practice could be unconstitutional pursuant to a narrower argument, under the fact-sensitive inquiry *Town of Greece* requires. Bormuth's motion for summary judgment arguing that legislator-led, exclusively Christian prayer at local government meetings is always unconstitutional is not a concession that there are no disputed material facts as to an alternative, narrower argument that Jackson County's prayer practice is unconstitutional because of facts specific to their prayer practice.

The second reason is related to the first. Courts must construe pro se pleadings liberally. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). This requirement underscores why

---

[7]In *Unan*, which the majority relies on, we concluded that the plaintiffs "failed to comply not only with the formal requirements of Rule 56(d), but also its substance" by failing to object to the district court's decision to hold discovery in abeyance and by conceding that they did not indicate who they would seek to depose or what documents they would request. 853 F.3d at 293. By contrast, Bormuth complied with the substance of Rule 56(d) by specifically indicating that he sought to depose the Jackson County Commissioners and to obtain documents related to the Resource Recovery Facility.

we should not interpret Bormuth's motions for summary judgment on a broader theory as a concession that there are no disputed facts as to a narrower theory, given that he also sought discovery to further develop the facts relevant to his narrower theory.[8]  Because Bormuth specifically requested additional discovery and is a pro se litigant whose pleadings must be construed liberally, Bormuth's motions for summary judgment do not justify the district court's denial of Bormuth's discovery motions.

The importance of these discovery motions bears emphasis.  The district court's erroneous denial of Bormuth's discovery motions deprived Bormuth of an opportunity to fairly litigate the constitutional issues he raised.  The majority's decision to affirm these denials is all the more disturbing when combined with its conclusion that the videos of Jackson County Board of Commissioners' meetings are not part of the record.  The majority couches its opinion in terms of Bormuth's failure to carry his evidentiary burden, *see* Maj. Op. at 32, but it does so while refusing to consider much of the evidence that Bormuth has presented (the videos) and refusing to allow Bormuth to develop more probative evidence (to depose the Commissioners).

*Town of Greece* leaves no question that a legislative prayer practice can cross a constitutional line, and that courts should review prayer practices to ensure that they do not fall outside of the tradition of solemn and respectful prayer or coerce participation in a religious exercise.  *See Town of Greece*, 134 S. Ct. at 1826–27.  In my view, and as discussed more fully below, the facts currently before this court are enough to show that Jackson County's prayer practice crosses a constitutional line.  It is one thing for the majority here to disagree with me on this point.  It is quite another thing for the majority to take the additional step of refusing to consider evidence that the legislators intended to proselytize, affirmatively excluded non-Christian prayer givers, and discriminated against a citizen who objected to the prayer practice. The effect of deciding this case without considering either the County's official video records or the additional evidence Bormuth might have uncovered in discovery is to insulate a practice from any judicial review even though it bears all the markings of an attempt to isolate and denigrate

---

[8]There is no support for the proposition in Judge Sutton's concurrence that Bormuth should not be treated the same as other pro se litigants because he "insisted on not having an attorney, even when one was offered." Concurrence at 41.  I note that the concurrence cites no authority for this proposition, most likely because there is none.  I also note that this proposition is as ill-conceived as it is unsupported.

non-Christians, or at least a callous disregard for the possibility of isolating and denigrating non-Christians.

### D.  Jackson County's prayer practice violates the Establishment Clause because it falls outside of the historical tradition identified in *Marsh*

Even without considering the videos and without the benefit of depositions of the Commissioners, it is clear to me that Jackson County's prayer practice is unconstitutional.  First, Jackson County's practice does not fall within the historical tradition of legislative prayer identified in *Marsh* and *Town of Greece*.  A combination of factors distinguishes this case from the practice upheld in *Marsh* and *Town of Greece*, including one important factor:  the identity of the prayer giver.  In *Marsh*, the Nebraska legislature opened its session with a prayer offered by a chaplain, 463 U.S. at 784; in *Town of Greece*, invited clergy and laypersons delivered the invocations, 134 S. Ct. at 1816–17.  Here, the Jackson County Commissioners give the prayers. *See* R. 10 (Am. Compl. ¶¶ 19–23) (Page ID #64–66).  The difference is not superficial. *See Town of Greece*, 134 S. Ct. at 1826 (distinguishing solicitations to pray by guest ministers from those by town leaders, noting that "[t]he analysis would be different if town board members" themselves engaged in the same actions).  When the Board of Commissioners opens its monthly meetings with prayers, there is no distinction between the government and the prayer giver:  they are one and the same.  The prayers, in Bormuth's words, are literally "governmental speech."  R. 29 (Pl. Resp. to Def. Mot. for Summ. J. at 1) (Page ID #318).

Legislator-led prayer at the local level falls far afield of the historical tradition upheld in *Marsh* and *Town of Greece*.  The setting—a local government meeting with constituent petitioners in the audience—amplifies the importance of the identity of the prayer giver in our analysis, and heightens the risks of coercion, as borne out by the facts in this case.

The identity of the prayer giver also leads to other problems with the Board of Commissioners' practice.    Because they are the ones delivering the prayers, the Commissioners—and only the Commissioners—are responsible for the prayers' content.  And because in Jackson County the prayer content is exclusively Christian, by delivering the prayers, the Commissioners are effectively endorsing a specific religion, Christianity.  In *Town of Greece*, the Supreme Court upheld the town's prayer practice in large part because it included prayers

representing a variety of faiths. Although initially all of the prayer givers were Christian ministers, eventually the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver invocations. *See Town of Greece*, 134 S. Ct. at 1817. When a Wiccan priestess asked for an opportunity to deliver the invocation, the town granted her request. *Id*. The Supreme Court emphasized that, "The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one." *Id*. at 1824; *see also id*. at 1829 (Alito, J., concurring) ("[T]he town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation. . . . The most recent list in the record of persons available to provide an invocation includes representatives of many non-Christian faiths."). In Jackson County, by contrast, there is no opportunity for members of other faiths to offer invocations. *See Lund*, 863 F.3d at 278 ("The openness evinced by [the] elected bodies [in *Marsh* and *Town of Greece*] contrasts starkly with Rowan County's policy of restricting the prayer opportunity to the commissioners alone."). Instead, there are exclusively Christian prayer givers and a pattern of explicitly Christian prayers.

What is more, in Jackson County the prayer givers are exclusively Christian because of an intentional decision by the Board of Commissioners. Unlike in *Town of Greece*, where the Court found no evidence of sectarian motive in the selection of speakers, at least one Jackson County Commissioner admitted that, in order to control the prayers' content, he did not want to invite the public to give prayers.

At a November 2013 meeting of the Personnel & Finance Committee, one of the Commissioners imagined what would happen if any Jackson County resident could lead the prayer:

> We all know that any one of us could go online and become an ordained minister in about ten minutes. Um, so if somebody from the public wants to come before us and say that they are an ordained minister we are going to have to allow them as well.

County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47–38:01). He continued:

> And I think we are opening a Pandora's Box here because you are going to get
> members of the public who are going to come up at public comment and we are
> going to create a lot of problems here when certain people come up here and say
> things that they are not going to like.

*Id.* at 38:02–38:16.  These comments reveal that the Board of Commissioners' control over the
content of the prayers is not just a function of the Commissioners' role as prayer givers—it is the
result of an affirmative decision by the Commissioners to exclude *other* prayer givers.  In other
words, the Board of Commissioners is limiting who can give the prayers in order to control the
prayers' content.   And the effect of the Board of Commissioners' decision is to prevent
participation by religious minorities and to endorse a specific religion.  This brings the County's
use of prayer to open its monthly meetings well outside the ambit of historically tolerated
legislative prayer.

Arguing that Jackson County prayer practice is constitutional, the majority opines that
legislator-led prayer falls within the historical tradition approved by *Town of Greece* because
there are examples showing that legislators have long been permitted to offer prayers before state
legislative sessions.   But the majority, Defendant, and amici "elide the distinction between
extending the prayer opportunity to lawmakers (as many legislatures do) and restricting it to
those lawmakers (as [Jackson] County did here)." *Lund*, 863 F.3d at 279.   The majority,
Defendant, and amici have not cited a single example of *local* legislative prayer practices limited
*exclusively* to legislators themselves.   The present-day example of the Rhode Island state
legislature, Maj. Op. at 21, being both contemporary and at the state level, does not suffice.  Maj.
Op. at 19–21.  Thus, even if there were a tradition of legislator-led prayer at the state level, this
tradition would not mean that legislator-led prayer at local government meetings is
constitutionally permissible.   Nor would it mean that legislator-led prayer is constitutionally
permissible even if each and every legislator offered sectarian prayers in the same faith tradition.
Nor, especially, would it mean that exclusively legislator-led prayer is constitutionally
permissible when it involves a combination of these factors, taking place at local government
meetings where each and every legislator offered sectarian prayers in the same faith tradition.

The majority also errs by seeking to analyze each feature of Jackson County's prayer
practice separately.   The Supreme Court has rejected this "divide-and-conquer" approach to

analyzing the constitutionality of multi-faceted practices, *United States v. Arvizu*, 534 U.S. 266, 274 (2002), and specifically has held that legislative prayer practices must be evaluated based on a totality of the circumstances, *Town of Greece*, 134 S. Ct. at 1823; *see also Lund*, 863 F.3d at 289 (Individuals "are not experiencing the prayer practice piece by piece by piece. It comes at them whole. It would seem elementary that a thing may be innocuous in isolation and impermissible in combination. In fact, the lead [Fourth Circuit] dissent's tired 'divide and conquer' strategy has been frowned upon by the Supreme Court itself.") (citing *Arvizu*, 534 U.S. at 274). Even if each piece of Jackson County's prayer practice is constitutionally permissible, that does not mean that the prayer practice as a whole is constitutional.

The majority also points out that the people of Jackson County can diversify the Board of Commissioners' prayer practice by electing Commissioners of different faiths, or no faith. Maj. Op. at 24. The majority apparently intends for this argument to be a defense of Jackson County's prayer practice, but really it is the worst case scenario. Voting for representatives based on what prayers they say is precisely what the First Amendment's religion clauses seek to prevent. *See Lund*, 863 F.3d at 282 ("For any Buddhists, Hindus, Jews, Muslims, Sikhs, or others who sought some modest place for their own faith or at least some less insistent invocation of the majority faith, the only recourse available was to elect a commissioner with similar religious views. We find this point troubling. [V]oters may wonder what kind of prayer a candidate of a minority religious persuasion would select if elected. Failure to pray in the name of the prevailing faith risks becoming a campaign issue or a tacit political debit, which in turn deters those of minority faiths from seeking office. Further, allowing the county to restrict to one the number of faiths represented at Board meetings would warp our inclusive tradition of legislative prayer into a zero-sum game of competing religious factions. Our Constitution safeguards religious pluralism; it does not sanction activity which would take us one step closer to a de facto religious litmus test for public office.") (internal quotation marks and citations omitted) (alteration in original); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty,

and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.").

## E.  Jackson County's prayer practice violates the Establishment Clause because it is coercive

Jackson County's prayer practice is unconstitutional for another reason, because it is coercive.  Justice Kennedy's opinion in *Town of Greece* held that, "[i]t is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'"  134 S. Ct. at 1825 (quoting *Cty. of Allegheny*, 492 U.S. at 659 (Kennedy, J., concurring in judgment in part and dissenting in part)).

As a threshold matter, I emphasize that Justice Kennedy's concurrence is the controlling *Town of Greece* opinion.  A majority of this court appears to agree that Justice Kennedy's opinion controls, although a few judges have stated their view that Justice Thomas's opinion controls.  *See* Maj. Op. at 27 n.10.  The parties in this case agree that Justice Kennedy's opinion controls, as Jackson County conceded at the en banc stage that Justice Kennedy's opinion is controlling.  Judges from our sister circuit overwhelmingly agree that Justice Kennedy's opinion controls:  in *Lund*, although the judges of the Fourth Circuit robustly debated how to apply Justice Kennedy's opinion to the facts before them, no judge took the position that Justice Thomas's opinion was controlling.  *See Lund*, 863 F.3d at 297–99 (Niemeyer, J., dissenting); *id.* at 319–21 (Agee, J., dissenting).  Finally, Supreme Court and Sixth Circuit precedent dictate that Justice Kennedy's opinion is controlling.[9]

---

[9]The Supreme Court has instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"  *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).  This court has held that "'narrowest' opinion refers to the one which relies on the 'least' doctrinally 'far-reaching-common ground' among the Justices in the majority:  it is the concurring opinion that offers the least change to the law."  *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009).  In *Town of Greece*, Justice Kennedy's opinion is the narrowest.  Although Justice Thomas's conception of coercion is more *restrictive*, Justice Kennedy's conception of coercion "offers the least change to the law."  *Cundiff*, 555 F.3d at 209.  There is controlling precedent supporting Justice Kennedy's opinion and no controlling precedent supporting Justice Thomas's concurrence.  Justice Thomas's concurrence is neither the "the least doctrinally far-reaching-common ground among the Justices in the majority," nor the "opinion that offers the least change to the law."  *Cundiff*, 555 F.3d at 209 (internal quotation marks omitted).  And when viewed within the context of the Court's holding, Justice Kennedy's opinion clearly represents the narrowest grounds.  The Court's holding was that there was no

Applying Justice Kennedy's opinion, I emphasize that the inquiry into whether a prayer practice is coercive is "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Town of Greece*, 134 S. Ct. at 1825. Although the Court in *Town of Greece* concluded that there was no evidence of coercion in the record before it, it held that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." *Id.* at 1826. All three elements are present here.

First, the Board of Commissioners directs the public to participate in the prayers at every monthly meeting. As the Supreme Court has observed, the source of these statements is significant. In *Town of Greece*, "board members themselves stood, bowed their heads, or made the sign of the cross during the prayer," but "*they at no point solicited similar gestures by the public*." *Id.* (emphasis added). Rather, it was the clergy who asked audience members to participate in the prayer. *Id.* The Supreme Court reasoned that, because this direction came from the clergy, it was inclusive, not coercive. *Id.* Here, it is the Board of Commissioners, and the Board of Commissioners only, that tells the public to join in the prayer. What is more, these instructions are almost always from the Chairman. *See, e.g.*, R. 10 (Am. Compl. ¶¶ 19–23) (Page ID #64–66). The Chairman presides over the meeting; his words are cloaked in procedural formality. The words "rise" and "assume a reverent position" from the Chairman, therefore, are not mere suggestions, they are commands. But even in the infrequent instances where it is the Commissioner giving the prayer who tells the public to "rise" or to "bow [their] head[s]," R. 29-1 (Pl. Resp. to Def. Mot. for Summ. J., Ex. E ¶¶ 9, 13, 22) (Page ID #370–71), the effect is the same: to coerce the public to participate in the exercise of religion.

This coercion is compounded by the setting in which it is exerted. *See Town of Greece*, 134 S. Ct. at 1825 (controlling opinion). Local government meetings are small and intimate. And unlike in federal and state legislative sessions, where the public does not speak to the

---

coercion. According to Justice Kennedy, this was because there was no coercion *in the record*. According to Justice Thomas, this was because there could *never* be coercion absent formal legal compulsion. Within the context of a ruling against the respondents, therefore, the narrower opinion is Justice Kennedy's, not Justice Thomas's. Accordingly, Justice Kennedy's conception of coercion is the holding of the Court.

legislative body except by invitation, citizens attend local government meetings to address issues immediately affecting their lives.  Jackson County residents have gone to the Board of Commissioners' monthly meetings to ask for funding for disabled students' transportation to school, County of Jackson, *June 18, 2013 Jackson County Board of Commissioners Meeting*, YouTube (June 19, 2013), http://tinyurl.com/2013jun19 (35:53–38:30), request repairs to roads leading to their homes or businesses, County of Jackson, *July 23, 2013 Jackson County Board of Commissioners Meeting*, YouTube (July 24, 2013), http://tinyurl.com/2015jul23 (24:58–30:19), and redress discrimination, County of Jackson, *March 17, 2015 Jackson County Board of Commissioners Meeting*, YouTube (Mar. 18, 2015), http://tinyurl.com/2015mar17c (5:27–7:42). Thus, there is increased pressure on Jackson County residents to follow the Board of Commissioners' instructions at these meetings, as the residents would not want to offend the local government officials they are petitioning.

Moreover, as amicus Americans United points out, the Commissioners prayed at the beginning of their meetings only when members of the public were in attendance.  The decision to pray only when members of the public were present indicates that the prayer was not directed at the Commissioners themselves, and that the purpose of the prayer was not to solemnize the proceedings for the Commissioners, but that the prayer was meant "to afford government an opportunity to proselytize or force truant constituents into the pews." *Town of Greece*, 134 S. Ct. at 1825.

Second, the Board of Commissioners has singled out Bormuth for opprobrium.  When Bormuth objected to being forced to acknowledge Jesus Christ as God when he attended a government meeting to discuss environmental issues from a scientific and economic perspective, a Commissioner made a disgusted face and turned his back.  County of Jackson, *August 20, 2013 Jackson County Board of Commissioners Meeting*, YouTube (Aug. 21, 2013), https://tinyurl.com/yamjn47a (20:00–21:09); R. 10 (Am. Compl. ¶¶ 31) (Page ID #69).  During a public meeting, a Commissioner stated that Bormuth's lawsuit was an "attack on Christianity and Jesus Christ, period."  County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50–32:59). Another Commissioner characterized Bormuth's lawsuit as "political correctness nonsense" and

complained that he has "had political correctness jammed down [his] throat." *Id.* at 43:00–43:18. That Commissioner continued:

> The Federalist Papers, if you read them, tell[] me that it is your duty to disobey an illegal law. And it has taken some *nitwit* two hundred-and-some years to come up with an angle like this to try to deprive me or other people, of my faith, of my rights.

*Id.* at 43:22–43:41 (emphasis added). In disparaging Bormuth, the Board of Commissioners' message is clear: residents who refuse to participate in the prayers are disfavored. Indeed, when Bormuth expressed his belief that the Board of Commissioners was violating the First Amendment during the public-comment period of the August 2013 meeting, one of the Commissioners made faces and then turned his back on Bormuth, refusing even to look at Bormuth while he spoke. R. 10 (Am. Compl. ¶ 31) (Page ID #69).

The majority brushes these comments aside, first saying that they were a reaction to Bormuth bringing "yet another lawsuit" against the County and "not to [Bormuth's] beliefs but to the litigious way he chose to express them." Maj. Op. at 31. The majority also says that, in any event, "[t]he Establishment Clause . . . does not require [government officials] to keep their cool." *Id.* Neither of the majority's statements is entirely accurate.

As for the claim that the Commissioners were reacting to Bormuth's lawsuit, not his beliefs, the incident where a Commissioner turned his back on Bormuth and made a face occurred the first time Bormuth expressed any objection to the prayer practice, before he filed this lawsuit. The Commissioners certainly continued to express publicly their disdain for Bormuth after he filed this lawsuit, but because they began publicly expressing this disdain the very first time he objected to the prayer practice, it is misleading to downplay their comments as mere frustration at having to defend a lawsuit rather than animosity toward Bormuth, his beliefs, and his objection to Jackson County's prayer practice. That "[t]his was not [Bormuth's] first legal grievance, to put it mildly," Concurrence at 42, is of no moment. Regardless of how "litigious" or "antagoni[zing]" Bormuth may be, Maj. Op. at 31, the fact is that government officials refused to listen to his objection, which he made during a Board of Commissioners meeting's public comment period, to a prayer practice that systematically excluded minority

religious views. The Commissioners also called Bormuth disparaging names and called his views nonsense.

As for the majority's view that "[t]he Establishment Clause . . . does not require [government officials] to keep their cool," the majority acknowledges that the Establishment Clause does prevent government officials from singling out religious minorities for opprobrium. Maj. Op. at 31; *see Town of Greece*, 134 S. Ct. at 1825 ("The analysis would be different if town board members . . . singled out dissidents for opprobrium . . ."). The majority appears to argue that a Commissioner turning his back on Bormuth and refusing to listen to him say that Jackson County's prayer practice disrespected non-Christian citizens is somehow distinct from singling him out for opprobrium. My only response is to ask the reader to imagine making an earnest, public plea to someone in a position of authority—a plea not about just any topic, but about a concern that the authority figure is disrespecting your religious beliefs, or disrespecting some value that you consider central to your life and perhaps definitive of who you are. You might not be troubled if the person told you that they disagreed with your concern, or if they listened but said nothing in response. But imagine if, instead of listening, they made a face of disgust and turned around, refusing to face you. Would you feel like this government official had expressed "contempt or distaste usually mingled with reproach and an implication of inferiority"? *Opprobrium*, *Merriam-Webster Unabridged Dictionary*, http://unabridged.merriam-webster.com/unabridged/opprobrium (last visited Aug. 16, 2017).

Third, Bormuth has submitted evidence suggesting that the Board of Commissioners has "allocated benefits and burdens based on participation in the prayer." *See Town of Greece*, 134 S. Ct. at 1826 (controlling opinion). Shortly after Bormuth filed his complaint, Jackson County officials nominated members for the County's new Solid Waste Planning Committee from a pool of applicants. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had three years of experience working on related issues, the Board of Commissioners did not nominate him. *Id.* Given that the Commissioners had publicly expressed their contempt for Bormuth, *id.* ¶ 31 (Page ID #69); *see also* R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149), the Board of Commissioners' decision not to nominate him could easily be interpreted as a response to Bormuth's refusal to participate in the prayers. Bormuth also sought to supplement

the record with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works.  R. 52 (Pl. Second Mot. to Suppl. Record at 1) (Page ID #932).  Although Bormuth is confident that he was "the most qualified applicant," the Board of Commissioners did not name him for the position.  *Id.* ¶ 6 (Page ID #933).  This rejection came just shy of a month after one of the Commissioners publicly called Bormuth a "nitwit."  *See* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (43:22–43:41).  Like the County's decision not to nominate him to the Solid Waste Planning Committee, this decision suggests that the Board of Commissioners was denying benefits to residents based on their beliefs.

The majority wholly fails to reckon with the possibility that the Board of Commissioners may have denied Bormuth these committee positions because of his refusal to participate in the Christian prayers.  Although the majority claims that it "assume[s] those facts not accepted by the district court," it defends the Commissioners' actions by arguing that "[a]ll we have are unverified assertions from [Bormuth's] complaint," that Bormuth "failed to put forth any evidence," and that "there is nothing in the record" supporting Bormuth's allegations.  Maj. Op. at 32 & n.13.  The reason there is little information in the record about the Commissioners' motivations is that the district court refused to allow Bormuth to depose any of the Commissioners.  Had Bormuth been able to depose the Commissioners, he might have developed additional evidence that they denied him positions because of his refusal to pray.  All the majority's reasoning accomplishes is to underscore that the district court's error in denying Bormuth's discovery motions was not harmless.

Based on the facts before this court, I would hold that the Jackson County Board of Commissioners' prayer practice violates the First Amendment's Establishment Clause.  Not only is the prayer practice well outside the tradition of historically tolerated prayer, but also it coerces Jackson County residents to support and participate in the exercise of religion.  Whether or not there were already sufficient facts to hold that the Jackson County prayer practice is unconstitutional, I would allow Bormuth to conduct discovery to gather more information about the Commissioners' purpose in opening their meetings with a prayer and in rejecting Bormuth's applications for positions on county committees.

## F. Conclusion

I conclude by underscoring two factual details about Jackson County's prayer practice. First, the Jackson County Board of Commissioners affirmatively excluded non-Christian prayer givers, and did so in an effort to control the content of prayers.  *See* County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47–38:16).    Second, Commissioners attempted to silence Bormuth and insulted him for criticizing their prayer practice.   For example, when Bormuth voiced his concern about the prayer practice at a meeting, a Commissioner turned his chair around, refusing to listen to him.   R. 10 (Am. Compl. at ¶ 31) (Page ID #69).   One Commissioner said that Bormuth was "attacking . . . my Lord and savior Jesus Christ."   R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149).   Separately, a Commissioner referred to Bormuth as "a nitwit."   County of Jackson, *Personnel & Finance Committee November 12, 2013 Jackson County, MI*, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50–32:59, 43:00–43:18, 43:22–43:41).

These facts show how far Jackson County's practice strays from the historically tolerated tradition of legislative prayer.   In *Town of Greece*, the Supreme Court made clear that its decision about the Town of Greece's prayer practice did not absolve courts of the duty to evaluate the constitutionality of factually distinguishable prayer practices.   Instead, it said that "[c]ourts remain free to review the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in *Marsh*, or whether coercion is a real and substantial likelihood."   *Town of Greece*, 134 S. Ct. at 1826–27.   "If circumstances arise in which the pattern and practice of ceremonial, legislative prayer is alleged to be a means to coerce or intimidate others, the objection can be addressed in the regular course."   *Id.* at 1826; *see also Marsh*, 463 U.S. at 795.   Jackson County's prayer practice gives rise to precisely those circumstances, but the majority neglects to address them.

In the closing paragraph of his concurrence in *Town of Greece*, Justice Alito explains the limits of Town of Greece's holding.  *Town of Greece*, 134 S. Ct. at 1834 (Alito, J., concurring). Justice Alito underscores the contrast between such obviously unconstitutional scenarios as "a litigant awaiting trial who is asked by the presiding judge to rise for a Christian prayer, of an

official at a polling place who conveys the expectation that citizens wishing to vote make the sign of the cross before casting their ballots," and the scenario presented in *Town of Greece*. *Id.* In *Town of Greece*, the prayers were not invariably Christian, the town made clear that it would allow any interested resident to offer an invocation, and government officials themselves did not say the prayers or direct the public to participate in prayers. *Id.* at 1829.

In the case before us today, the majority is dangerously close to permitting exactly what Justice Alito said *Town of Greece* obviously does not permit—government officials instructing citizens to participate in sectarian prayer before commencing government proceedings. There is no daylight between polling place workers asking individuals to pray before casting their ballots, as in Justice Alito's example, and county commissioners asking individuals to pray before participating in local government meetings, as actually happens in Jackson County. This similarity underscores why a tradition that protects the Town of Greece's right to open its meetings with solemn and respectful prayers, which was targeted at legislators and offered by clergy or volunteers from a variety of faith traditions, does not protect Jackson County's policy to restrict its legislative prayer practice to government officials themselves asking the public to participate in exclusively Christian prayer. And certainly, a tradition of solemn and respectful prayers does not protect Jackson County's engaging in a legislative prayer practice that entails Commissioners turning their chairs when a citizen attempts to voice his objection to the prayer practice, publicly deriding a citizen because he speaks out against the prayer practice, and denying committee positions to a citizen because he will not participate in the prayer practice. For these reasons, I respectfully dissent.

---------------

## DISSENT

---------------

HELENE N. WHITE, Circuit Judge, dissenting. I join in the conclusion of a majority of the judges on this panel that Justice Kennedy's opinion in *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014) controls our analysis, not Justice Thomas's.

I agree with the dissenting judges that we may properly consider the videos of the Jackson County Board of Commissioners meetings, and that Bormuth should have been permitted to take the discovery he requested and to supplement the record. I also agree that the district court erred in granting summary judgment in favor of Jackson County. I do not agree that Bormuth is entitled to summary judgment. Rather, I would remand.

As all agree, legislator-led prayer is constitutional if it fits within the historical tradition of legislative prayer identified by the Supreme Court. *See Town of Greece*, 134 S. Ct. at 1819-20. Prayer practices within that tradition have an appropriate purpose; they seek to "elevate the purpose of the occasion and to unite lawmakers in their common effort," rather than "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." *Id.* at 1823. Similarly, our nation's historical tradition does not include prayer practices that are coercive; legislators may not "single[] out dissidents for opprobrium," "allocate[] benefits and burdens based on participation in the prayer," treat citizens "differently depending on whether they joined the invocation," or "signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished." *Id.* at 1826. The majority pays lip service to these principles by largely considering the prayer practice in a vacuum, and drawing the most benign inferences from the facts it actually confronts. In contrast, the dissent examines and analyzes the practice with all its blemishes, as the Court has directed.

Although I would not find any one factor controlling, the factors discussed in the dissenting opinion are important to the requisite "fact-sensitive" inquiry whether the prayer practice is coercive. *Town of Greece*, 134 S. Ct. at 1825. And, on the record before us, these factors strongly support the conclusions that the prayer practice is a far cry from the practice

found constitutional in *Town of Greece*, and that the practice is, and indeed is intended to be, coercive.

Although Jackson County is clearly not entitled to summary judgment, I would not grant summary judgment to Bormuth, either.  Because the district court did not consider most of the evidence discussed by the dissent and misunderstood its relevance, it did not consider Jackson County's response to the evidence. Further, although Jackson County has admitted the authenticity of the videos, it challenges the factual inferences drawn by the dissent and should be permitted to support alternative inferences with evidence.  For these reasons, I conclude that if the court were to reverse the grant of summary judgment in favor of Jackson County, the proper disposition would be to remand for further proceedings,[1] not for entry of judgment in favor of Bormuth.  Of course, none of this matters given the majority's affirmance.

---

[1] In *Town of Greece*, the Supreme Court had the benefit of a fully developed record, which included affidavits and deposition testimony from several town officials.  *See Galloway v. Town of Greece*, 732 F. Supp. 2d 195, 201 (W.D.N.Y. 2010) (subsequent history omitted).

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 15-1869

PETER CARL BORMUTH,

        Plaintiff - Appellant,

   v.

COUNTY OF JACKSON,

        Defendant - Appellee.

> **FILED**
> Sep 06, 2017
> DEBORAH S. HUNT, Clerk

Before: COLE, Chief Judge; BATCHELDER, MOORE, CLAY, GIBBONS,
ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE,
WHITE, STRANCH, DONALD, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

UPON CONSIDERATION of a majority of the Judges of this court in regular active service having voted to rehear this case en banc, the supplemental briefs and arguments of the pro se appellant and of counsel,

IT IS ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk